**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| UNITED STATES OF AMERICA | : |
| | : |
| v. | :     CRIMINAL ACTION |
| | : |
| MOSHE PORAT, | :     NO. 2:21-CR-00170-GJP-1 |
|           Defendant. | : |
| | : |
| | : |

## ORDER

AND NOW, this _____ day of _____, 2021, upon consideration of Defendant Dr.

Moshe Porat's Motion To Dismiss The Indictment For Failure To State An Offense Pursuant to

Fed. R. Crim P. 12(b)(3), it is ORDERED that the motion is GRANTED.

 

_____
HONORABLE GERALD J. PAPPERT
*Judge, United States District Court*

# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL ACTION |
| v. | : | NO. 2:21-CR-00170-GJP-1 |
| MOSHE PORAT, | : | ORAL ARGUMENT REQUESTED |
| Defendant. | : |  |

## DEFENDANT DR. MOSHE PORAT'S MOTION TO
## DISMISS THE INDICTMENT FOR FAILURE TO
## STATE AN OFFENSE PURSUANT TO FED. R. CRIM. P. 12(b)(3)

Defendant Dr. Moshe Porat, by and through his undersigned counsel, hereby moves to dismiss the indictment for failure to state an offense pursuant to Fed. R. Crim. P. 12(b)(3). In support of this motion, Dr. Porat relies on the attached memorandum of law, which is incorporated here.

WHEREFORE, Dr. Porat respectfully requests that this Court dismiss the indictment for failure to state an offense pursuant to Fed. R. Crim. P. 12(b)(3).

Dated: May 28, 2021

/s/ Jay P. Lefkowitz
Jay P. Lefkowitz, P.C.
Robert W. Allen, P.C.
(admitted *pro hac vice*)
KIRKLAND & ELLIS LLP
601 Lexington Avenue,
New York, NY 10022
(212) 446-4800
lefkowitz@kirkland.com

Respectfully submitted,

/s/ Michael A. Schwartz
Michael A. Schwartz (PA 60234)
Richard J. Zack (PA 77142)
Tiffany N. Bracewell (admitted *pro hac vice*)
TROUTMAN PEPPER HAMILTON
SANDERS LLP
3000 Two Logan Square
Eighteenth & Arch Streets
Philadelphia, PA 19103-2799
(215) 981-4494
(800) 615-2315 (fax)
Michael.Schwartz@Troutman.com

*Attorneys for Defendant Dr. Moshe Porat*

# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL ACTION |
| v. | : | NO. 2:21-CR-00170-GJP-1 |
| MOSHE PORAT, | : | ORAL ARGUMENT REQUESTED |
| Defendant. | : | |

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT DR. MOSHE PORAT'S MOTION TO DISMISS THE INDICTMENT FOR FAILURE TO STATE AN OFFENSE PURSUANT TO FED. R. CRIM. P. 12(b)(3)

Jay P. Lefkowitz, P.C.
Robert W. Allen, P.C.
(admitted *pro hac vice*)
KIRKLAND & ELLIS LLP
601 Lexington Avenue,
New York, NY 10022
(212) 446-4800
lefkowitz@kirkland.com

Michael A. Schwartz (PA 60234)
Richard J. Zack (PA 77142)
Tiffany N. Bracewell (admitted *pro hac vice*)
TROUTMAN PEPPER HAMILTON
SANDERS LLP
3000 Two Logan Square
Eighteenth & Arch Streets
Philadelphia, PA 19103-2799
(215) 981-4494
(800) 615-2315 (fax)
Michael.Schwartz@Troutman.com

*Attorneys for Defendant Dr. Moshe Porat*

# TABLE OF CONTENTS

Page

INTRODUCTION ............................................................................................................ - 1 -

BACKGROUND ............................................................................................................. - 3 -

LEGAL STANDARD ...................................................................................................... - 7 -

ARGUMENT ................................................................................................................... - 8 -

I.     The Indictment Fails to Allege a Property Crime. ..................................................... - 8 -

      A.     U.S. News & World Report Rankings Are Not Cognizable Property
            Interests. ...................................................................................................... - 8 -

      B.     Incidental Effects on Enrollment or Donations Do Not Make the Alleged
            Conduct a Property Crime. ......................................................................... - 10 -

II.    The Indictment Fails to Allege a Scheme to Defraud. .............................................. - 14 -

III.   The Indictment Fails to Allege that Dr. Porat Acted with Specific Intent to
      Defraud. ................................................................................................................... - 18 -

IV.   This Court Should Adopt a Convergence Requirement And Dismiss the
      Indictment. ............................................................................................................... - 21 -

CONCLUSION ............................................................................................................... - 23 -

REQUEST FOR ORAL ARGUMENT ............................................................................ - 23 -

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Cleveland v. United States*, 531 U.S. 12 (2000) ................................................. 9, 11, 22

*Hammerschmidt v. United States*, 265 U.S. 182 (1924) ........................................21

*Kelly v. United States*, 140 S. Ct. 1565 (2020) ..................................1, 2, 8, 9, 10, 11, 14

*McNally v. United States*, 483 U.S. 350 (1987)............................................ 14, 21, 22

*Mylan Labs., Inc. v. Akzo, N.V.*, 770 F. Supp. 1053 (D. Md. 1991) ......................21, 23

*Neder v. United States*, 527 U.S. 1 (1999) ..................................................22

*Pasquantino v. United States*, 544 U.S. 349 (2005) ......................................10

*Skilling v. United States*, 561 U.S. 358 (2010) .................................... 3, 10, 13

*Sorich v. United States*, 555 U.S. 1204 (2009).................................................3

*United States v. Al Hedaithy*, 392 F.3d 580 (3d Cir. 2004)..................................8

*United States v. Alkaabi*, 223 F. Supp. 2d 583 (D.N.J. 2002) .............................8, 14

*United States v. Bergrin*, 650 F.3d 257 (3d Cir. 2011) ......................................3, 7

*United States v. Berroa*, 856 F.3d 141 (1st Cir. 2017)........................................2, 12

*United States v. Bryant*, 655 F.3d 232 (3d Cir. 2011).........................................3, 21

*United States v. Christopher*, 142 F.3d 46 (1st Cir. 1998)....................................21

*United States v. Dobson*, 419 F.3d 231 (3d Cir. 2005) ......................................18

*United States v. Ernst*, No. 19-10081-IT, 2020 U.S. Dist. LEXIS 218928 (D. Mass. Nov. 23, 2020) ...............................................................9, 14

*United States v. Evans*, 844 F.2d 36 (2d Cir. 1988)...........................................8

*United States v. Harra*, 985 F.3d 196 (3d Cir. 2021) ........................................20

*United States v. Henry*, 29 F.3d 112 (3d Cir. 1994) .................................... 1, 3, 8, 9

*United States v. Lew*, 875 F.2d 219 (9th Cir. 1989)......................................21, 23

*United States v. Ochs*, 842 F.2d 515 (1st Cir. 1988) ........................................14

*United States v. Palma*, No. 19-20626, 2020 U.S. Dist. LEXIS 214675 (E. D. Mich. Nov. 17, 2020) ............................................. 2, 11, 12

*United States v. Panarella*, 277 F.3d 678 (3d Cir. 2002) ............................. 8

*United States v. Pearlstein*, 576 F.2d 531 (3d Cir. 1978) ............................. 19

*United States v. Sadler*, 750 F.3d 585 (6th Cir. 2014) ............................. 9, 16

*United States v. Schiff*, 602 F.3d 152 (3d Cir. 2010) ................................. 7

*United States v. Shellef*, 507 F.3d 82 (2d Cir. 2007) .................................... 3, 15, 16, 17

*United States v. Shelton*, 848 F.2d 1485 (10th Cir. 1988) ............................. 21

*United States v. Sidoo*, 468 F. Supp. 3d 428 (D. Mass. 2020) ..................................... 10

*United States v. Takhalov*, 827 F.3d 1307 (11th Cir. 2016) .................................... 2, 15, 16, 17, 18

*United States v. Tiche*, 424 F. Supp. 996 (W.D. Pa. 1977) ............................. 19

*United States v. Walters*, 997 F.2d 1219 (7th Cir. 1993) ............................. 11

*United States v. Weaver*, 220 F. App'x 88 (3d Cir. 2007) ............................. 18

**Statutes**

18 U.S.C. § 1343 ............................................................. 14

**Other Authorities**

Challenge Success, *A "Fit" Over Rankings: Why College Engagement Matters More Than Selectivity* (2018) (available at https://www.challengesuccess.org/wp-content/uploads/2018/10/Challenge-Success-White-Paper-on-College-Admissions-October-2018.pdf) ........................ 17

Jonathan Rothwell & Siddharth Kulkarni, Metropolitan Policy Program at Brookings, *Beyond College Rankings: A Value-Added Approach to Assessing Two- and Four-Year Schools* (2015) (available at https://www.brookings.edu/wp-content/uploads/2015/04/BMPP_CollegeValueAdded.pdf) ..................................... 17

Marguerite Clarke, *Quantifying Quality: What Can the U.S. News and World Report Rankings Tell Us About the Quality of Higher Education?*, 10 Educ. Pol'y Analysis Archives, no. 16, March 20, 2002 (available at https://epaa.asu.edu/ojs/article/view/295/421) ........................ 17

Orin Kerr, *Is it a Federal Crime for a University to Submit Fake Numbers to U.S. News to Change Its Ranking?* (Apr. 23, 2021), (available at https://reason.com/volokh/2021/04/23/is-it-a-federal-crime-for-a-university-to-submit-fake-numbers-to-u-s-news-to-change-its-ranking/) ...............................................14

Press Conference, Statements by Acting U.S. Attorney (Apr. 16, 2021) (available at https://spaces.hightail.com/space/OIsB9iVglv) ...............................................13

Press Release, Dep't of Justice, U.S. Atty's Office, E.D. Pa., Former Temple Business School Dean Indicted for Fraud (Apr.16, 2021) (available at https://www.justice.gov/usao-edpa/pr/former-temple-business-school-dean-indicted-fraud).............................................................................................................13

Restatement (Second) of Torts § 538 (1977)..............................................................22

# INTRODUCTION

The question in this case is whether submitting inaccurate information to U.S. News & World Report ("U.S. News") is a federal crime under the wire fraud statute. It is not. The government has alleged that Dr. Moshe Porat, the former dean of the Richard J. Fox School of Business and Management at Temple University (the "Fox School"), conspired to provide false information to U.S. News so that it would treat the Fox School more favorably in its annual rankings. To the extent the government is able to prove these allegations, the conduct at issue would undoubtedly qualify as deceitful. But as the Supreme Court repeatedly has cautioned, the wire fraud statute "do[es] not criminalize" all instances of "deception, corruption, [or] abuse of power." *Kelly v. United States*, 140 S. Ct. 1565, 1568 (2020); *see also United States v. Henry*, 29 F.3d 112, 114-15 (3d Cir. 1994). For a wire fraud indictment to charge a cognizable crime, the government must allege that the "object of the[] dishonesty" was to obtain "money or property." *Kelly*, 140 S. Ct. at 1568. That a scheme may have monetary consequences as an "incidental" or even "foresee[able]" "byproduct" is not enough. *Id.* at 1573-74. The present allegations cannot satisfy this requirement for the straightforward reason that the object of the alleged deception here—achieving higher U.S. News rankings—does not implicate money or property.

Presumably recognizing the shortcomings of its theory, the government asserts that the "goals" of the conspiracy included ***not just*** the rankings themselves ***but also*** the potential downstream effects of those rankings, namely the possibility that more students might "apply to Fox, matriculate at Fox, and pay tuition to Fox." (Indictment ¶ 45). But tacking on that supposed "goal[]" is insufficient. The indictment includes no allegations whatsoever that any particular students received less than what they paid for. The object of the alleged scheme, in

other words, was exactly what the indictment describes in different headings: a scheme to deceive "**U.S. News**" to achieve higher rankings. (*See, e.g.*, *id.* ¶¶ 45-46 (emphasis added)).

In any event, and however characterized, it simply cannot be the case that potential downstream effects on students or donors are sufficient to make the conduct alleged here a federal crime. Any act of deception can be alleged to have some eventual monetary consequence. Manufacturers who secure product approvals and doctors who obtain licenses to practice medicine under false pretenses, for example, can be described as intending to take "money and property" from future customers. In both instances, however, courts have held that obtaining the relevant approval or license ***did not*** constitute wire fraud. *See United States v. Berroa*, 856 F.3d 141, 147 (1st Cir. 2017); *United States v. Palma*, No. 19-20626, 2020 U.S. Dist. LEXIS 214675, at *12 (E. D. Mich. Nov. 17, 2020). That is because the associated monetary effects are better described as "incidental *(even if foreseen)* byproduct[s]" of the fraud, and not its "object." *Kelly*, 140 S. Ct. at 1574 (emphasis added). The same is true here: potential effects on the Fox School's enrollment or overall revenue were incidental to the underlying alleged scheme to manipulate the U.S. News rankings—which, again, is not a property crime because rankings are not property.

The indictment also should be dismissed for the additional and independent reason that it at best alleges a scheme to induce students who might otherwise have attended different schools to instead matriculate at the Fox School. But inducing a student to attend the Fox School, even through deceit, does not constitute wire fraud for the straightforward reason that the affected students received exactly what they paid for: an education at the Fox School. "[E]ven if a defendant lies, and even if the victim made a purchase because of that lie, a wire-fraud case" must be dismissed if "the alleged victims 'received exactly what they paid for.'" *United States v.*

*Takhalov*, 827 F.3d 1307, 1314 (11th Cir. 2016) (quoting *United States v. Shellef*, 507 F.3d 82, 108 (2d Cir. 2007)). The indictment should be dismissed for the further reasons that it fails to allege a specific intent to defraud and fails to allege that Dr. Porat deprived U.S. News—the party he allegedly deceived—of money or property, a requirement known as "convergence." *United States v. Bryant*, 655 F.3d 232, 249 (3d Cir. 2011) (describing convergence as the circumstance where "the party to whom the fraudulent pretenses were made" is "the same as the party from whom money or property would have been taken").

At bottom, this case is an effort to expand the wire fraud statute into an area it should not be. The federal government should not be regulating, much less through criminal prosecutions, universities' submissions to U.S. News. While the government may have prosecuted this or similar cases under a private honest services theory in the past by claiming that Dr. Porat breached duties to his employer, that theory is no longer viable in light of the Supreme Court's decision in *Skilling v. United States*. *See* 561 U.S. 358, 408-09 (2010) (prohibiting the government from prosecuting breaches of fiduciary duties under the wire fraud statute in the absence of a bribe or kickback). This Court, as the Third Circuit did in *Henry*, should reject the government's efforts to avoid those limitations by repackaging this case as a property fraud, especially given the obligation to resolve ambiguity in favor of lenity rather than criminality. *See Henry*, 29 F.3d at 116; *cf. Sorich v. United States*, 555 U.S. 1204, 1206 (2009) (noting that the expansiveness of the wire fraud statute "invites abuse by headline-grabbing prosecutors in pursuit of local officials, state legislators, and corporate CEOs who engage in any manner of unappealing or ethically questionable conduct") (Scalia, J., dissenting from denial of cert.).

## BACKGROUND

For purposes of a motion to dismiss, the Court must accept the allegations in the indictment as true. *See United States v. Bergrin*, 650 F.3d 257, 265 (3d Cir. 2011).

According to the indictment, Temple University is a public university based in Philadelphia (Indictment ¶ 1), and the Fox School is Temple's business school (*id.* ¶ 2). The Fox School offers several different MBA programs, including, as relevant here, a part-time MBA ("PMBA") program and an online MBA ("OMBA") program. (*Id.* ¶ 3). Dr. Porat was the Dean of the Fox School from 1996 until July 2018. (*Id.* ¶ 26). During that same time, Dr. Porat also served as the Dean of a second school within Temple: the School of Sport, Tourism and Hospitality Management. Beforehand, Dr. Porat served for eight years as Chairman of the Department of Risk Management, Insurance, and Actuarial Science at the Fox School. Dr. Porat has spent his entire professional career of over 40 years at Temple University.

Several different media companies publish annual rankings of what they claim are the best colleges and graduate schools in the country. The indictment references seven such companies: U.S. News, The Financial Times, The Princeton Review, The Economist, Bloomberg News, Forbes, and Poets & Quants. (*Id.* ¶¶ 6-7). These rankings "purport[edly]" are based on different combinations and weightings of objective and subjective criteria, such as incoming students' test scores and work experience, job placement, and the schools' reputations among peers. (*Id.* ¶ 8). The indictment alleges that a school's or program's ranking by a given publication "can" influence its reputation, which in turn "can" attract more applicants and "can" increase "enrollment and tuition revenues." (*Id.* ¶ 9).

The indictment alleges that Dr. Porat and two other individuals, Fox School Professor Isaac Gottlieb and Fox School Manager of Finance Marjorie O'Neill, conspired to induce one of those seven referenced rankings publications, U.S. News, to rank the Fox School's PMBA and OMBA programs more highly between 2014 and 2018. (*See id.* ¶ 44). This allegedly was done by submitting inaccurate information regarding three incoming-student metrics to U.S. News.

(*See id.* ¶¶ 44, 55, 58, 82, 86, 93).  The indictment does not allege any misconduct with respect to other degree programs or with respect to the other rankings publications.

For PMBA program rankings, U.S. News considers, among many other factors, the average work experience of incoming PMBA students and the percentage of overall MBA students who are part-time.  (*Id.* ¶ 78).  The indictment alleges that the Fox School, with Dr. Porat's knowledge, combined its PMBA, OMBA, and executive MBA programs and submitted aggregate rather than program-specific data for these two questions.  (*Id.* ¶¶ 79, 82-84, 90-92).  The indictment further faults Dr. Porat and his alleged conspirators for not "contact[ing] a U.S. News representative and ask[ing] for clarification" about the relevant requirements.  (*Id.* ¶ 85).

For OMBA program rankings, the indictment alleges that the Fox School represented that 100 percent of the Fox School's OMBA students had taken the Graduate Management Admission Test ("GMAT") when the number actually was lower.  (*Id.* ¶¶ 46, 49-51, 55, 58).  The indictment implies (though it does not allege) that this submission resulted in the Fox School's average GMAT scores being given greater weight by U.S. News.  (*See id.* ¶¶ 55-56).  The indictment does not allege that Dr. Porat or his supposed conspirators misrepresented what the average GMAT scores were.

Dr. Porat's alleged involvement in the submission of inaccurate percentages of incoming students who had taken the GMAT is premised on a single July 2014 conversation in which Ms. O'Neill allegedly stated that U.S. News would give the Fox School full credit for the average GMAT score of incoming students if she reported that all OMBA students had taken the GMAT, and, in response, Dr. Porat allegedly said to "'report it that way' or words to that effect."  (*Id.* ¶¶ 46, 49-51).  Notably, according to notes from the very same interview in which Ms. O'Neill recounted Dr. Porat telling her to "'report it that way,'" Ms. O'Neill also stated that she "[did]

not believe that [Dr.] Porat thought the issue all the way through and [did] not believe that he was deliberately trying to fool anyone."[1]  The indictment does not include this caveat, nor does it allege that Dr. Porat gave any additional instructions to Ms. O'Neill or anyone else after July 2014 regarding how to report the number or percentage of incoming students who had taken the GMAT.  (*See id.* ¶ 58).

The indictment alleges that the Fox School's OMBA program rose from No. 9 in U.S. News' rankings in 2014 to No. 1 in 2018, and that its PMBA program rose from No. 53 in 2014 to No. 7 in 2017.  (*Id.* ¶¶ 98, 102).  The indictment does not, however, include any allegations with respect to the relative weight or importance of the data at issue or the data's effect on the Fox School's rankings; the closest it comes is recounting an alleged email in which Mr. Gottlieb expressed his personal belief that the Fox School's OMBA program would have been ranked No. 6 if it had reported accurate information about the number of OMBA entrants who reported GMAT scores.  (*Id.* ¶¶ 71, 110).

The indictment describes the alleged object or goal of the conspiracy differently and inconsistently.  In headers, the indictment states that the scheme was meant "to defraud *U.S. News*."  (*Id.* ¶¶ 45-46, 76-77 (emphasis added)).  Elsewhere, the scheme is described as an effort to defraud unspecified "*readers* of U.S. News" rather than U.S. News itself.  (*Id.* ¶ 44 (emphasis added); *see also id.* (alleging that the defendants conspired to "deceive readers of U.S. News by providing false and misleading information to U.S. News about Fox's OMBA and PMBA programs in order to fraudulently inflate Fox's ranking")).  And elsewhere still, the indictment alleges that the scheme was meant to defraud "Fox applicants, students, and donors" by

---

[1] Based on, among other things, the government's apparent failure to present to the grand jury Ms. O'Neill's exculpatory statements to Jones Day, Dr. Porat has filed a separate motion seeking disclosure of the prosecutor's comments and legal instructions to the grand jury.

"attracting more students to apply to Fox, matriculate at Fox, and pay tuition to Fox, and enticing Fox alumni and other benefactors to donate money to Fox." (*Id.* ¶¶ 43, 45). Despite these varying assertions, the indictment does not allege that students who enrolled in the Fox School's OMBA or PMBA programs received an education inferior to what they expected, nor does it include any allegations whatsoever with respect to the amount of or rationale for donations.

The indictment does allege that enrollment in the Fox School's OMBA and PMBA programs generally increased over time (*id.* ¶¶ 99, 103), but it does not allege a causal relationship between the Fox School's rankings and its enrollment, let alone the school's overall revenue. The indictment asserts that there was a "correlation" between ranking and enrollment (*id.* ¶ 10), but it concedes that enrollment in the PMBA program actually ***fell*** in at least one year despite increased rankings (*id.* ¶¶ 20-21), that tuition for the OMBA program ***decreased*** despite the improvement in the Fox School's rankings (*id.* ¶ 18), and that tuition for the PMBA program "varied over time" (*id.* ¶ 25). Nor does the indictment address the Fox School's ability to increase enrollment revenues by simply admitting more students, or allege that Dr. Porat's compensation or job security was in any way dependent on revenue, whether through enrollment or donations, or on the Fox School's rankings.

## LEGAL STANDARD

Federal Rule of Criminal Procedure 12(b)(3)(B) allows a district court to review the sufficiency of the indictment to "ensur[e] that legally deficient charges do not go to a jury." *Bergrin*, 650 F.3d at 268. Dismissal of an indictment is proper where "the indictment's allegations do not suffice to charge an offense." *United States v. Schiff*, 602 F.3d 152, 161, 167 (3d Cir. 2010) (affirming partial dismissal of an indictment alleging a "failure to rectify misstatements of others" because such theory was not "legally viable"). Although factual allegations are assumed to be true, the indictment must do more than merely "recite[]" in

"general terms" the "essential elements of the offense." *United States v. Panarella*, 277 F.3d 678, 685 (3d Cir. 2002). Moreover, a district court must find that "a charging document fails to state an offense if the specific facts alleged in the charging document fall beyond the scope of the relevant criminal statute, as a matter of statutory interpretation." *Id.* Applying that standard here, the indictment must be dismissed.

## ARGUMENT

## I. THE INDICTMENT FAILS TO ALLEGE A PROPERTY CRIME.

### A. U.S. News & World Report Rankings Are Not Cognizable Property Interests.

As the Supreme Court recently reaffirmed in *Kelly*, the wire fraud statute "prohibits only deceptive schemes to deprive [the victim of] money or property." 140 S. Ct. at 1571 (alteration in original) (internal citation and quotation omitted). "[T]he object of the alleged scheme or artifice to defraud must be a traditionally recognized property right," *United States v. Al Hedaithy*, 392 F.3d 580, 590 (3d Cir. 2004), the "hallmarks" of which are "exclusivity and transferability." *United States v. Alkaabi*, 223 F. Supp. 2d 583, 590 (D.N.J. 2002); *see also Henry*, 29 F.3d at 115 ("That the right at issue . . . has not been treated as a property right in other contexts and that there are many basic differences between it and common-law property are relevant considerations in determining whether the right is property under the federal fraud statutes.") (quoting *United States v. Evans*, 844 F.2d 36, 41 (2d Cir. 1988)).

Distilled, the indictment alleges a scheme to achieve higher rankings for the Fox School's OMBA and PMBA programs by submitting inaccurate data to U.S. News. (*See* Indictment ¶¶ 45-46, 76-77 (describing scheme in headers as meant "to defraud U.S. News")). A higher U.S. News ranking, however, is not the "traditional" type of excludable and transferable property that the wire fraud statute protects. Whatever signaling function rankings may serve, they cannot

be traded or sold, and they do not otherwise resemble traditional concepts of property. *Cf. Kelly*, 140 S. Ct. at 1572 ("lane realignment" is not a deprivation of "property"); *Cleveland v. United States*, 531 U.S. 12, 24 (2000) (regulatory licenses that cannot be bought or sold on the open market are not "property").

Nor can there be any type of property interest based on the integrity of U.S. News' ranking process or the effect of the alleged scheme on "readers of U.S. News." (Indictment ¶ 44). In *United States v. Henry*, for instance, the Third Circuit affirmed the dismissal of an indictment that sought to characterize deprivation of a "fair bidding opportunity" as a species of property crime. 29 F.3d at 115-16. That indictment alleged that the defendant breached his fiduciary duty by disclosing confidential bid information to a particular bank, but, because the honest services fraud statute was not available, *see id.* at 114, the government tried to proceed under the wire fraud statute by stretching the concept of "property" to include the opportunity for other banks to bid in a fair environment, *id.* at 113-14. The Third Circuit rejected that theory, reasoning that a fair bidding opportunity, although it may be valuable and affect a bank's "possible future receipt of property," is not itself a "traditionally recognized, enforceable property right." *Id.* at 115; *see also United States v. Sadler*, 750 F.3d 585, 591-92 (6th Cir. 2014) (reversing conviction and holding the wire fraud statute is "limited in scope to the protection of property rights, and the ethereal right to accurate information doesn't fit that description. Nor can it plausibly be said that the right to accurate information amounts to an interest that has long been recognized as property.") (internal quotations and citations omitted); *United States v. Ernst*, No. 19-10081-IT, 2020 U.S. Dist. LEXIS 218928, at *14-24 (D. Mass. Nov. 23, 2020) (holding that neither an admission slot nor the integrity of a university's

admissions process was a cognizable form of property).[2]  So too here, interference with an industry ranking does not implicate property interests.

**B.** **Incidental Effects on Enrollment or Donations Do Not Make the Alleged Conduct a Property Crime.**

If the indictment alleged nothing more than a scheme to achieve higher U.S. News rankings through submission of inaccurate data, it could not proceed.  Such conduct would constitute neither honest services fraud (because no bribes or kickbacks are alleged, *see Skilling*, 561 U.S. at 408-09) nor wire fraud (because rankings are not property).  Implicitly recognizing that more is needed, the government attempts to expand the scope of the alleged scheme to include an additional aim: obtaining money from applicants, students, and donors.  As the indictment carefully (and vaguely) puts it, the "goals" of the alleged scheme "included" attracting more students to apply to the Fox School, matriculate, and pay tuition, and more benefactors to donate.  (Indictment ¶ 45).  In other words, the government tries to repackage the alleged conduct as a property crime by tacking on allegations of potential downstream monetary harm to applicants, students, and donors.

Any theory of prosecution that relies on the alleged deprivation of money from applicants, students, and donors, however, also fails as a matter of law.  To make out a crime under the wire fraud statute, the government must allege that the property at issue "play[s] more than some bit part" in the scheme.  *Kelly*, 140 S. Ct. at 1573 (quoting *Pasquantino v. United States*, 544 U.S. 349, 355 (2005)).  "Or put differently, a property fraud conviction cannot stand when the loss to the victim is only an incidental by-product of the scheme" as opposed to its

---

[2] In a separate "Varsity Blues" prosecution of parents (versus coaches and athletic department administrators in *Ernst*), the court found that universities have an intangible property interest in the "integrity of their academic system."  *United States v. Sidoo*, 468 F. Supp. 3d 428, 442 (D. Mass. 2020).

"object." *Id.* at 1573 & n.2, 1574; *see also United States v. Walters*, 997 F.2d 1219, 1226 (7th Cir. 1993) ("[T]he victim's loss must be an objective of the scheme rather than a byproduct of it.").

The government's allegations are insufficient under this standard. Recently, in the so-called "Bridgegate" case, the government charged two individuals who closed several lanes of the George Washington Bridge to exact political revenge against a Democratic mayor. In so doing, they concocted a fake "traffic study" that required the Port Authority to incur costs for additional employee time. *Kelly*, 140 S. Ct. at 1572. The government sought to defend its conviction on the ground that the costs for employee time for this "traffic study" constituted sufficient property to bring the conduct within the reach of the wire fraud statute. *Id.* at 1573. The Court, however, unanimously disagreed. While it acknowledged that "[a] government's right to its employees' time and labor . . . can undergird a property fraud prosecution," it held that employee time and labor were merely incidental consequences of the scheme, *even though they were foreseeable*. *Id.* at 1573-74. In so holding, the Court sought to prevent "'a sweeping expansion of federal criminal jurisdiction'" that would result if prosecutors could bring conduct within the wire fraud statute "just by pointing to [a regulatory decision's] incidental costs." *Id.* (quoting *Cleveland*, 531 U.S. at 24).

*United States v. Palma* rejected another attempt by the government to re-characterize the object of a wire fraud scheme based on downstream monetary effects. There, the government alleged that the defendant, an engineer, devised a scheme to manipulate the emissions control systems of certain Fiat Chrysler vehicles to obtain regulatory approval for sale in the United States. *See Palma*, 2020 U.S. Dist. LEXIS 214675, at *3, *5-6. In light of *Kelly*, the government expressly alleged that the scheme also had the "goal" of "obtaining money from

potential purchasers" of the affected vehicles. *Id.* at *10. The court, however, dismissed the charges. *Id.* at *12-13. Framing the Supreme Court's ruling in *Kelly* in terms of whether the government alleged a "causal connection" between the alleged deceit and the property underlying the wire fraud charge, the court rejected the government's argument that "regulatory approval was a means to a financial end." *Id.* at *12. The causal connection between the defendant's alleged deceit regarding the emissions control systems and the customers' loss of money, the court held, was "tenuous at best" and, as was the case in *Kelly*, "only an incidental byproduct of the scheme." *Id.*

Similarly, in *United States v. Berroa*, the government charged as mail fraud a scheme to obtain medical licenses through submission of falsified exam scores. Because earlier precedent precluded the government from arguing that the medical licenses were themselves property, the government alleged that the defendants deprived "unsuspecting consumers" of money and property by using their improperly obtained licenses to receive payment for medical services. *Berroa*, 856 F.3d at 149. Although few, if any, patients presumably would have wanted to be seen by a doctor who needed a falsified exam score to practice medicine, the court nonetheless held that the scheme was outside the mail fraud statute. *Id.* at 149-50. "Endorsing such a prosecution theory," the court explained, "would extend the scope of federal jurisdiction to cover cases where the underlying fraudulent scheme" is "far removed from any money or property." *Id.* at 152.

So too here: the monetary effects of the alleged scheme on Fox School students and donors are incidental to the alleged scheme rather than its object. The indictment concedes that the connection between rankings and enrollment is tenuous at best (*see* Indictment ¶¶ 9-25 (alleging that rankings "can" improve reputation, which "can" lead to increases in applicants,

which "can" increase enrollment and tuition revenues)), especially given that the Fox School *decreased* tuition during the relevant period (*id.* ¶¶ 18, 25); and it makes no allegations whatsoever regarding the effect of rankings on donations. Nor is there any allegation that Dr. Porat personally benefitted from the alleged scheme or had a financial interest in it. Although the indictment includes several superfluous allegations about Dr. Porat's compensation (*id.* ¶¶ 26, 107), it does not allege that Dr. Porat's pay depended on rankings, applications, enrollment, or any other Fox School financial metric.[3] Reading the indictment as a whole, and taking the allegations in the light most favorable to the government, the inescapable conclusion is that this alleged scheme was an effort to increase the prestige of the Fox School's OMBA and PMBA programs—not a scheme that was ever meant to steal from the Fox School's students or trick them into overpaying.

Indeed, when announcing the charges in this case, the acting U.S. Attorney stated that "making misrepresentations to rankings programs like U.S. News not only defrauds the ranking system, but undermines the entire academic system and the students who deserve to be there based on their hard work."[4] While such conduct may have been prosecutable under a private honest services fraud theory before *Skilling* required a bribe or a kickback, *see* 561 U.S. at 408-

---

[3] Because the allegations regarding Dr. Porat's compensation are irrelevant and prejudicial, Dr. Porat has filed a separate motion seeking to strike them from the indictment.

[4] *See* Press Conference, Statements by Acting U.S. Attorney (Apr. 16, 2021) ("When a university's statistics and metrics are tainted by fraud, the resulting harm extends far and wide and creates a loss of faith in the value of our academic institutions, which we saw most recently with the now-famous 'Varsity Blues' case. . . . The success of the higher education system in the United States relies on . . . transparency and honesty about the system itself.") (available at https://spaces.hightail.com/space/OIsB9iVglv); *see also* Press Release, Dep't of Justice, U.S. Atty's Office, E.D. Pa., Former Temple Business School Dean Indicted for Fraud (Apr.16, 2021) (available at https://www.justice.gov/usao-edpa/pr/former-temple-business-school-dean-indicted-fraud).

09, the government cannot morph that same prosecution into a property crime. *Accord United States v. Ochs*, 842 F.2d 515, 527 (1st Cir. 1988) ("[W]e do not think courts are free simply to recharacterize every breach of fiduciary duty as a financial harm, and thereby to let in through the back door the very prosecution theory that the Supreme Court tossed out the front."). Rankings are not property, nor is students' "hard work."

At bottom, misrepresentations to U.S. News of the type alleged here do not amount to wire fraud or conspiracy to commit wire fraud. To hold otherwise would "leave[] [the] outer boundaries" of the wire fraud statute "ambiguous" and approve of the government's "use [of] the criminal law to enforce [its view of] integrity in broad swaths," contrary to the Third Circuit's longstanding decision in *Henry* and the Supreme Court's recent direction in *Kelly*, among others. *Kelly*, 140 S. Ct. at 1574; *see also, e.g.*, *McNally v. United States*, 483 U.S. 350, 360 (1987); *Ernst*, 2020 U.S. Dist. LEXIS 218928, at *27-28 (citing *Cleveland*, *McNally*, *Kelly*, and *Berroa* in rejecting the government's theory of property fraud and holding that "the federal property fraud statutes should not be used as a backdoor for expanding the scope of federal criminal jurisdiction"); *Alkaabi*, 223 F. Supp. 2d at 591 ("[I]f Congress wishes to make 'cheating on tests' a federal crime, it must do so with greater clarity.").

## II.    THE INDICTMENT FAILS TO ALLEGE A SCHEME TO DEFRAUD.

The indictment also should be dismissed for the independent reason that it fails to allege a scheme to ***defraud*** anyone of anything—that is, to use deception to cause a victim some injury. The federal wire fraud statute does not criminalize just any deceptive scheme. It specifically criminalizes schemes "to defraud." 18 U.S.C. § 1343. Courts consistently have recognized that the wire fraud statute embodies a distinction between defrauding (which the statute reaches) and merely deceiving (which it does not). *See* Orin Kerr, *Is it a Federal Crime for a University to Submit Fake Numbers to U.S. News to Change Its Ranking?* (Apr. 23, 2021) (collecting cases,

with comments by former EDPA Assistant U.S. Attorney and Adjunct Professor Michael Levy)
(available at https://reason.com/volokh/2021/04/23/is-it-a-federal-crime-for-a-university-to-submit-fake-numbers-to-u-s-news-to-change-its-ranking/).

As the Eleventh Circuit put it in *United States v. Takhalov*, "to defraud, one must intend
to use deception to cause some injury; but one can deceive without intending to harm at all."
827 F.3d at 1312. Deceiving is therefore "a necessary condition of defrauding but not a
sufficient one." *Id.* A defendant "'schemes to defraud' only if he schemes to deprive someone
of something of value" by trick or deceit. *Id.*

As a corollary, courts have "drawn a fine line between schemes that do no more than
cause their victims to enter into transactions they would otherwise avoid—which do not violate
the mail or wire fraud statutes—and schemes that depend for their completion on a
misrepresentation of an essential element of the bargain—which do violate the mail and wire
fraud statutes." *Shellef*, 507 F.3d at 108. A "schemer who tricks someone to enter into a
transaction has not 'schemed to defraud' so long as he does not intend to harm the person he
intends to trick. And this is so even if the transaction would not have occurred but for the trick."
*Takhalov*, 827 F.3d at 1313.

Thus, to take a simple example, a man who tricks his neighbor into coming over by
telling her his child is ill, only to ask her to change a dollar bill for him, has not "schemed to
defraud" his neighbor if he gives her a real dollar bill in exchange for four quarters. *Id.*
Although the transaction would not have occurred but for the phony illness, the transaction was
not fraudulent because the man gave the neighbor exactly what she was due. If the man had
given the neighbor a counterfeit dollar bill, by contrast, he would have "schemed to defraud" her
of her four quarters. *Id.* Or to take a real case, if a club owner hires attractive women to pose as

tourists and lure visiting businessmen into his club, and the businessmen receive exactly what they pay for—drinks, and nothing more—they have not been "defrauded" even if they were induced to buy drinks that they might not have purchased had they known of the arrangement between the women and the club owner. *Id.* at 1310-11, 1313-14. Or in another real case, if the owner of a sham pain management clinic lies to pharmaceutical distributors about her intention to order drugs for indigent patients, thus inducing the distributors to do business with her, but she pays the distributors' asking price, she has not schemed to harm the distributors by depriving them of something of value. *See Sadler*, 750 F.3d at 590-91; *see also, e.g.*, *Shellef*, 507 F.3d at 107-09 (no scheme to defraud where buyer induced seller to transact by falsely promising to export goods, but seller received what it bargained for in the transaction itself). As these cases illustrate, a misrepresentation constitutes a "scheme to defraud" only if it is intended to harm a counterparty by depriving it of the benefit of its bargain.

With those principles in mind, the indictment's allegations do not support a wire fraud charge—even when construed most favorably to suggest that rankings may influence decision-making. The indictment fails to allege a scheme to defraud because it does not allege facts that, if true, would show that Dr. Porat intended to harm students and donors by depriving them of something of value. There is no allegation that any student did not receive a Fox School business education in exchange for tuition dollars or that any donor's money was used impermissibly. Students who enrolled at the school received everything that was promised them, and donors' funds were directed precisely as represented. Nor is there any allegation that Temple administrators, Dr. Porat, Mr. Gottlieb, or Ms. O'Neill believed a Fox School business education was subpar or less valuable than the asking price. To the contrary: if anything, the facts alleged indicate that Dr. Porat, Mr. Gottlieb, and Ms. O'Neill thought the rankings

themselves were flawed and based on arbitrary criteria—such as the requirement that 75 percent of incoming students take the GMAT in order for a school to receive full credit for incoming GMAT scores—that resulted in rankings that failed to reflect the true quality of Fox School degree programs. (*See* Indictment ¶¶ 46-52).[5] There certainly is no allegation that Dr. Porat intended to **harm** students or donors by attracting them to the Fox School. Here, as in other cases, "even if a defendant lies," and even if alleged victims "made a purchase because of that lie," there is no wire fraud if alleged victims "'received exactly what they paid for.'" *Takhalov*, 827 F.3d at 1314 (quoting *Shellef*, 507 F.3d at 108).

To allege that students and donors were *defrauded*, rather than simply deceived, the indictment would need to allege facts showing that Dr. Porat, Mr. Gottlieb, and Ms. O'Neill lied "about the nature of the bargain itself." *Id.* at 1313. But the indictment alleges no such facts. Students were not buying a ranking when they attended the Fox School's OMBA or PMBA programs: they were buying educations, which they received in full. The indictment alleges no factual matter about the worth of U.S. News rankings or rankings readership. Instead, the indictment acknowledges the proliferation of rankings publications other than U.S. News (Indictment ¶¶ 6-7), and very vaguely states through a **series of hypotheticals** that a ranking "**can**" influence a program's reputation, which in turn "**can**" influence the program's future

---

[5] Scholarly research also has found college and university rankings like U.S. News to be arbitrary, irrelevant, and poor indicators of educational "quality." *See generally* Challenge Success, *A "Fit" Over Rankings: Why College Engagement Matters More Than Selectivity* (2018) (available at https://www.challengesuccess.org/wp-content/uploads/2018/10/Challenge-Success-White-Paper-on-College-Admissions-October-2018.pdf); Jonathan Rothwell & Siddharth Kulkarni, Metropolitan Policy Program at Brookings, *Beyond College Rankings: A Value-Added Approach to Assessing Two- and Four-Year Schools* (2015) (available at https://www.brookings.edu/wp-content/uploads/2015/04/BMPP_CollegeValueAdded.pdf); Marguerite Clarke, *Quantifying Quality: What Can the U.S. News and World Report Rankings Tell Us About the Quality of Higher Education?*, 10 Educ. Pol'y Analysis Archives, no. 16, March 20, 2002 (available at https://epaa.asu.edu/ojs/article/view/295/421).

ranking and "*can*" lead to "increases in enrollment and tuition revenues"—not that any ranking *does* or *did* any of those things.  (*Id.* ¶ 9 (emphasis added)).  And even setting that problem aside, the indictment conspicuously makes no allegations *at all* about the influence of rankings on donors.  (*See id.* (referencing only applicants, students, employers, and peer institutions)).

On those facts, there can be no "scheme to defraud" because there was no intention to harm students and donors by tricking them into parting with money in an unfair transaction. That U.S. News rankings may have induced some students and donors to enter a transaction they otherwise would not have entered—but a fair transaction, in which they received exactly what they paid for—does not make the alleged scheme one to "defraud."  Again, intent to deceive is not intent to defraud, and the federal wire fraud statute reaches only the latter.  The indictment at most alleges an intent to deceive with respect to U.S. News rankings and thereby to induce students and donors to enter a transaction, but it nowhere alleges facts showing intent to *defraud* students and donors of money in a harmful exchange.  Accordingly, the indictment fails to allege a conspiracy to commit wire fraud under 18 U.S.C. § 371 or a scheme to defraud under 18 U.S.C. § 1343 and must be dismissed.

## III.     THE INDICTMENT FAILS TO ALLEGE THAT DR. PORAT ACTED WITH SPECIFIC INTENT TO DEFRAUD.

Wire fraud is a specific intent crime.  *See Takhalov*, 827 F.3d at 1319-21.  A defendant therefore cannot be made to stand trial for wire fraud unless the government alleges that the defendant "knowingly and willfully participated in a scheme to obtain money or property through fraud and specifically intended to do so."  *United States v. Weaver*, 220 F. App'x 88, 91 (3d Cir. 2007) (citations omitted); *see also United States v. Dobson*, 419 F.3d 231, 237 (3d Cir. 2005) ("[I]t is not sufficient for the United States to prove merely that a defendant participated in a fraudulent scheme; rather, it must show that the defendant did so knowingly and in furtherance

of the illicit enterprise.") (internal citation and quotation omitted). Fraudulent intent may be

satisfied by alleging and proving that a defendant made misrepresentations to the victim(s) with

*knowledge that the statements were false*. *See United States v. Pearlstein*, 576 F.2d 531, 541-43

(3d Cir. 1978) (reversing mail fraud convictions arising from an alleged scheme involving the

sale of distributorships for a direct-mail-marketing pen company because "there was no evidence

from which the jury reasonably could have concluded that the salesmen had knowledge of [the]

false and misleading nature" of the promotional material used in their sales presentations—the

only (indirect) link between the salesmen and the scheme); *United States v. Tiche*, 424 F. Supp.

996, 1001 (W.D. Pa. 1977) (the "mere knowledge of shadowy dealings" is insufficient to

establish specific intent to defraud).

   The indictment uses a form of the word "intent" only five times, three times relating

exclusively to Ms. O'Neill's independent alleged criminal acts done "***without the knowledge*** of

[Dr.] Porat" (Indictment ¶ 76 (emphasis added); at 24 ¶ 5); once relating to Dr. Porat's alleged

provision of false information to investigators ***after*** the "scheme" was over (*id.* at 25 ¶ 9); and

once in a recitation of the intent element of the offense (*id.* at 26). Rather than allege that Dr.

Porat acted knowingly and willfully and with intent to defraud, the indictment repeatedly alleges

that the metrics submitted by Ms. O'Neill to U.S. News were false. (*Id.* ¶¶ 53, 55, 58, 65, 76,

83-86, 94-96).

   The indictment dedicates just two paragraphs to Dr. Porat's knowledge in 2014: Ms.

O'Neill allegedly told Dr. Porat about the number of test-taking entrants and proposed how to

earn more credit for that metric, and in response, Dr. Porat ambiguously said to "'report it that

way,' or words to that effect." (*Id.* ¶¶ 41-42, 49-51). The indictment fails to allege that Dr. Porat

ever knew what number Ms. O'Neill actually submitted in 2014 or in later years. (*Id.* ¶¶ 53, 55,

58, 83-86, 88-93, 95). The indictment similarly fails to allege that Dr. Porat knew that the interpretation discussed by many about average work experience and percentage of part-time MBA students enrolled was false or fraudulent, or even what the survey requested in the first place or what number(s) Ms. O'Neill ultimately provided to U.S. News. (*See id.* ¶¶ 78-96).

Significantly, the indictment does not allege that Dr. Porat knew that the No. 1 ranking actually conferred by U.S. News—which he "directed other Fox and Temple employees to tout" and approved e-mails about—was false. (*See id.* ¶¶ 57, 60, 75, 86). *See United States v. Harra*, 985 F.3d 196, 209-10 (3d Cir. 2021) (exploring the effect of ambiguity on scienter and explaining that "[i]n run-of-the-mill cases where there is no dispute over the meaning of the question or reporting requirement to which a defendant responded, proving falsity is straightforward: A statement is false if it is 'untrue.' And as a necessary corollary, a statement that is "'literally true . . . is, by definition, not false.'" (citation omitted)). While the indictment attempts to criminalize Dr. Porat's conduct in January 2018 after he learned that inaccurate information had been submitted to U.S. News (which he has admitted, in retrospect, reflected poor judgment), it is undisputed that the No. 1 ranking remained in place until January 24, 2018. (Indictment ¶ 108). Although the Fox School may have submitted some inaccurate information to U.S. News that may have had some bearing on its No. 1 ranking, the fact that the Fox School was ranked No. 1 was literally true at the time Dr. Porat's alleged misrepresentations in January 2018 were made.

Because the indictment fails to allege Dr. Porat's knowledge of the falsity of the metrics submitted to U.S. News or Dr. Porat's willful participation in a scheme with the intent to defraud, the indictment should be dismissed.

## IV. THIS COURT SHOULD ADOPT A CONVERGENCE REQUIREMENT AND DISMISS THE INDICTMENT.

The indictment must be dismissed for a fourth independent reason: it fails to allege that the recipient of the inaccurate (or deceptive) information, U.S. News, *also* was the party who parted with any money or property—a concept known as "convergence." *See Bryant*, 655 F.3d (describing convergence as requiring that "the party to whom the fraudulent pretenses were made" be "the same as the party from whom money or property would have been taken"). The federal courts of appeals are split on whether the federal wire and mail fraud statutes require convergence, and the Third Circuit has yet to decide the issue. *See id.* at 249; *compare, e.g.*, *United States v. Lew*, 875 F.2d 219, 221 (9th Cir. 1989) (reading mail fraud statute to require convergence), *with United States v. Christopher*, 142 F.3d 46, 54 (1st Cir. 1998) (declining to read the mail and wire fraud statutes to require convergence).

The best reading of the statutes, however, requires that the deceived party be the same as the party deprived of money or property. As the Supreme Court explained in *McNally v. United States*, the federal fraud statutes import traditional concepts of fraud, and "the words 'to defraud' commonly refer 'to wronging one in *his* property rights by dishonest methods or schemes.'" 483 U.S. at 358 (quoting *Hammerschmidt v. United States*, 265 U.S. 182, 188 (1924)) (emphasis added). In other words, "the intent must be to obtain money or property ***from the one who is deceived***." *Lew*, 875 F.2d at 221 (emphasis added); *United States v. Shelton*, 848 F.2d 1485, 1495 (10th Cir. 1988) ("Under *McNally*, instructions on the elements of mail fraud must require the jury to find that the victim of the scheme was *itself* defrauded of money or property."); *Mylan Labs., Inc. v. Akzo, N.V.*, 770 F. Supp. 1053, 1074 (D. Md. 1991) ("This convergence of identity seems inherent in the idea of fraud as provided in the fraud statutes and defined by the Supreme Court in *McNally*."). The Supreme Court's decision in *Cleveland v. United States* reinforces this

understanding by requiring that the property taken be property "in the hands of the victim." 531 U.S. at 15.

The necessity of convergence further follows from the Court's decision in *Neder v. United States*, which confirmed that materiality is a required element of federal mail and wire fraud. 527 U.S. 1, 25 (1999). Drawing again on common law concepts of fraud, the Court explained that a matter is material if a reasonable person would attach importance to it "in determining **his** choice of action" or the maker of a statement knows that "its recipient" regards it as important "in determining **his** choice of action." *Id.* at 22 n.5 (quoting Restatement (Second) of Torts § 538 (1977)) (emphasis added); *see also id.* at 16 (holding that a "false statement is material if it has a natural tendency to influence, or is capable of influencing, the decision of the decisionmaking body **to which it was addressed**") (citations omitted) (emphasis added). In other words, materiality entails convergence between the party allegedly deceived and the party allegedly deprived of money or property. Moreover, to the extent the federal wire fraud statute is ambiguous with respect to the requirement of convergence, the rule of lenity counsels in favor of reading it more restrictively to import the concept of convergence. *See McNally*, 483 U.S. at 359-60 ("[W]hen there are two rational readings of a criminal statute, one harsher than the other, we are to choose the harsher only when Congress has spoken in clear and definite language.").

The indictment here fails to meet the convergence requirement because it does not state facts showing that the party allegedly intended to be deceived (U.S. News) is the same as the parties allegedly intended to be deprived of money (applicants, students, and donors). The factual allegations about intended deception focus almost entirely on the alleged submission of inaccurate data to U.S. News to induce U.S. News to move the Fox School's PMBA and OMBA programs higher in its annual rankings. (*See* Indictment ¶¶ 29-42, 46-60, 77-96). The sparse,

conclusory factual allegations about intended monetary deprivation, meanwhile, focus on students and donors, *not* U.S. News. (*See id.* ¶¶ 43-45). Where, as here, the indictment fails to allege intent to obtain money or property *from the party meant to be deceived*, it must be dismissed. *See, e.g.*, *Lew*, 875 F.2d at 221-22 (attorney could not be convicted of mail fraud where misrepresentations were made to government, but money was obtained from clients); *Mylan Labs.*, 770 F. Supp. at 1073-74 (no wire and mail fraud RICO predicates where misrepresentations were allegedly made to FDA, but third party was deprived of market share).

## CONCLUSION

For the foregoing reasons, defendant Dr. Moshe Porat respectfully requests that the Court grant the motion to dismiss the indictment.

## REQUEST FOR ORAL ARGUMENT

Pursuant to Local Criminal Rule 12.1 and Section III.A of this Court's Policies and Procedures, Dr. Porat respectfully requests that the Court hear oral argument, which he believes will aid the Court in considering this motion given the novelty and complexity of the legal arguments underlying this first-of-a-kind prosecution.

Dated: May 28, 2021

Respectfully submitted,

/s/ Jay P. Lefkowitz
Jay P. Lefkowitz, P.C.
Robert W. Allen, P.C.
(admitted *pro hac vice*)
KIRKLAND & ELLIS LLP
601 Lexington Avenue,
New York, NY 10022
(212) 446-4800
lefkowitz@kirkland.com

/s/ Michael A. Schwartz
Michael A. Schwartz (PA 60234)
Richard J. Zack (PA 77142)
Tiffany N. Bracewell (admitted *pro hac vice*)
TROUTMAN PEPPER HAMILTON
SANDERS LLP
3000 Two Logan Square
Eighteenth & Arch Streets
Philadelphia, PA 19103-2799
(215) 981-4494
(800) 615-2315 (fax)
Michael.Schwartz@Troutman.com

*Attorneys for Defendant Dr. Moshe Porat*

## CERTIFICATE OF SERVICE

I, Michael A. Schwartz, hereby certify that on May 28, 2021, I caused a true and correct copy of the foregoing Motion To Dismiss The Indictment For Failure To State An Offense Pursuant to Fed. R. Crim P. 12(b)(3) and Memorandum of Law in Support to be served via ECF and email upon the following:

Mark Dubnoff, Esq.
Assistant U.S. Attorney
615 Chestnut Street, Suite 1250
Philadelphia, PA 19106
mark.dubnoff@usdoj.gov


/s/ Michael A. Schwartz