**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | CRIMINAL ACTION |
| | : | |
| MOSHE PORAT, | : | NO. 2:21-CR-00170-GJP-1 |
| Defendant. | : | |
| | : | |

**ORDER**

AND NOW, this _____ day of _____, 2021, upon consideration of Defendant Moshe Porat's Motion to Compel Discovery Pursuant to *Brady v. Maryland*, it is ORDERED that the motion is GRANTED.  The government shall produce the reports, memoranda, notes, and/or summaries of interviews or proffers for Marjorie O'Neill, Rajan Chandran, Isaac Gottlieb, Diana Breslin-Knudsen, and any other witness/potential witness that contain *Brady* material within 7 days of the date of this Order.

_____
HONORABLE GERALD J. PAPPERT
*Judge, United States District Court*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| UNITED STATES OF AMERICA | : |
| | : |
| v. | : |
| | : |
| MOSHE PORAT, | : |
| Defendant. | : |
| | : |
| | : |

CRIMINAL ACTION

NO. 2:21-CR-00170-GJP-1

**DEFENDANT MOSHE PORAT'S MOTION TO**
**COMPEL DISCOVERY PURSUANT TO *BRADY V. MARYLAND***

Pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963), Defendant Dr. Moshe Porat, by and through his undersigned counsel, hereby moves this Court for an order compelling the government to immediately produce the government's reports, memoranda, notes, and/or summaries of interviews or proffers for Marjorie O'Neill, Rajan Chandran, Isaac Gottlieb, Diana Breslin-Knudsen, and any other witness/potential witness that contain exculpatory or favorable information to his defense.

Multiple attempts to seek these materials from the government have resulted only in production of heavily redacted reports of three interviews of Ms. O'Neill and a heavily redacted report of one interview of Dr. Chandran, necessitating the filing of this motion.

In support of this motion, Dr. Porat relies on the attached memorandum of law, which is incorporated herein.

WHEREFORE, Dr. Porat respectfully requests that this Court enter the attached order compelling discovery pursuant to *Brady v. Maryland*.

Dated: July 6, 2021

Respectfully submitted,

/s/ Jay P. Lefkowitz

Jay P. Lefkowitz, P.C.
Robert W. Allen, P.C.
(admitted *pro hac vice*)
KIRKLAND & ELLIS LLP
601 Lexington Avenue,
New York, NY 10022
(212) 446-4800
lefkowitz@kirkland.com

/s/ Michael A. Schwartz

Michael A. Schwartz (PA 60234)
Richard J. Zack (PA 77142)
Tiffany N. Bracewell (admitted *pro hac vice*)
TROUTMAN PEPPER HAMILTON
SANDERS LLP
3000 Two Logan Square
Eighteenth & Arch Streets
Philadelphia, PA 19103-2799
(215) 981-4494
(800) 615-2315 (fax)
Michael.Schwartz@Troutman.com

*Attorneys for Defendant Dr. Moshe Porat*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | CRIMINAL ACTION |
| | : | |
| MOSHE PORAT, | : | NO. 2:21-CR-00170-GJP-1 |
| Defendant. | : | |
| | : | |
| | : | |
| | : | |

**MEMORANDUM OF LAW IN SUPPORT OF**
**DEFENDANT MOSHE PORAT'S MOTION TO**
**COMPEL DISCOVERY PURSUANT TO *BRADY V. MARYLAND***

Jay P. Lefkowitz, P.C.
Robert W. Allen, P.C.
(admitted *pro hac vice*)
KIRKLAND & ELLIS LLP
601 Lexington Avenue,
New York, NY 10022
(212) 446-4800
lefkowitz@kirkland.com

Michael A. Schwartz (PA 60234)
Richard J. Zack (PA 77142)
Tiffany N. Bracewell (admitted *pro hac vice*)
TROUTMAN PEPPER HAMILTON
SANDERS LLP
3000 Two Logan Square
Eighteenth & Arch Streets
Philadelphia, PA 19103-2799
(215) 981-4494
(800) 615-2315 (fax)
Michael.Schwartz@Troutman.com

*Attorneys for Defendant Dr. Moshe Porat*

## **TABLE OF CONTENTS**

INTRODUCTION ................................................................................................- 1 -

BACKGROUND .................................................................................................- 3 -

I.       Prior Investigation & Litigation.................................................................- 3 -

II.      Indictment .................................................................................................- 4 -

III.     Discovery ..................................................................................................- 5 -

ARGUMENT ....................................................................................................- 11 -

I.       *Brady* Compels the Prompt Production of Evidence that Is Favorable to the
         Defense. ..................................................................................................- 11 -

II.      The Undisclosed Interview Reports and Notes Contain Information that Is
         Favorable to the Defense. ......................................................................- 13 -

         A.       Inconsistencies between the Agent's Grand Jury Testimony and
                  Exculpatory Jones Day Interviews................................................- 14 -

         B.       Other Exculpatory Material from the Jones Day Investigation .......- 17 -

III.     Interview Reports and Notes that Contain *Brady* Material Are Discoverable and
         Should Be Produced Now. .......................................................................- 20 -

CONCLUSION................................................................................................- 25 -

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Berger v. United States*, 205 U.S. 78 (1935) ................................................12

*Brady v. Maryland*, 373 U.S. 83 (1963) ..............................................2, 11

*Dennis v. Sec'y, Pa. Dep't of Corr.*, 834 F.3d 263 (3d Cir. 2016) ...........................11, 12

*In re Special Proceedings*, Misc. No. 09-0198 (D.D.C. Mar. 15, 2012) ......................................23

*Kyles v. Whitley*, 514 U.S. 419 (1995) ................................................12

*Slutzker v. Johnson*, 393 F.3d 373 (3d Cir. 2004).................................................21

*United States v. Acosta*, 357 F. Supp. 2d 1228 (D. Nev. 2005)...............................13

*United States v. Agurs*, 427 U.S. 97 (1976)...............................................12, 13

*United States v. Alvin*, 340 F. Supp. 3d 323 (E.D. Pa. 2014) ..............................12

*United States v. Bagley*, 473 U.S. 667 (1985) ..............................................24

*United States v. Burke*, 571 F.3d 1048 (10th Cir. 2009)...............................12

*United States v. Carter*, 313 F. Supp. 2d 921 (E.D. Wis. 2004)...............................13

*United States v. Coles*, No. 1:16-CR-212, 2021 U.S. Dist. LEXIS 2407 (M.D. Pa. Jan. 7, 2021)...............................................21

*United States v. Devos Ltd.*, No. 14-CR-574, 2017 U.S. Dist. LEXIS 3744 (E.D. Pa. Jan. 10, 2017)...............................................21

*United States v. Higgs*, 713 F.2d 39 (3d Cir. 1983)...............................................11, 23

*United States v. Kaplan*, 554 F.2d 577 (3d Cir. 1977)...............................................12

*United States v. Murphy*, 569 F.2d 771 (3d Cir. 1978)...............................................21

*United States v. Naegele*, 468 F. Supp. 2d 150 (D.D.C. 2007)...............................13

*United States v. Nejad*, 487 F. Supp. 3d 206 (S.D.N.Y. 2020)...............................23

*United States v. Nejad*, No. 18-cr-224, 2020 U.S. Dist. LEXIS 126266 (S.D.N.Y. July 17, 2020)...............................................23

*United States v. Pelullo*, 105 F.3d 117 (3d Cir. 1997)...............................10, 21, 24, 25

*United States v. Pelullo*, 399 F.3d 197 (3d Cir. 2005)...............................................10

*United States v. Ramos*, 27 F.3d 65 (3d Cir. 1994) ........................................22

*United States v. Rigas*, 779 F. Supp. 2d 408 (M.D. Pa. 2011)................................2, 11, 22, 23, 24

*United States v. Safavian*, 233 F.R.D. 12 (D.D.C. 2005) ............................................13

*United States v. Starusko*, 729 F.2d 256 (3d Cir. 1984) ....................................12, 22, 23

*United States v. Staton*, No. 10-CR-800, 2012 U.S. Dist. LEXIS 81385 (E.D. Pa. June 5, 2012)........................................................................21

*United States v. Stevens*, No. 08-cr-231, 2009 U.S. Dist. LEXIS 39046 (D.D.C. Apr. 7, 2009)........................................................................23, 24, 25

*United States v. Sudikoff*, 36 F. Supp. 2d 1196 (C.D. Cal. 1999) ................................13

*United States v. Vella*, 562 F.2d 275 (3d Cir. 1977) ....................................22

**Other Authorities**

Dep't of Justice, *Guidance for Prosecutors Regarding Criminal Discovery* (Dec. 2017) ........................................................................12

Due Process Protections Act, S. 1380 (Oct. 21, 2020) ............................................5, 12

Justice Manual § 9-5.0001, Policy Regarding Disclosure of Exculpatory and Impeachment Information (Jan. 2020)........................................................12

Zane David Memeger, United States Attorney for the Eastern District of Pennsylvania, *Memorandum regarding Discovery Best Practices to All Criminal AUSAs* (Oct. 15, 2010) (available at www.justice.gov/sites/default/files/usao/pages/attachments/2015/04/01/pae_discovery_policy.pdf) ........................................................................22

## INTRODUCTION

Despite being ordered at the arraignment on April 23, 2021 "to timely disclos[e] *Brady* information to the defendant," the government has failed to do so.  In fact, the government has resisted acknowledging that it possesses any *Brady* material.  And, after multiple attempts by counsel for Dr. Porat to seek prompt production of *Brady* materials, the government only reluctantly produced on June 29, 2021 four heavily redacted reports of interviews of alleged co-conspirator Marjorie O'Neill and Dr. Rajan Chandran, the person who Ms. O'Neill claims was present when Dr. Porat allegedly directed the submission of false information to U.S. News & World Report ("U.S. News") and who does not support Ms. O'Neill's story.  But, these disclosures are only the tip of the iceberg.  As explained below, the government possesses significantly more exculpatory material in its files.  The government should not be permitted to strategically delay producing *Brady* materials.  Instead, this Court should order the government to promptly produce all reports, memoranda, notes, and/or summaries of interviews or proffers that contain information that is exculpatory or favorable to Dr. Porat's defense.

During the course of the government's lengthy investigation, the government has interviewed at least 20 witnesses, the vast majority of whom were previously interviewed as part of Temple University's internal investigation conducted by Jones Day into the events underlying the charges in this case and/or deposed as part of a related civil action.  Thus, even before the government's involvement in this case, the existing body of notes, reports, and transcripts contained significant amounts of exculpatory and favorable evidence regarding Dr. Porat's lack of participation in or knowledge of the alleged scheme to deceive U.S. News and his lack of intent to defraud.  Indeed, orally and in writing, the government has acknowledged that in its own interactions with many of those same witnesses (including Ms. O'Neill, Isaac Gottlieb, and Dr. Chandran), exculpatory and favorable evidence came to light.

Despite its acknowledgement that it possesses *Brady* information, the government repeatedly has declined to produce to Dr. Porat documents that contain that exculpatory and/or favorable information over the past two months.  In resisting its obligations, the government has offered a variety of rationales: it has asserted that it informally referenced some exculpatory information during pre-indictment discussions with counsel, that it does not have an obligation to produce summaries of witness interviews because it has not decided who it will call as witnesses at trial, and that interview- or proffer-related materials themselves are not discoverable under *Brady v. Maryland*, 373 U.S. 83 (1963).  These rationales have no merit.  As the court held in *United States v. Rigas*, 779 F. Supp. 2d 408, 414-15 (M.D. Pa. 2011), the government cannot use Federal Rule of Criminal Procedure 16 or the Jencks Act, 18 U.S.C. § 3500, to escape its *Brady* obligations, and its refusal to promptly disclose under *Brady* its notes, reports, memoranda, or summaries of interview or proffers that contain information favorable to Dr. Porat is improper and adversely impacts counsel's ability to properly prepare for trial.  Indeed, the government belatedly recognized this when it recently reversed course and produced overly redacted versions of some but not all of the relevant interview memos.

In light of the government's restrictive and changing views of its disclosure obligations, Dr. Porat respectfully requests that the Court issue an order compelling the government to promptly produce the government's reports, memoranda, notes, and/or summaries of interviews or proffers for Marjorie O'Neill, Rajan Chandran, Isaac Gottlieb, Diana Breslin-Knudsen, and any other witness/potential witness that contain information favorable to Dr. Porat, consistent with its obligations under *Brady* and Judge Hey's April 23, 2021 Order requiring that such materials be produced at the earliest opportunity.

**BACKGROUND**

## I.      PRIOR INVESTIGATION & LITIGATION

In January 2018, Temple University learned that the Richard J. Fox School of Business

and Management ("Fox School") had submitted certain inaccurate information in connection

with U.S. News' 2018 survey of the best online MBA ("OMBA") programs.  Following this

revelation, Temple University retained Jones Day to conduct an internal investigation into the

scope of the Fox School's possible misreporting, which investigation lasted at least five months

and involved the interview and re-interview of at least 17 individuals; the review of more than

32,000 documents; and the retention of a data analytics firm to systematically audit historical

submissions by the Fox School.  *See* Temple University, Update on Fox Rankings (July 9, 2018)

([https://news.temple.edu/sites/news/files/images/findings_and_recommendations.pdf](https://news.temple.edu/sites/news/files/images/findings_and_recommendations.pdf)) ("Jones

Day Public Report").  In its public report summarizing the key findings of investigation, Jones

Day concluded:

> The employee principally responsible for preparing and submitting Fox's
> responses to ranking surveys [Marjorie O'Neill] knowingly and intentionally
> misreported certain information to U.S. News and failed to correct inaccuracies
> with respect to other information.  The investigative record is inconclusive as to
> whether this employee, in knowingly and intentionally misreporting information,
> was acting at the specific direction of any other Fox personnel.

*Id.* at 2.

Following his removal as Dean of the Fox School as a result of the Jones Day

investigation, in May 2019, Dr. Porat initiated a civil suit for defamation against Temple

University and its now-former president, Richard Englert, in the Philadelphia Court of Common

Pleas.  In that suit, the parties deposed 36 individuals—primarily Temple University and Fox

School administrators and employees, including most of the individuals interviewed as part of

the Jones Day investigation.  In an effort to seek the U.S. Attorney's Office's prosecution of Dr.

Porat, Temple University subsequently waived attorney-client privilege and work product

protections and then produced to Dr. Porat certain interview memoranda, interview notes, and document sets reviewed with witnesses during the Jones Day investigation.  These materials were re-produced by the government with select additions in its initial discovery disclosures.

## II.    INDICTMENT

On April 15, 2021, the grand jury returned an indictment charging Dr. Porat with conspiring and participating in a wire fraud scheme to provide false, fraudulent, or misleading information as part of the Fox School's submissions to U.S. News, in violation of 18 U.S.C. § 371 (Count I) and 18 U.S.C. § 1343 (Count II).  The indictment alleges that Dr. Porat, two other individuals (Mr. Gottlieb, a professor, and Ms. O'Neill, Manager of Finance), and perhaps others conspired to induce U.S. News to rank the Fox School's OMBA and part-time MBA ("PMBA") programs more highly by submitting inaccurate information regarding three incoming-student metrics (out of more than 100 metrics and survey questions) between 2014 and 2018.  *See* Indictment ¶¶ 44, 55, 58, 82, 86, 93.

For OMBA program rankings, the indictment alleges that the Fox School represented 100 percent of its OMBA students had taken the Graduate Management Admission Test ("GMAT") when the number actually was lower.  *See* Indictment ¶¶ 46, 49-51, 55, 58.  Dr. Porat's alleged involvement is premised on a single alleged July 2014 conversation in which Ms. O'Neill allegedly stated that U.S. News would give the Fox School full credit for the average GMAT score of incoming students if she reported that all OMBA students had taken the GMAT, and, in response, Dr. Porat allegedly said to "'report it that way' or words to that effect."  *Id.* ¶¶ 46, 49-51.  The indictment does not allege that Dr. Porat asked any other questions or offered any other guidance or commentary to Ms. O'Neill or anyone else after July 2014 regarding how to report the number or percentage of entrants who had taken the GMAT.  *Id.* ¶ 58.  And, as the indictment confirms, Ms. O'Neill, ***without Dr. Porat's knowledge***, intentionally submitted

inaccurate information about admissions data, the mean grade point averages ("GPAs") of incoming students, and the average student indebtedness for the Fox School.  *Id.* ¶ 76.

On April 23, 2021, Dr. Porat made his initial appearance and entered a plea of not guilty. As required by the Due Process Protections Act, S. 1380 (Oct. 21, 2020), United States Magistrate Judge Elizabeth Hey orally issued an order confirming the government's disclosure obligations under *Brady* and warning of the possible consequences of the government's failure to comply.  *See* Tr. of Initial Appearance and Arraignment at 4:24-5:10 (Exhibit A).  A week before his initial appearance, Dr. Porat already had sent a detailed letter to the government seeking discovery under Fed. R. Crim. P. 16 and under *Brady*.  *See* Letter to AUSA Mark Dubnoff, dated April 16, 2021 (Exhibit B).

## III.    DISCOVERY

Prior to indictment, counsel for Dr. Porat engaged in multiple exchanges with the government concerning the facts of the Fox School's misreporting to U.S. News during the course of the government's investigation.  During those discussions, the government represented to counsel for Dr. Porat that it conducted at least twenty witness interviews and that multiple witnesses were interviewed more than once.

Specifically, on or around November 6, 2020, the government represented that it had conducted interviews with the following witnesses: Marjorie O'Neill, Rajan Chandran, Isaac Gottlieb, Diana Breslin-Knudsen, Jessica Benenson, Debbie Campbell, Peter Dworkin, Joanne Epps, Darin Kapanjie, Tom Kegelman, Aubrey Kent, Christine Kiely, Robert Morse, Paul Pavlou, William Rieth, Virginia Roth, Michael Smith, and Phyllis Tutora.  The government further stated that it conducted at least two interviews with Isaac Gottlieb, Diana Breslin-Knudsen, and Marjorie O'Neill.  Of note, the government represented that Ms. O'Neill admitted that she began including false representations about student debt and GPAs in the 2016 U.S. News submission.  For GPAs, Ms. O'Neill explained that she had created an Excel spreadsheet

including a special formula to round up in a manner inconsistent with traditional rounding rules and/or U.S. News' requirements.  Ms. O'Neill admitted that Dr. Porat did not direct her to make these false representations, and the government conveyed to counsel that it did not believe that Dr. Porat was aware of these false representations made by Ms. O'Neill.  Ms. O'Neill's admissions to the government are consistent with the key findings from the Jones Day investigation.  *See* Jones Day Public Report at 1-2.

Counsel for Dr. Porat separately learned around this time that Dr. Chandran informed the government that he believed that the Fox School appropriately responded to rankings surveys.  According to Dr. Chandran, Ms. O'Neill maintained sole responsibility for collecting data, preparing the Fox School's rankings submissions, and ultimately for falsifying inputs.  Based on his long professional relationship with Dr. Porat, Dr. Chandran told the government that Dr. Porat did not review any underlying data or numbers that were submitted to rankings publications.  According to Dr. Chandran, while Dr. Porat may have been involved in policy decisions impacting the Fox School's rankings, he did not get into the weeds on the submissions themselves.

On January 26, 2021, the government repeated to counsel for Dr. Porat that it had participated in at least twenty witness interviews, including three interviews with Ms. O'Neill, one interview with Dr. Chandran, and at least one interview with U.S. News.  The government stated that Ms. O'Neill admitted that she intentionally made misrepresentations to U.S. News, some of which Dr. Porat did not know about, and she did so to ensure her job security.

With these specific statements in mind, combined with Jones Day's investigative conclusions—which declined to find that Dr. Porat personally was involved in or had knowledge of any data manipulation—Dr. Porat expressly encouraged the government to obtain for itself and carefully review Jones Day's previously undisclosed interview notes and memoranda.  When the government did so and, in turn, Dr. Porat received copies of some of these Jones Day

materials, Dr. Porat discovered numerous other examples of exculpatory information from a broader range of Fox School personnel, which he outlined in painstaking detail for the government.  Accordingly, immediately following the unsealing of the indictment on April 16, 2021 and as noted above, counsel for Dr. Porat sent the government a letter containing detailed and specific discovery requests pursuant to the applicable rules of discovery, Fed. R. Crim. P. 16, *Brady/Giglio*, and the Due Process Protections Act.  *See* Exhibit B.

On May 11, 2021, the government responded, in part, to Dr. Porat's initial discovery requests.  *See* Letter from AUSA Dubnoff, dated May 11, 2021 (Exhibit C).  Though the government's response included transcripts of grand jury testimony of Isaac Gottlieb and FBI Special Agent Robert McManigal, it did not include any reports, memoranda, summaries, or notes of any witness interview or proffers.  Several days later in an email response agreeing to the government's proposed protective order for its second discovery production, counsel for Dr. Porat inquired about "producing the 302s (or other agency reports) of your witness interviews which we believe contain *Brady* material."  *See* Email to AUSA Dubnoff, dated May 17, 2021 (Exhibit D at 2).

The government responded on May 18, 2021:

As you know, such reports are statements of the law enforcement officers and agents who wrote them, not statements of witnesses.  Thus, they're not discoverable under Rule 16, and they wouldn't be discoverable Jencks or *Giglio* until such time as I decide to call a particular agent/officer as a witness.  As for "*Brady* material," I'm assuming you mean exculpatory information, which I'm required to disclose under *Brady*.  If so, I believe I wouldn't need to produce the reports themselves – which, again, are just statements of the law enforcement officers -- as long as I disclose or have disclosed the exculpatory information.

If you think I am misunderstanding the government's obligations under *Brady*, *Giglio*, the Jencks Act, and/or Rule 16, please let me know, and I'd be happy to review any legal authorities you cite.

*See* Email from AUSA Dubnoff, dated May 18, 2021 (Exhibit D at 1).

Counsel for Dr. Porat sent a supplemental letter to the government on May 19, 2021, renewing Dr. Porat's discovery requests under *Brady* for "the immediate production of all 302s, Memoranda of Interviews ("MOIs"), and other reports, notes, or summaries of interviews or proffers, including but not limited to those conducted by FBI Special Agents Robert McManigal and Brian Coughlin, DOE Special Agent Kristy Smith, and USPIS Special Agent George Clark." *See* Letter to AUSA Dubnoff, dated May 19, 2021 (Exhibit E).  Counsel for Dr. Porat explained that the information purportedly shared in the government's witness interviews, upon which Special Agent McManigal's grand jury testimony is based, "is inconsistent with what these same persons provided in their interviews as part of the Jones Day investigation and during their depositions taken in *Porat v. Temple University*, No. 04754 (Phila. Cty. Ct. Com. Pl. 2019), some of which the government also included in its initial discovery production."  *Id.*  Counsel for Dr. Porat specifically identified that the government's interviews and/or proffers with Dr. Chandran, Ms. O'Neill, and Ms. Breslin-Knudsen contain *Brady* material and should be disclosed.  *Id.*  As the government had requested, counsel for Dr. Porat also cited to a number of relevant cases, including in the Third Circuit, that support the disclosure of the government's reports and notes of interviews under *Brady*.  *Id.*

On May 24, 2021, the government made a second discovery production—which did not include the reports, memoranda, summaries, or notes of any witness interviews or proffers—and acknowledged that it was reviewing counsel's letter sent on May 19.  *See* Letter from AUSA Dubnoff, dated May 24, 2021 (Exhibit F).  After counsel for Dr. Porat and the government conferred by phone about disclosure of witness interview reports and notes under *Brady* and the government's receipt of supporting case law sent by counsel on May 26, 2021, the government expressed its view that Dr. Porat's legal authority was unpersuasive and again inquired whether there was "any case in which a court, federal or state, has ordered the government to produce all

agent reports and notes of interviews to defense counsel at this stage of the proceedings." *See*
Email from AUSA Dubnoff, dated May 27, 2021 (Exhibit G).

On June 4, 2021, after receiving several more requests from counsel for Dr. Porat for
*Brady* materials, including the reports of interviews of Ms. O'Neill, Mr. Gottlieb, Dr. Chandran,
Ms. Breslin-Knudsen, and other witnesses who provided information favorable to Dr. Porat, the
government replied:

> We are aware of our *Brady* obligations, have met all of our *Brady* obligations, and
> will continue to meet our *Brady* obligations.  For example, we have made numerous
> *Brady* disclosures to you, both orally and in writing, and often repeatedly.  We
> have, however, never acknowledged that we "are in possession of *Brady*
> materials."  We have told you that we have agent reports that were written by
> agents, none of which have been read, let alone endorsed by the interviewed
> witnesses.  Such reports are not "*Brady* materials."

> I note that you have now twice declined my invitation to provide us with any
> citation to any case, federal or state, in which any court has ever ordered the
> government to produce to defense counsel all agent reports and agent notes at this
> stage of the proceedings.  I am now renewing  this invitation a third time.  If you
> are aware of any such cases, please let us know.  I will read them.

> Otherwise, we will continue to take a practical approach which includes reviewing
> the agent reports ourselves and producing them, perhaps with some redactions,
> when and where we believe it is appropriate to do so.

*See* Email from AUSA Dubnoff, dated June 4, 2021 (Exhibit H).

And, after a follow-up request in which counsel for Dr. Porat reminded the government
of prior statements acknowledging that the government possessed *Brady* material, the
government replied on June 15, 2021:

> To be clear, I have said no such thing.

> I have, however, asked you on three occasions to provide us with a single citation
> to a single case in the history of American jurisprudence to support your
> request.  You have thrice failed to identify one.

> If you have such a case, please provide the citation.

*See* Email from AUSA Dubnoff, dated June 15, 2021 (Exhibit I).

One day later, the government produced interview reports and accompanying exhibits for only two witnesses, John Byrne and Robert Morse, through whom the government suggested it may seek to offer expert opinions.

In a final attempt to resolve this issue and clarify that Dr. Porat also seeks early disclosure of *Jencks* material (as is common in this District) in light of both parties' existing trial obligations, counsel for Dr. Porat sent another letter, dated June 22, 2021, seeking prompt production of *Brady* material, including "all FBI 302s, Memoranda of Interviews ("MOIs"), and other reports, notes, or summaries of interviews or proffers . . . ***that contain information that is favorable to Dr. Porat***."  *See* Letter to AUSA Dubnoff, dated June 22, 2021 (Exhibit J).  Counsel for Dr. Porat reminded the government of its prior representations that at least two witnesses— Ms. O'Neill and Dr. Chandran—had provided information favorable to Dr. Porat in their interviews, which would have been summarized in FBI 302s, MOIs, and/or notes.  *See id.* Counsel for Dr. Porat also provided additional legal authority for what should be the uncontroversial proposition that interview materials that contain information favorable to the defense are discoverable under *Brady*.  *See id.*

On June 29, 2021, the government responded by producing heavily redacted excerpts of the interview reports for Ms. O'Neill and Dr. Chandran and made the following statement about its improper approach to producing *Brady* material:

> [T]o the extent you claim this information is "*Brady* information," your letter admits that the government already provided it to you.  None of the authorities you have cited suggests that the government has an obligation to produce the same information again, but in a different format, such as an agent report of an interview. . . . *Pelullo* makes clear that the government has no such obligation.[1]

---

[1] In its June 29 letter, the government relied on *United States v. Pelullo*, 399 F.3d 197, 202 (3d Cir. 2005), which considered the impact of a failure to disclose information ***post-trial***. The government did not respond to the specific authority Dr. Porat cited in support of the proposition that interview materials containing information favorable to Dr. Porat's defense are discoverable ***pre-trial*** under *Brady*, including an earlier decision in a related prosecution, *United States v. Pelullo*, 105 F.3d 117, 120, 122 (3d Cir. 1997) (remanding for a new trial after government "inexplicably failed to abide by its obligation under *Brady* to disclose potential

*See* Letter and Attachments from AUSA Dubnoff, dated June 29, 2021 (Exhibit K).  The

government attempted to justify its more than two-month failure to promptly produce *Brady*

materials by claiming that the lead AUSA is "preparing for a trial in another case," that the

government "is in the process of preparing responses to [other] pretrial motions," and that a

second AUSA "is still new to the case and getting up to speed."  *See id.*  None of these reasons

are sufficient to outweigh Dr. Porat's right to prompt production under *Brady*.

## ARGUMENT

I.     ***BRADY* COMPELS THE PROMPT PRODUCTION OF
       <u>EVIDENCE THAT IS FAVORABLE TO THE DEFENSE.</u>**

Under the rule developed more than half a century ago in *Brady v. Maryland*, "the

suppression by the prosecution of evidence favorable to an accused upon request violates due

process where the evidence is material either to guilt or to punishment, irrespective of the good

faith or bad faith of the prosecution."  373 U.S. at 87.  To withhold the evidence upon request

"casts the prosecutor in the role of an architect of a proceeding that does not comport with

standards of justice."  *Id.* at 88.  Disclosure under *Brady* includes both "materials going to the

heart of the defendant's guilt or innocence and . . . materials that might well alter the jury's

judgment of the credibility of a crucial prosecution witness."  *United States v. Higgs*, 713 F.2d

39, 42 (3d Cir. 1983).

The prosecution's broad duty of disclosure under *Brady* is rooted in preserving fairness in

criminal trials, given the "government's unquestionable advantage in criminal proceedings."

*Dennis v. Sec'y, Pa. Dep't of Corr.*, 834 F.3d 263, 290 (3d Cir. 2016).  Prosecutors should act in

favor of disclosure, since "the failure to make any response is seldom, if ever, excusable," *United*

---

impeachment evidence," including rough notes of agency interviews with defendant and a key
government witness), and *Rigas*, 779 F. Supp. 2d at 414-15 (granting defendants' motion to
compel pretrial production of government interview notes under *Brady*).

*States v. Agurs*, 427 U.S. 97, 106 (1976), and as representatives of the United States, prosecutors must satisfy their obligations in a criminal case in the interest of justice, not winning.  *See Kyles v. Whitley*, 514 U.S. 419, 439-440 (1995) (quoting *Berger v. United States*, 205 U.S. 78, 88 (1935)); *Dennis*, 834 F.3d at 293 ("[A]mple disclosure is 'as it should be' because it 'tend[s] to preserve the criminal trial, as distinct from the prosecutor's private deliberations, as the chosen forum for ascertaining the truth about criminal accusations.'") (quoting *Kyles*, 514 U.S. at 439-40).  *See also* Justice Manual § 9-5.0001, Policy Regarding Disclosure of Exculpatory and Impeachment Information (Jan. 2020) ("[P]rosecutors generally must take a broad view of materiality and err on the side of disclosing exculpatory and impeaching evidence.").

 *Brady* material must be made available to the defendant ***as soon as*** it becomes evident to the government that the information in its possession falls within the ambit of the rule.  *See United States v. Starusko*, 729 F.2d 256, 261 (3d Cir. 1984) (reiterating the Third Circuit's "longstanding policy of encouraging early production" of *Brady* material); *United States v. Kaplan*, 554 F.2d 577, 578 (3d Cir. 1977) ("[W]e disapprove and discourage a practice of delayed production"); *United States v. Alvin*, 340 F. Supp. 3d 323, 334 (E.D. Pa. 2014) ("Delayed disclosure of material and exculpatory evidence can violate the *Brady* rule," as "it would 'eviscerate the purpose of the *Brady* rule and encourage gamesmanship were [courts] to allow the government to postpone disclosures to the last minute.'") (quoting *United States v. Burke*, 571 F.3d 1048, 1054 (10th Cir. 2009)); Due Process Protections Act, S. 1380 (Oct. 21, 2020) (amending the Federal Rules of Criminal Procedure to require district courts to issue, at the outset of every criminal case, an order confirming the prosecutor's disclosure obligations under *Brady*).  *See also* Dep't of Justice, *Guidance for Prosecutors Regarding Criminal Discovery* (Dec. 2017) ("Providing broad and early discovery often promotes the truth-seeking mission of the Department and fosters a speedy resolution of many cases.  It also provides a

margin of error in case the prosecutor's good faith determination of the scope of appropriate discovery is in error."); Exhibit A at 4:24-5:10.

Therefore, as many district courts have concluded, in the context of a pretrial motion for *Brady* evidence, the question of whether information is favorable is the key inquiry, and an attempt to prospectively assess whether the information would be material at trial is not necessary. *See United States v. Naegele*, 468 F. Supp. 2d 150, 153 (D.D.C. 2007) ("[T]he duty to disclose evidence 'favorable to the accused' pretrial (and during trial) applies 'without regard to whether the failure to disclose it likely would affect the outcome of the upcoming trial.'") (quoting *United States v. Safavian*, 233 F.R.D. 12, 16 (D.D.C. 2005)); *United States v. Carter*, 313 F. Supp. 2d 921, 925 (E.D. Wis. 2004) ("[T]he court should require disclosure of favorable evidence under *Brady* and *Giglio* without attempting to analyze its 'materiality' at trial.  The judge cannot know what possible effect certain evidence will have on a trial not yet held."); *United States v. Sudikoff*, 36 F. Supp. 2d 1196, 1199 (C.D. Cal. 1999) ("Because the definitions of materiality as applied to appellate review are not appropriate in the pretrial discovery context, the Court relies on the plain meaning of 'evidence favorable to an accused' as discussed in *Brady*").  Thus, "[w]hether evidence is 'useful,' 'favorable,' or 'tends to negate the guilt or mitigate the offense' are semantic distinctions without difference in a pretrial context." *United States v. Acosta*, 357 F. Supp. 2d 1228, 1233 (D. Nev. 2005).  And "because the significance of an item of evidence can seldom be predicted accurately until the entire record is complete, the prudent prosecutor will resolve doubtful questions in favor of disclosure." *Agurs*, 427 U.S. 108.

## II.   THE UNDISCLOSED INTERVIEW REPORTS AND NOTES <u>CONTAIN INFORMATION THAT IS FAVORABLE TO THE DEFENSE.</u>

Based on (1) the government's prior representations about the identity, quantity, and frequency of witnesses interviewed and the exculpatory information that admittedly exists from those interviews or proffers, principally described above and partially produced in heavily

redacted form for two witnesses on June 29, 2021 (*see* Exhibit K); (2) the discrepancies between Special Agent McManigal's testimony before the grand jury and the interview materials from the Jones Day investigation; and (3) the extensive exculpatory information in the Jones Day interview materials and depositions of the same individuals whom the government later interviewed, Dr. Porat knows or reasonably believes that numerous key witnesses have offered information undermining or negating Dr. Porat's alleged intent, knowledge of, and/or participation in the charged scheme to defraud.  And to date, the government has not made—and cannot make—any argument disputing that information within its reports, memoranda, notes, and/or summaries of interviews or proffers is favorable to Dr. Porat's defense.  Accordingly, the Court should require the government to disclose its interview and/or proffer materials, formal or informal, for any such witness who has revealed *Brady* evidence, including but not limited to Ms. O'Neill, Dr. Chandran, Mr. Gottlieb, and Ms. Breslin-Knudsen.

A.     **Inconsistencies between the Agent's Grand Jury Testimony and Exculpatory Jones Day Interviews**

As the grand jury transcripts included in the government's initial discovery production make evident, Special Agent McManigal's testimony in support of the indictment is explicitly based on his or other agents' interviews with Ms. O'Neill, Mr. Gottlieb, Donna Ferrari, and Robert Morse.  *See* Excerpts of Feb. 4, 2021 and Apr. 1, 2021 Grand Jury Testimony (Exhibit L at 1-3).  Considering the events and conversations referenced in these transcripts, Special Agent McManigal's testimony also appears to be based, at least in part, on his or other agents' interviews with Dr. Chandran, Ms. Breslin-Knudsen, Debbie Campbell, Joanne Epps, Darin Kapanjie, Tom Kegelman, Aubrey Kent, Christine Kiely, Phyllis Tutora, and William Rieth. This comports with the government's representation that it has interviewed each of these individuals.

The information purportedly shared in these interviews is explicitly referenced in the indictment and tracks nearly verbatim Special Agent McManigal's testimony in several instances. As counsel for Dr. Porat explained to the government on May 19, 2021, this information is inconsistent with what these same persons provided in their interviews as part of the Jones Day investigation. *See* Exhibit F. Specifically, there are notable contradictions regarding Dr. Porat's participation in the alleged scheme, knowledge, and intent—essential elements of the conspiracy and wire fraud charges against him—which suggest the government's multiple interview reports with Ms. O'Neill, Dr. Chandran, Ms. Breslin-Knudsen, and other witnesses likely contain *Brady* material.

For example, based on his "conversations" with Ms. O'Neill, Special Agent McManigal testified that, in response to Ms. O'Neill's suggestion to Dr. Porat and Dr. Chandran that the Fox School report to U.S. News that all of its incoming OMBA students took the GMAT, Dr. Porat told Ms. O'Neill to "report it that way, or words to that effect." *See* Exhibit L at 4. However, in previous interviews with Jones Day, Ms. O'Neill offered numerous contradictory explanations for her misreporting that do not involve Dr. Porat at all, including that "[i]t was just easier to reference the number of applicants rather than have all the moving parts" of confirming and converting GMAT scores since "[the applicants] are all required to come in with [a standardized test score]," *see* O'Neill Jones Day Interview Notes at 22 (Apr. 23, 2018), and ***hypothetically***, if Fox only had 8 of 70 entrants with GMAT scores, she "***would have said*** [to Dr. Chandran and Dr. Porat] we would not get full credit[,] ***we would have*** to have 100% or ***we would have*** had to have every student – and [Dr. Porat's] response was yeah let's report all of them or something to that effect," *see id.* at 20 (emphasis added). Ms. O'Neill further stated in her interviews with Jones Day that she "does not believe that [Dr.] Porat thought the issue all the way through and does not believe that he was deliberately trying to fool anyone." *See* O'Neill Jones Day Interview Mem. at 10 (Feb. 2, 2018). Rather, his purported remark about the GMAT reporting

"was just a comment" during a meeting that lasted "15-20 minutes at most." *See* O'Neill Jones

Day Interview Notes at 17 (Apr. 23, 2018).

    With respect to that same meeting on which Special Agent McManigal offered testimony,

Dr. Chandran denied it took place—he could "categorically say such a meeting never happened"

and Ms. O'Neill "was never told to misreport data" at any meeting. *See* Chandran Jones Day

Interview Mem. at 3 (Feb. 26, 2018). Dr. Porat understands that Dr. Chandran made similar

statements in his proffer to the government in approximately 2019, which would have been

summarized in notes and/or, at a minimum, in the rest of the OIG interview report that the

government chose not to produce. *See* Exhibit K.

    Special Agent McManigal also testified that Dr. Porat "reduce[d] the oversight that other

people had over what [Ms. O'Neill] was submitting on behalf of Fox to U.S. News." *See* Exhibit

L at 5. However, Ms. Breslin-Knudsen previously offered a differing explanation. She

explained that "part of the problem" that resulted in the misreporting was that program directors

themselves—not the reorganization of a committee—facilitated Ms. O'Neill pulling data without

oversight. *See* Breslin-Knudsen Jones Day Interview Mem. at 5 (Feb. 13, 2018). Ms. Breslin-

Knudsen also reported that the former Provost "cared about rankings," and thus required the Fox

School to send its data to a newly-created University-level office for independent verification—

not less oversight. *See* Breslin-Knudsen Jones Day Interview Notes at 4-5 (May 2, 2018). Dr.

Chandran, among other Fox School personnel, reported that the Rankings Committee was not

"disband[ed]," as Special Agent McManigal testified; rather, the rankings submissions review

structure evolved to streamline the increasingly onerous process, foster consistency, and ensure

the preservation of confidential information—aligning with the structure used by many other

business schools. *Compare* Exhibit L at 5 *with* Chandran Jones Day Interview Notes at 2-4

(May 3, 2018), Breslin-Knudsen Jones Day Interview Mem. at 2 (Feb. 13, 2018), Tutora Jones

Day Interview Mem. at 3 (Feb. 2, 2018), Tutora Jones Day Interview Notes at 11-12 (June 26, 2018), *and* Kiely Jones Day Interview Notes at 3 (Feb. 13, 2018).

Based on these and other discrepancies*,* Dr. Porat reasonably believes that the government's interview and proffer notes, FBI 302s, and/or other similar summaries of interviews—of the very same individuals who provided exculpatory information to Jones Day—reflect witnesses' statements supporting that Dr. Porat did not willfully participate in a conspiracy or scheme to defraud and did not act with intent to defraud.

## B.    Other Exculpatory Material from the Jones Day Investigation

The interviews conducted by Jones Day contain significant facts supporting its finding of "inconclusive[ness]" with respect to "whether [Ms. O'Neill], in knowingly and intentionally misreporting information, was acting at the specific direction of ***any*** other Fox personnel."  Jones Day Public Report at 2 (emphasis added).  In the Jones Day record, Ms. O'Neill appears to have offered at least ten conflicting explanations for her misreporting of the number of Fox School entrants with GMAT scores and other data to U.S. News.  In addition to the two explanations noted above, Ms. O'Neill claimed:

(1)    the misreporting was a keying or clerical error on her part, *see* Breslin-Knudsen Jones Day Interview Notes at 13 (May 2, 2018); Kegelman Jones Day Interview Notes at 18 (May 2, 2018);

(2)    the "ranking review group," the "graduate admissions group," and/or "the deans" gave her instructions about standardized testing being required, which confused her, *see* O'Neill Jones Day Interview Mem. at 9 (Feb. 2, 2018);

(3)    she and "the deans" discussed "the fact that Fox would get full credit in the rankings methodology if it had more entrants with GMAT scores," to which Dr. Porat allegedly responded, "Let's do it that way," *see id.* at 9-10;

(4)    at the time she received the alleged instruction from Dr. Porat, the difference between the number of entrants and the number of entrants reporting GMAT scores was *de minimis*, *see id.*, which other witnesses established was false;

(5)    she did not know about GMAT waivers, despite evidence that she participated in meetings about waivers and she was aware of the waiver policy on the Fox

- 17 -

School's website, *see* O'Neill Jones Day Interview Notes at 22 (Apr. 23, 2018); Breslin-Knudsen Jones Day Interview Notes at 13 (May 2, 2018);

(6)     she did not believe the accuracy of the information provided by William Rieth from the Salesforce database about the entrants reporting GMAT scores and, thus she ignored Mr. Rieth's attempts to correct that input prior to the Fox School's Fall 2017 submission to U.S. News, *see* O'Neill Jones Day Interview Mem. at 8-9, 11-12 (Feb. 2, 2018); O'Neill Jones Day Interview Notes at 23, 52-53, 56 (Apr. 23, 2018);

(7)     she was "not always aware of changes [that might impact data reporting]" and she worked alone, without guidance or assistance, and lacked training on critical data repositories, *see* O'Neill Jones Day Interview Mem. at 15; O'Neill Jones Day Interview Notes at 53 (Apr. 23, 2018); and

(8)     despite acknowledging that the Fox School leadership wanted accuracy, she took it upon herself to "read between the lines to come up with what [she] needed to do," *see* O'Neill Jones Day Interview Mem. at 13 (Feb. 2, 2018).

Based on these and other facts, Jones Day concluded in a non-public version of its investigation report that Ms. O'Neill "submitted false undergraduate GPA information to U.S. News on multiple occasions after consulting with former Admissions Director Phyllis Tutora"— not Dr. Porat.  *See* Fox School OMBA Rankings Data Investigation: Report on Key Findings ("Jones Day Private Report") at 3.  Specifically, ***beginning in 2013***, Ms. O'Neill inflated GPA scores of "certain entrants, including [by] increasing GPAs listed as a 1/100th value to the next highest 1/10th value . . . and then reporting the mean derived from those inflated values" or sometimes the median.  *Id.* at 5 & n.1.  Ms. O'Neill later "used similar methods" to increase the GPA submitted in the 2015-18 OMBA rankings.  *Id.*  Ms. O'Neill's contradictory explanations when the Fox School discovered the misreporting and during the resulting Jones Day investigation not only create reasonable doubt that Dr. Porat specifically instructed her to submit false information in the first place, but also suggest that Dr. Porat never knew of the fraudulent nature of Ms. O'Neill's activities.  The government's multiple interviews of Ms. O'Neill, Ms. Breslin-Knudsen, and other witnesses will contain similar favorable statements.

In addition to materials relating to Ms. O'Neill, the interviews of other Fox School personnel will support that Dr. Porat lacked any intent to defraud and did not agree to or conspire to achieve higher U.S. News rankings through fraudulent means.  For example, Ms. Breslin-Knudsen, Ms. O'Neill, and Dr. Chandran affirmed that Dr. Porat did not review survey submissions for the Fox School's OMBA and PMBA programs or verify the underlying data alongside or independently of Ms. O'Neill.  *See* Breslin-Knudsen Jones Day Interview Notes at 4, 11-12 (May 2, 2018) (stating that Dr. Porat "[was] absolutely not looking" at survey submissions or verifying data, and Dr. Chandran—not Dr. Porat—was supposed to assume that role and work with Ms. O'Neill when the committee system evolved); O'Neill Jones Day Interview Mem. at 5 (Feb. 2, 2018) (stating that it had been "several years" since Dr. Porat had reviewed the Fox School's U.S. News submissions); O'Neill Jones Day Interview Notes at 10 (Apr. 23, 2018) (again stating that it had been "several years" since anyone but Ms. O'Neill had been responsible for getting "the entire package" "out the door" to U.S. News—"Now and again Diana would say the dean needs to [see] everything.  And well the dean doesn't want to see everything.  So that would be the extent of it."); Chandran Jones Day Interview Mem. at 3 (Feb. 26, 2018) ("Chandran and Porat did not review any compiled draft ranking submissions with O'Neill."); Chandran Jones Day Interview Notes at 25 (May 3, 2018) ("The Dean doesn't have time to discuss these kinds of things.  I don't think he has the patience to go over [Ms. O'Neill's spreadsheets] in great detail.").

Ms. Breslin-Knudsen, Dr. Chandran, Ms. Tutora, Mr. Kegelman, and Mr. Rieth conveyed that Dr. Porat did not pressure anyone to manipulate data, cut corners, or do anything unethical with respect to the Fox School's rankings submissions.  *See* Breslin-Knudsen Jones Day Interview Mem. at 6 (Feb. 13, 2018) (describing the pressure Dr. Porat exerted as pressure "about how the school could make things legitimately better"); Breslin-Knudsen Jones Day Interview Notes at 15 (May 2, 2018) ("I don't think the Dean was ever telling people to

- 19 -

manipulate."); Chandran Jones Day Interview Notes at 8 (May 3, 2018) ("Moshe is always saying let's present material that is correct and if you have any doubt, ask people involved in US News."); Tutora Jones Day Interview Mem. at 9-10 (Feb. 2, 2018) (affirming that "she did not feel pressure to do" anything unethical and that "no one would be told that they were a 'failure' or not doing their job as a result of any disappointment concerning rankings . . . the response instead would be to consider what the school was doing and how to move forward"); Kegelman Jones Day Interview Mem. at 8 (Feb. 12, 2018) ("[I]t would not have been a reasonable reaction to the culture to falsify any data" and "knowing what kind of person Porat is, he knows that Porat would never do anything like this."); Rieth Jones Day Interview Mem. at 10 (Feb. 1, 2018) (confirming that there is not a "culture of cutting numbers differently" at the Fox School and that he had never felt "subjected to undue pressure").

The prevalence of this and other exculpatory information in the Jones Day interview memoranda and notes, and the fact the government has interviewed these same witnesses, establish that the government's notes, reports, memoranda, and/or summaries contain information favorable to Dr. Porat's defense.

## III.   INTERVIEW REPORTS AND NOTES THAT CONTAIN *BRADY* MATERIAL ARE DISCOVERABLE AND SHOULD BE PRODUCED NOW.

Dr. Porat's request for *Brady* information is (and always has been) straightforward: he seeks the reports, memoranda, notes, and/or summaries of the government's interviews ***that contain exculpatory or otherwise favorable information to his defense***.  In lieu of addressing the merits of Dr. Porat's claim that the government is in possession of such information, the government repeatedly attempts to recharacterize Dr. Porat's request as an open-ended one for ***all*** reports and notes from every government interview conducted in this case, *see* Exhibits G and H, and most recently, as a request for reproduction of the same *Brady* information the government orally conveyed to Dr. Porat, *see* Exhibit K.  The government further attempts to

shield favorable information in those reports and notes by asserting the interviewed witnesses never read or endorsed them. *See* Exhibits G, H, and K. Similarly, and inaccurately, the government attempts to assert that Dr. Porat's request merely is a disguised attempt to obtain the early production of *Jencks* material, and it is up to the government's unfettered discretion to produce such information "when and where [it] believe[s] it is appropriate to do so." *See* Exhibits H, I, and K.[2]

First, contrary to the government's arguments, reports and notes of interviews containing information favorable to the defense—including for impeachment purposes—are discoverable under *Brady* and its progeny, regardless of whether the witness has reviewed or "signed off" on them. *See Slutzker v. Johnson*, 393 F.3d 373, 388 (3d Cir. 2004) (withholding police report of interview with witness who identified suspect as someone other than defendant violated defendant's due process rights under *Brady*); *Pelullo*, 105 F.3d at 120, 122 (remanding for a new trial on a wire fraud count after government "inexplicably failed to abide by its obligation under *Brady* to disclose potential impeachment evidence," including rough notes of agency interviews with defendant and a key government witness that contained critical phrases excluded from the

---

[2] Courts in this Circuit repeatedly have endorsed and facilitated the government's compliance with the practice of producing *Jencks* material in advance of trial to allow defense counsel sufficient time to prepare. *See United States v. Murphy*, 569 F.2d 771, 773 n.5 (3d Cir. 1978) ("[T]here is a prevailing practice by government attorneys of delivering Jencks material to defense counsel sufficiently in advance of the conclusion of direct examination to obviate trial interruptions solely to permit defense counsel to study the disclosures. That is a salutary practice and we encourage it."); *United States v. Coles*, No. 1:16-CR-212, 2021 U.S. Dist. LEXIS 2407, at *11 n.4 (M.D. Pa. Jan. 7, 2021) (in an order addressing defendants' pretrial discovery motions, acknowledging that the scheduling order requires the government to disclose *Jencks* material "a full month" before trial "given the complexity of the case"); *United States v. Devos Ltd.*, No. 14-CR-574, 2017 U.S. Dist. LEXIS 3744, at *84 (E.D. Pa. Jan. 10, 2017) (encouraging the government "to disclose any Jencks material in such time as to allow Defendants to use it meaningfully in accordance with prevailing practice"); *United States v. Staton*, No. 10-CR-800, 2012 U.S. Dist. LEXIS 81385, at *2 n.2 (E.D. Pa. June 5, 2012) (criticizing the government's intended disclosure of *Jencks* material three days prior to trial as "strain[ing] reasonableness" and encouraging the government to produce such material earlier).

final interview reports upon which government agents relied during their testimony about defendant's alleged scheme to defraud and fraudulent intent); *United States v. Ramos*, 27 F.3d 65, 68 (3d Cir. 1994) ("[T]he rough interview notes of FBI agents should be kept and produced so the trial court can determine whether the notes should be made available to the [defendant] under the rule of *Brady* . . . or the Jencks Act.") (quoting *United States v. Vella*, 562 F.2d 275, 276 (3d Cir. 1977)); *Starusko*, 729 F.2d at 260-61 (FBI 302 report of a cooperating alleged co-conspirator relating to defendant's knowledge of and involvement in the offense is required to be disclosed under *Brady*); *Rigas*, 779 F. Supp. 2d at 414-15 (granting defendants' motion to compel pretrial production of government interview notes under *Brady*).  *See also* Zane David Memeger, United States Attorney for the Eastern District of Pennsylvania, *Memorandum regarding Discovery Best Practices to All Criminal AUSAs* (Oct. 15, 2010) (explaining that the United States Attorney's Office for the Eastern District of Pennsylvania "has historically practiced what some lawyers refer to as 'open-file' discovery and for good reason," and acknowledging that agent reports and notes relating to witnesses, even those that may not be called at trial, "may have information that is helpful to the defense that should be disclosed as part of our *Brady* obligation" and that "[w]e should take a broad view of exculpatory material," "producing all such material, even if its materiality is dubious") (available at www.justice.gov/sites/default/files/usao/pages/attachments/2015/04/01/pae_discovery_policy.pdf).

Second, the government "cannot conflate Jencks and *Brady* to eviscerate the latter"—government interview materials containing exculpatory or favorable information must be disclosed under *Brady*, whether or not the government plans to call the agents who authored the materials or the witnesses who were interviewed.  *See Rigas*, 779 F. Supp. 2d at 413-14.  And following clear Third Circuit precedent and Judge Hey's April 23, 2021 Order, exculpatory or favorable information should be produced now, especially given the government's long awareness of it.  *See Starusko*, 729 F.2d at 261 ("flatly" rejecting the government's argument that

- 22 -

it, instead of the court, should decide when to turn over *Brady* materials and "applaud[ing]" the court's order requiring pretrial disclosure of a 302 report); *Higgs*, 713 F.2d at 44 n.6 (confirming the district court's discretionary authority to order the pretrial disclosure of *Brady* materials "to ensure the effective administration of the criminal justice system").

As the government is aware, the well-publicized failure to disclose ***exculpatory interview materials*** ultimately led to vacated guilty verdicts and dismissal of the indictments with prejudice in *United States v. Nejad* and *United States v. Stevens*.  *See United States v. Nejad*, No. 18-cr-224, 2020 U.S. Dist. LEXIS 126266, at *2-3 (S.D.N.Y. July 17, 2020); *United States v. Stevens*, No. 08-cr-231, 2009 U.S. Dist. LEXIS 39046, at *2 (D.D.C. Apr. 7, 2009).  In *Nejad*, the government failed to disclose the recording of a witness interview containing significant exculpatory evidence that was not reflected in the related interview notes, as well as exculpatory statements from another witness interview, all of which undermined the government's arguments as to the defendant's knowledge and intent to commit the alleged bank fraud and money laundering.  *United States v. Nejad*, 487 F. Supp. 3d 206, 212-13 (S.D.N.Y. 2020) (concluding that "the Government's failure to further pursue the question of whether the [] 302s were required to be disclosed under *Brady* is shocking.").  Similarly, in *United States v. Stevens*, the government failed to disclose "significant exculpatory evidence" principally contained in FBI 302s and other interview materials, "which would have independently corroborated Senator Stevens's defense [to the false statement charges] and his testimony, and seriously damaged the testimony and credibility of the government's key witness."  *See* Report to Hon. Emmet G. Sullivan of Investigation Conducted Pursuant to the Court's Order, dated April 7, 2009 at 1, 6-9, 20-21, *In re Special Proceedings*, Misc. No. 09-0198 (D.D.C. Mar. 15, 2012), Doc. 84; Mot. to Set Aside Verdict & Dismiss Indictment with Prejudice at 1-2, *United States v. Stevens*, No. 08-cr-231 (D.D.C. Apr. 1, 2009), Doc. 324 ("Mot. to Set Aside Verdict & Dismiss").

The Third Circuit also has made clear that the government's *Brady* obligations extend to exculpatory interview materials.  In *Pelullo*, the court granted a new trial based on the government's failure to disclose *Brady* materials, which included exculpatory phrases in rough interview notes with the defendant and a government witness, which phrases did not appear in the final interview reports upon which agents' testimony relied.  *See Pelullo,* 105 F.3d at 120, 124.  The agents' testimony was the "linchpin" of the government's case, making the "credibility of the government witnesses [] so central to the government's case" that the withheld impeachment evidence in the interview materials constituted a material *Brady* violation warranting a new trial.  *Id.* at 122-24 (citing *United States v. Bagley*, 473 U.S. 667, 676 (1985) ("Impeachment evidence . . . as well as exculpatory evidence, falls within the *Brady* rule.")).

In rejecting government arguments similar to those offered here, the court in *Rigas* granted the defendants' motion to compel the pretrial production of government interview notes under *Brady*—including for one individual who the government explicitly asserted would not be called as a witness at trial—based on the interviewees' "significant" roles in the defendants' company and transactions at issue in the charged conspiracy and tax evasion offenses.  *See Rigas*, 779 F. Supp. 2d at 412, 414-15.  In so doing, the *Rigas* court sought to prevent the government from "using the Jencks Act to escape its *Brady* obligation" and to avoid the devolution of the case "into one that sacrifices the Defendants' due process rights based on an overly restrictive interpretation of the Government's discovery obligations."  *Id.* at 413, 415 n.5.

The government's recent, very limited disclosure of heavily redacted reports of two witnesses is insufficient.  *Compare Pelullo*, 105 F.3d at 120 (*Brady* violation arose from exculpatory evidence contained in the undisclosed notes of agency interviews that was excluded from the produced final interview reports) *and Stevens*, No. 08-cr-231, Mot. to Set Aside Verdict & Dismiss at 1-2 (*Brady* violation arose when exculpatory evidence from multiple 302s was not disclosed in the government's *Brady* letter or in the 302s that eventually were produced), *with*

- 24 -

Exhibit D at 1 ("I believe I wouldn't need to produce the reports themselves – which, again, are just statements of the law enforcement officers – as long as I disclose or have disclosed the exculpatory information.") *and* Exhibit K (producing heavily redacted excerpts of four interview reports that narrowly "refer to the specific representations" about *Brady* evidence in Dr. Porat's June 22 letter).  To ensure compliance with the government's *Brady* obligations and to protect Dr. Porat's due process rights, the Court should require the government to disclose all materials in its possession (*i.e.*, formal reports and memoranda and informal notes and summaries) that contain information favorable to his defense.

## CONCLUSION

For these reasons, Dr. Porat seeks an order compelling the government to produce the government's reports, memoranda, notes, and/or summaries of interviews or proffers for Marjorie O'Neill, Rajan Chandran, Isaac Gottlieb, Diana Breslin-Knudsen, and any other witness/potential witness that contain exculpatory or favorable information to his defense.

Dated: July 6, 2021                                   Respectfully submitted,

/s/ Jay P. Lefkowitz                                  /s/ Michael A. Schwartz
Jay P. Lefkowitz, P.C.                                Michael A. Schwartz (PA 60234)
Robert W. Allen, P.C.                                 Richard J. Zack (PA 77142)
(admitted *pro hac vice*)                             Tiffany N. Bracewell (admitted *pro hac vice*)
KIRKLAND & ELLIS LLP                                  TROUTMAN PEPPER HAMILTON
601 Lexington Avenue,                                 SANDERS LLP
New York, NY 10022                                    3000 Two Logan Square
(212) 446-4800                                        Eighteenth & Arch Streets
lefkowitz@kirkland.com                                Philadelphia, PA 19103-2799
                                                      (215) 981-4494
                                                      Michael.Schwartz@Troutman.com

*Attorneys for Defendant Dr. Moshe Porat*

**CERTIFICATE OF SERVICE**

I, Michael A. Schwartz, hereby certify that on July 6, 2021, I caused a true and correct copy of the foregoing Defendant Moshe Porat's Motion to Compel Discovery Pursuant to *Brady v. Maryland* and Memorandum of Law in Support to be served via ECF and email upon the following:

Mark Dubnoff, Esq.
M.T. Soltis, Esq.
Assistant U.S. Attorney
615 Chestnut Street, Suite 1250
Philadelphia, PA 19106
mark.dubnoff@usdoj.gov
Mary.Soltis@usdoj.gov


/s/ Michael A. Schwartz