**IN THE UNITED STATES DISTRICT COURT**

**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

UNITED STATES OF AMERICA :

     v.                     :   **CRIMINAL NO. 21-170**

MOSHE PORAT            :

**GOVERNMENT'S OPPOSITION TO THE**
**DEFENDANTS' MOTION TO DISMISS THE INDICTMENT**

     The United States of America, through its attorneys, Jennifer Arbittier Williams, Acting United States Attorney, and Mark B. Dubnoff and MaryTeresa Soltis, Assistant United States Attorneys, hereby opposes defendant Moshe Porat's Motion to Dismiss the Indictment for Failure to State an Offense Pursuant to Fed. R. Crim. P. 12(b)(3).

     As detailed below, Porat's motion distorts the indictment in an attempt to analogize his prosecution to *Kelly v. United States*, 140 S. Ct. 1565 (2020), the so-called "Bridgegate" case, in which the Supreme Court vacated the fraud convictions of two public officials who used deception to alter traffic flow over the George Washington Bridge in order to punish the mayor of Fort Lee, New Jersey. The two cases, however, are nothing alike.

     In *Kelly*, the Court stressed that the defendants acted corruptly "for a political reason." 140 S. Ct. at 1568. In this case, the indictment charges Porat and his co-conspirators with acting deceptively for a monetary reason: to entice people to pay tuition and make donations to Temple University's Richard J. Fox School of Business and Managements ("Fox"). Such allegations, if proven, would clearly constitute federal crimes. *See id.* (defendants could violate the federal fraud statutes only if an object of their dishonesty was to obtain money or property).

The fact that the indictment accuses Porat and his co-conspirators of carrying out their fraud scheme by making false representations about Fox to U.S. News & World Report ("U.S. News") and other publications that rank business schools does not mean either that those "Rankings Publications" were the conspirators' only victims or that the purpose of the scheme was simply to inflate Fox's rankings. Count One alleges that the fraudulently inflated rankings were just a means to the conspirators' end: "to obtain money and property from Fox applicants, students, and donors." Indictment at 9, ¶ 43. Count Two similarly accuses Porat of devising "a scheme to defraud Fox applicants, students, and donors out of money and property." *Id.* at 26, ¶ 2. Indeed, the alleged wire fraud predicate was an email that Porat caused to be sent directly to Fox donors and potential donors, not to U.S. News. *Id.* ¶ 4.

Porat himself has admitted that the "real victims" of Fox's misrepresentations to U.S. News were Fox students, not U.S. News. Those students paid expensive tuition to obtain what they expected would be highly marketable MBAs from a top-ranked business school, only to get degrees from a tainted program mired in scandal. In an email to "Temple University Leaders, colleagues and friends," dated May 1, 2019, Porat wrote:

> It is those students – *my Fox students* – particularly our M.B.A. students at the Fox School, who deserved better. They made decisions to attend our University, based in part on rankings data they thought to be accurate. Data that should have been accurate. Not a day goes by that I don't think about the impact these failings have had on our students. I can only imagine how my students have felt knowing they made critical life decisions based, in part, on erroneous data … .  Temple's students deserve better than this. … Our students are the real victims here.[1]

---

[1] The quoted language is from a 1,400-word statement that Porat said he was submitting for publication in the Philadelphia Inquirer to coincide with his filing of a $25 million defamation lawsuit against Temple. The Inquirer declined to publish Porat's "column." Instead, it reported on the lawsuit and, in an online edition, provided a link to Porat's statement on the website of his retained law firm. Porat's lawyers have since taken down his statement.

The indictment reflects the grand jury's agreement with Porat on this point. His motion to dismiss should be denied.

## I.       STATEMENT OF THE CASE

On April 15, 2021, a federal grand jury sitting in the Eastern District of Pennsylvania returned a sealed two-count indictment against Porat, which the government unsealed the next day. The indictment charged Porat, the former Dean of Fox, with one count of conspiracy to commit wire fraud, in violation of 18 U.S.C. § 371, and one count of wire fraud, in violation of 18 U.S.C. § 1343. The indictment also contained a notice of forfeiture.

Contemporaneously, the Acting United States Attorney for the Eastern District of Pennsylvania filed and unsealed an Information against Isaac Gottlieb, a former Fox professor, and Marjorie O'Neill, a former Fox employee, which charged both of them with one count of conspiracy to commit wire fraud. That case is docketed at Criminal No. 21-160.

Count One of the indictment alleged that from approximately July 2014 until approximately July 2018, Porat conspired with Gottlieb and O'Neill "and other persons known and unknown to the grand jury, to devise a scheme and artifice to defraud and to obtain money and property from Fox applicants, students, and donors, by means of materially false and fraudulent pretenses, representations, and promises, and for the purpose of executing such scheme and artifice, to transmit and cause to be transmitted," interstate wire communications. Indictment ¶ 43.

Count One further alleged that the conspirators agreed to deceive readers of U.S. News by providing false and misleading information to U.S. News about Fox's online MBA ("OMBA") and part-time ("PMBA") programs "in order to fraudulently inflate Fox's ranking in the U.S. News surveys of top OMBA and PMBA programs." *Id.* ¶ 44. The indictment alleged

that the goals of the conspiracy "included attracting more students to apply to Fox, matriculate at Fox, and enticing Fox alumni and other benefactors to donate money to Fox." *Id.* ¶ 45.

In the "Manner and Means" section of Count One, the indictment alleged that Porat and his co-conspirators agreed to make a series of misrepresentations to U.S. News about Fox's OMBA and PMBA programs. *See generally id.* ¶¶ 46-96. With regard to the OMBA program, Porat and his co-conspirators allegedly agreed to report to U.S. News that all of Fox's OMBA students had taken the Graduate Management Admission Test ("GMAT"), even though they knew that only a small percentage of Fox's OMBA students had actually taken the GMAT. *Id.* ¶¶ 48-58. The co-conspirators allegedly knew that if they had reported accurate information, Fox would not receive full credit for its average GMAT scores, which would lower its ranking. *See generally id.* O'Neill allegedly told Porat in July 2014 that if Fox falsely reported that all of its OMBA students had taken the GMAT, "[Fox] would climb in the U.S. News rankings," *id.* ¶ 50, and Porat allegedly "told O'Neill to 'report it that way,' or words to that effect." *Id.* ¶ 51.

The conspirators allegedly caused Fox to submit the false information to U.S. News, and in January 2015, U.S. News ranked Fox's OMBA program in a three-way tie for No. 1 in the nation. *Id.* ¶¶ 55-56. Porat then allegedly "directed other Fox and Temple employees to tout the No. 1 ranking in marketing materials directed toward people whom [Porat] hoped would pay money to Fox in the form of tuition or donations: namely, potential applicants, students, alumni, and other benefactors." *Id.* ¶ 57. According to the indictment, Fox continued to report false information about the OMBA program for the next three years, and each time U.S. News ranked Fox's OMBA program No. 1. *Id.* ¶¶ 58-59. Porat then allegedly directed other Fox and Temple employees to market the No. 1 ranking to people he hoped would pay money to Fox. *Id.* ¶ 60.

On January 22, 2018, Porat allegedly directed other Fox and Temple employees to transmit a marketing email to the "Porat 100," which included donors and potential donors to Fox. *Id.* ¶ 75. This email touted Fox's OMBA program's fourth straight No. 1 ranking by U.S. News. *Id.* According to the indictment, Porat knew when he authorized the transmission of this marketing email to donors and potential donors that: (a) the U.S. News rankings had been based on false information, and (b) according to Gottlieb, Fox would have been ranked No. 6 if the correct information had been submitted to U.S. News. *Id.*

With regard to the PMBA program, Count One alleged that Porat and his co-conspirators agreed to make false representations to U.S. News about the average work experience of incoming PMBA students and the percentage of Fox's PMBA students who were "part-time." *See generally id.* ¶¶ 77-98. The co-conspirators allegedly believed that if they reported higher numbers in both categories, U.S. News would rank Fox's PMBA program higher. *Id.* ¶ 78. The co-conspirators allegedly agreed to combine Fox's PMBA students with the students in Fox's OMBA program and executive MBA ("EMBA") program when providing information to U.S. News based on a rationalization that all of those students could be classified as "part-time." *Id.* ¶ 79. Since the OMBA and EMBA students typically had more work experience than PMBA students, combining all three cohorts when calculating average months of work experience would produce a larger number than the average months of work experience of PMBA students alone. *Id.*

The indictment alleged that the co-conspirators ignored instructions on the U.S. News survey questionnaires and intentionally provided false and misleading information to U.S. News about the average work experience of Fox's PMBA students and the number of Fox students who were "part-time" in 2014. *Id.* ¶¶ 83-86. In March 2015, U.S. News published new

PMBA rankings, and Fox had climbed from No. 53 to No. 20. *Id.* ¶ 87. The indictment alleged

that the co-conspirators agreed to continue providing false information to U.S. News about Fox's

PMBA program for the next few years. *Id.* ¶¶ 88-95. U.S. News allegedly relied on the false

information and moved Fox's PMBA program up to No. 16 in 2016 and No. 7 in 2017. *Id.* ¶¶ 94,

96.

Count One further alleged that after other people learned that Fox had provided

false information to U.S. News about its OMBA program, Porat and his co-conspirators tried to

cover up those misrepresentations. *Id.* ¶¶ 64-74, 110-118. Among other things, Porat allegedly

resisted other Fox administrators' demands to report the inaccuracies to U.S. News; made false

and misleading statements to Temple's president and provost about the scope and significance of

Fox's false data submissions to U.S. News; urged Temple's president and provost not to hire an

outside law firm to investigate what had transpired; and lied to those outside investigators. *See*

*generally id.* ¶¶ 110-118. Porat also allegedly urged his personal assistant to download

WhatsApp so they could communicate with one another without anybody being able to trace

their communications. *Id.* ¶ 115.

Count Two alleged that from "at least July 2010" – four years before the start of

his alleged conspiracy with Gottlieb and O'Neill – until at least July 2018, Porat "devised and

intended to devise a scheme to defraud Fox applicants, students, and donors out of money and

property." *Id.* at p.26, ¶ 2. Count Two further alleged that on January 22, 2018, for the purpose of

executing the scheme, Porat caused an interstate wire transmission of an email to Fox donors and

potential donors that stated: "It may be a new year, but at the Fox School of Business, some

things haven't changed. For the fourth straight year, the Fox Online MBA **ranks #1 in the**

**nation** according to U.S. News & World Report, 2018. In the same report, the Fox Online

Bachelor of Business **ranks #2 in the nation** for the second year in a row." *Id.* ¶ 4.

On April 23, 2021, Porat was arraigned and pleaded not guilty to both charges.

His case is scheduled to go to trial on November 8, 2021. Meanwhile, Gottlieb and O'Neill have

both pleaded guilty to the charge in the Information that they conspired with Porat and others to

defraud Fox applicants, students, and donors out of money. *See* Criminal No. 21-160, ECF Nos.

8, 19.

On May 28, 2021, Porat filed three pretrial motions: a Motion to Dismiss the

Indictment for Failure to State an Offense Pursuant to Fed. R. Crim. P. 12(b)(3), ECF No. 24; a

Motion for Disclosure of Prosecutors' Grand Jury Instructions Pursuant to Fed. R. Crim. P. 6(e),

ECF No. 25; and a Motion to Strike Surplusage from the Indictment Pursuant to Fed. R. Crim. P.

7(d). ECF No. 26. A hearing on all three motions is scheduled for July 20, 2021.

## II.    ARGUMENT

### A.    <u>The Legal Framework for Analyzing a Motion to Dismiss</u>

The federal pleading rules require an indictment to be a "plain, concise, and

definite written statement of the essential facts constituting the offense charged." Fed. R. Crim.

P. 7(c)(1). The Third Circuit has held that an indictment is facially sufficient if it "(1) contains

the elements of the offense intended to be charged, (2) sufficiently apprises the defendant of

what he must be prepared to meet, and (3) allows the defendant to show with accuracy to what

extent he may plead a former acquittal or conviction in the event of a subsequent prosecution."

*United States v. Bergrin*, 650 F.3d 257, 264 (3d Cir. 2011) (quoting *United States v. Vitillo*, 490

F.3d 314, 321 (3d Cir. 2007)). "Moreover, no greater specificity than the statutory language is

required so long as there is sufficient factual orientation to permit the defendant to prepare his

defense and to invoke double jeopardy in the event of a subsequent prosecution." *Id.* (internal quotation marks and citation omitted).

"To determine whether an indictment contains the elements of the offense intended to be charged, a district court may look for more than a mere recitation in general terms of the essential elements of the offense." *Id.* (citing *United States v. Panarella*, 277 F.3d 678, 685 (3d Cir. 2002) (internal quotation marks omitted)). An indictment may be insufficient when it "fails to state an offense if the specific facts alleged in the charging document fall beyond the scope of the relevant criminal statute, as a matter of statutory interpretation." *Panarella*, 277 F.3d at 685.

"In evaluating a Rule 12 motion to dismiss, a district court must accept as true the factual allegations set forth in the indictment." *United States v. Huet*, 665 F.3d 588, 595 (3d Cir. 2012). This is because factual questions are left to the jury, and therefore "a pretrial motion to dismiss an indictment is not a permissible vehicle for addressing the sufficiency of the government's evidence." *United States v. DeLaurentis*, 230 F.3d 659, 660 (3d Cir. 2000). Ultimately, "[a]n indictment returned by a legally constituted and unbiased grand jury…if valid on its face, is enough to call for trial of the charge on the merits." *Costello v. United States*, 350 U.S. 359, 363 (1956).

 **B.** <u>**Discussion**</u>

  **1.** <u>**The Elements of Conspiracy and Wire Fraud**</u>

In this case, Count One of the indictment alleges that Porat violated 18 U.S.C. § 371, which states in relevant part that: "[i]f two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the

conspiracy, each shall be fined under this title or imprisoned not more than five years, or both."

18 U.S.C. § 371.

　　　　　To convict Porat of conspiracy to commit wire fraud, the government would have

to prove four elements beyond a reasonable doubt:

| First: | That two or more persons agreed to commit an offense against the United States, which in this case would be wire fraud; |
| Second: | That Porat was a party to or member of that agreement; |
| Third: | That Porat joined the agreement or conspiracy knowing of its objective to commit an offense against the United States and intending to join together with at least one other alleged conspirator to achieve that objective; that is, that Porat and at least one other alleged conspirator shared a unity of purpose and the intent to achieve a common goal or objective, to commit wire fraud; and |
| Fourth: | That at some time during the existence of the agreement or conspiracy, at least one of its members performed an overt act in order to further the objectives of the agreement. |

3rd Circuit Model Criminal Jury Instructions, No. 6.18.371A.

　　　　　Count Two charges Porat with violating the federal wire fraud statute, which

provides in relevant part that: "[w]hoever, having devised or intending to devise any scheme or

artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses,

representations, or promises, transmits or causes to be transmitted by means of wire, radio, or

television communication in interstate or foreign commerce, any writings, signs, signals,

pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined under this

title or imprisoned not more than 20 years, or both." 18 U.S.C. § 1343.

　　　　　To convict Porat of wire fraud, the government would have to prove three

elements beyond a reasonable doubt:

| First: | That Porat knowingly devised a scheme to defraud or to obtain money or property by materially false or fraudulent pretenses, representations or |

|          | promises or willfully participated in such a scheme with knowledge of its fraudulent nature; |
|----------|---|
| Second:  | That Porat acted with intent to defraud; and |
| Third:   | That in advancing, furthering, or carrying out the scheme, Porat transmitted any writing, signal, or sound by means of a wire, radio, or television communication in interstate commerce or caused the transmission of any writing, signal, or sound of some kind by means of a wire, radio, or television communication in interstate commerce. |

3rd Circuit Model Criminal Jury Instructions, No. 6.18.1343. *See also United States v. Hedaithy*, 392 F.3d 580, 590 (3d Cir. 2004) ("To prove mail or wire fraud, the evidence must establish beyond a reasonable doubt (1) the defendant's knowing and willful participation in a scheme or artifice to defraud, (2) with the specific intent to defraud, and (3) the use of the mails or interstate wire communications in furtherance of the scheme.") (citations omitted). "A sufficient charging document must therefore allege the foregoing three elements." *Id.* "Additionally, the object of the alleged scheme or artifice to defraud must be a traditionally recognized property right." *Id.* (citing *United States v. Henry*, 29 F.3d 112, 115 (3d Cir. 1994)).

### 2. The Indictment Alleges All Elements of Conspiracy and Wire Fraud

In this case, the indictment alleges all the elements of both a conspiracy charge and a wire fraud charge.

In Count One, Paragraph 43 alone alleges the first two elements of a conspiracy charge: namely, the existence of an agreement by two or more persons to commit wire fraud, and that Porat was a party to or member of the agreement. Paragraphs 43 through 45 all contain allegations to satisfy the third element: that Porat joined the conspiracy knowing of its objective to commit wire fraud and intending to join with at least one other alleged conspirator to commit wire fraud.

- 10 -

Count One also contains numerous allegations that Porat did not just join an alleged conspiracy to defraud Fox applicants, students, and donors out of money and property; he led the conspiracy. Count One also alleges that the co-conspirators committed at least nine different overt acts to further the conspiracy and accomplish its objects, which is sufficient to allege the fourth element of the conspiracy charge.

In Count Two, Paragraph 2 alleges facts to support the first two elements of a wire fraud charge: namely, that Porat devised a scheme to defraud Fox applicants, students, and donors out of money and property; and that Porat intended to devise such a scheme. Paragraph 3, by incorporating Paragraphs 44 through 117 of Count One, elaborates upon the false and fraudulent pretenses that Porat allegedly used to effectuate his fraud scheme. Paragraph 4 identifies a specific interstate wire transmission that Porat caused to be transmitted for the purpose of executing the wire fraud scheme.

### 3.        Porat's Challenges to the Indictment are Baseless

In his motion to dismiss, Porat's principal argument is that the indictment fails to allege a federal crime. Mot. at 8-14. According to Porat, the indictment alleges only a scheme to achieve higher rankings for Fox's OMBA and PMBA programs by submitting inaccurate data to U.S. News, which does not implicate any property rights protected by the wire fraud statute. *Id.* at 8-10. Porat argues that to the extent the indictment alleges an intent by Porat and his co-conspirators to deprive Fox applicants, students, and donors of money, such a goal is only an "incidental by-product of the scheme" to defraud U.S. News and insufficient to support federal criminal charges against them. *Id.* at 10-14.

Porat next argues that although the indictment might allege a scheme to deceive, it does not allege a scheme "to defraud." *Id.* at 14-18. According to Porat, the indictment fails to

allege that he sought to harm any of the students or donors who paid money to Fox, based on the fraudulently inflated U.S. News rankings of Fox's OMBA and PMBA programs. *Id.* Porat also argues that the indictment fails to allege that he acted with specific intent to defraud anyone. *Id.* at 18-20. Lastly, Porat asks this Court to adopt what he calls a "convergence" requirement, which he says means a requirement that the initial recipient of false and deceptive information be the same party deprived of money or property as a result of the fraud scheme. *Id.* at 21-23. Porat argues that if the Court adopts this requirement – which the Third Circuit has not yet addressed - the indictment must be dismissed because it alleges that the initial recipient of the conspirators' misrepresentations was U.S. News, whereas the intended victims of the fraud were Fox applicants, students, and donors. *Id.*

      All of Porat's arguments are based on mischaracterizations of the indictment.

### a)     <u>The Indictment Alleges Property Crimes</u>

#### (1)     <u>The Indictment Alleges a Scheme to Obtain Money</u>

      Porat's principal argument is based on straw man logic. He states: "[d]istilled, the indictment alleges a scheme to achieve higher rankings for the Fox School's OMBA and PMBA programs by submitting inaccurate data to U.S. News," Mot. at 8, and then claims that "[a] higher U.S. News ranking, however, is not the 'traditional' type of excludable and transferrable property that the wire fraud statute protects.'" Mot. at 8. Porat then expands on his arguments that U.S. News rankings are not property. *Id.* at 9-10 (citing *Henry*, *United States v. Sadler*, 750 F.3d 585, 591-92 (6th Cir. 2014); *United States v. Ernst*, 502 F. Supp. 3d 637 (D. Mass. 2020)).

      Porat, however, is choosing to "distill" the indictment in a way that ignores most of what the indictment actually says. The indictment states that the primary object of Porat and his co-conspirators' scheme was to defraud Fox applicants, students, and donors out of money.

The government has alleged and will prove that the defendants did not endeavor to goose the rankings simply to make themselves feel better about their institution and their positions; instead, they did it for purposes of financial gain from the readers of U.S. News. Indeed, the indictment's entire description of the conspirators' misrepresentations to U.S. News appears in the "Manner and Means" and "Overt Acts" sections of Count One. That is because, according to the indictment, lying to U.S. News about Fox's OMBA and PMBA programs was just a means to the end of obtaining money from applicants, students, and donors. Put another way, the indictment alleges that U.S. News was just a conduit between the conspirators and their fraud targets. For purposes of evaluating Porat's motion to dismiss, those allegations must be accepted as true. *Huet*, 665 F.3d at 595.

This case is no different from any matter in which a fraudster uses a third party to convey false statements to his targets. Say, for instance, the operator of a Ponzi scheme arranges the printing of flyers setting forth fanciful promises of return on investment; or the promoter of the sale of worthless land commissions the erection of a billboard making false declarations of the land's great value and soliciting prospective buyers. Plainly, the only target of such false communications is not the printer of the flyers or the billboard company. This situation perhaps most commonly arises in the realm of securities fraud, where a company presents false information in required filings, in a manner that encourages stockholders to purchase stock or refrain from selling stock. No court has ever held that the only targets of such false statements are the financial printers who create the documents or the government agencies that receive them. Rather, where the purpose of the communication is to defraud stockholders to whom the documents are made available, a claim of fraud may be presented. This case is no different. The U.S. News rankings, for the defendants, were a form of advertising to victims; the defendants

arranged false rankings, by giving false information, in order to obtain money from students and donors of money.

Moreover, Count One is filled with allegations that Porat made and caused other people to make false and misleading statements directly to Fox applicants, students, and donors: i.e., statements touting Fox's rankings in U.S. News, which Porat allegedly knew had been based on fraudulent representations that he authorized. For example, Paragraph 57 alleges that after U.S. News ranked Fox's OMBA program No. 1 in 2015, Porat "directed other Fox and Temple employees to tout the No. 1 ranking in marketing materials directed toward people whom defendant Porat hoped would pay money to Fox in the form of tuition or donations: namely, potential applicants, students, alumni, and other benefactors." Indictment at 12.

Paragraph 60 alleges that after Fox's OMBA program was ranked No. 1 by U.S. News in each of the next three years, Porat again "directed other Fox and Temple employees to tout the No. 1 ranking in marketing materials directed toward people whom defendant Porat hoped would pay money to Fox in the form of tuition or donations: namely, potential applicants, students, alumni, and other benefactors." *Id.*

Paragraph 64 alleges that on January 9, 2018, even after Porat was told at a dean's meeting that the latest No. 1 ranking was based on false information Fox had submitted to U.S. News about the number of OMBA students who had taken the GMAT, Porat disregarded the advice of other top administrators, went to a welcome reception for new OMBA students, "made a champagne toast to those students, and announced that Fox had been ranked No. 1 again." *Id.* at 13.

Paragraph 65 alleges that later on the same day, Porat "approved a marketing email for Temple to send to 'recruiters,' which boasted that Fox's OMBA program had been ranked No. 1 in the U.S. News survey for the fourth straight year." *Id.*

Paragraph 75 alleges that on January 22, 2018, Porat "directed other Fox and Temple employees to transmit a marketing email to an email mailing list called the 'Porat 100,' which included people who were known by defendant PORAT to be donors and potential donors to Fox." *Id.* at 15. The indictment alleges that the subject line of the email read: "#1 ONLINE MBA," and that the email stated: "It may be a new year, but at the Fox School of Business, some things haven't changed. For the fourth straight year, the Fox Online MBA **ranks #1 in the nation** according to U.S. News & World Report, 2018. In the same report, the Fox Online Bachelor of Business **ranks #2 in the nation** for the second year in a row." *Id.*

The indictment also contains numerous allegations that Porat and his co-conspirators lied and deceived parties other than U.S. News in order to further their scheme to defraud potential Fox applicants, students, and donors out of money. Count One accuses Porat of personally lying and trying to deceive Temple's president, provost, and outside investigators. *See, e.g. id.* at 15, ¶ 72; 21, ¶ 110; 22-23, ¶¶ 113-114. None of these alleged lies were intended to boost Fox's rankings; they were intended to continue the deception and fraud scheme and enable Porat to keep his $600,000-a-year job.

In short, the text of the indictment belies Porat's distorted "distillation" of the charges against him. Porat's citations to *Kelly*, *Henry*, *Sadler*, and *Ernst* are all misplaced. This is not a case where the indictment has alleged a scheme to deprive a victim of some ambiguous asset that may or may not constitute a property right. *See, e.g., Kelly*, 140 S. Ct. at 1572 (a government's right to allocate traffic lanes is not a property right); *Henry*, 29 F. 3d at 112 (a

bank's interest in having a fair opportunity to bid for a public contract is not a property right); *Ernst*, 502 F. Supp. 3d at 647 (university admission slots are not money or property under the federal fraud statutes); *United States v. Sidoo*, 468 F. Supp. 3d 428, 441 (D. Mass. 2020) (university admission slots are property interests cognizable under the mail and wire fraud statutes).[2]

In this case, the indictment alleges a scheme to deprive victims of one of the most "traditional" property interests: money. *See United States v. Hird*, 913 F.3d 332, 340 (3d Cir. 2019) (quoting *Reiter v. Sonotone Corp.*, 442 U.S. 330, 338 (1979) ("Money, of course, is a form of property."). *See also United States v. Granberry,* 908 F.2d 278, 280 (8th Cir. 1990) ("Money is money, and "*money*" is specifically mentioned in the statutory words" of the federal mail fraud statute). *See also Kelly*, 140 S. Ct. at 1565 (the New Jersey officials who conspired to close the traffic lanes from Fort Lee, New Jersey, to Manhattan over the George Washington Bridge could have been convicted of federal wire fraud and federal program fraud "if an object of their dishonesty was to obtain the [New York] Port Authority's money or property.").

### (2)    Obtaining Money was the Primary Object, not an "Incidental Consequence" of the Charged Scheme

Moreover, contrary to what Porat argues, this is not a case where the alleged deprivation of money or property played only "some bit part" in the scheme, *see* Mot. at 10 (citing *Kelly*, 140 S. Ct. at 1573), or was "merely [an] incidental consequence[] of the scheme." Mot. at 11 (citing *Kelly*, 140 S. Ct. at 1573-74). In other words, this is not a case like *Kelly*, in which the defendants used deception for the purpose of punishing a political opponent and only

---

[2] Porat's reliance on *Sadler* is misplaced for the additional reason that *Sadler* involved a post-verdict challenge to the sufficiency of evidence, not a pre-trial challenge to the sufficiency of an indictment. *See* 750 F.3d at 589-93.

happened to deprive the Port Authority of New York and New Jersey of some money to pay for additional bridge toll collectors and traffic engineers. *See* 140 S. Ct. at 1572-73.

This is precisely the sort of case that the Court in *Kelly* said would support a fraud prosecution, because in this case, the property interest – i.e., money – is an "object of the fraud." *Id.* at 1573. According to the indictment, Porat and his co-conspirators sought to entice prospective and actual business school students to pay tuition to Fox, and they wanted alumni and other benefactors to donate money to Fox. The indictment further alleges that the scheme was successful. *See* Indictment at 20-21, ¶¶ 97-107. The indictment is replete with allegations, which the government will prove, that the defendants were not interested in elevated U.S. News rankings for their own sake; those rankings were an obvious means to an end, to raise the image of the school in a manner that would cause more students and alumni to pay money to the school.

According to the indictment, in the 2014-15 academic year, the last year before U.S. News ranked Fox's OMBA program No. 1 based on the conspirators' alleged fraud, Fox had approximately 133 incoming OMBA students. *Id.* at 4, ¶ 12. In the 2015-16 academic year, after Fox had been ranked No. 1 as a result of Porat's alleged fraud, Fox had 198 incoming OMBA students, which is 65 more students than in 2014-15. *Id.* ¶ 13. In 2016-17, after Fox had been ranked No. 1 a second time, Fox's OMBA enrollment jumped to 253, or 120 more than the 2014-15 academic year. *Id.* ¶ 14. In 2017-18, after a third straight No. 1 ranking, Fox's OMBA enrollment skyrocketed to 336 students above the base year. *Id.* ¶ 15. *See also id.* ¶¶ 98-99.[3]

In total, therefore, Porat and his co-conspirators' alleged fraud on OMBA applicants and students led to an increase in enrollment of 388 students at Fox in just three years.

---

[3] Those numbers came crashing back down after the fraud was exposed. Fox had approximately 133 incoming OMBA students in 2018-19 and approximately 106 incoming students in 2019-20. *Id.* ¶¶ 16-17.

The tuition in each of these three academic years was approximately $59,760. *Id.* at 12, ¶ 18. That means that the total additional tuition revenue generated for Fox's OMBA program as a result of Porat's alleged fraud was approximately $23,186,880. In other words, the government will prove that this was not only a scheme to defraud, it was actually a successful scheme.

With regard to the PMBA program, the indictment alleges that Fox had 88 incoming PMBA students in 2014-15, the last academic year before the alleged fraud conspiracy. *Id.* at 21 ¶ 103. In the next three years, as Fox's PMBA program soared from No. 53 in the U.S. News Rankings to No. 20 to No. 16 to No. 7, enrollment in the program correspondingly climbed high above the base-level for the 2014-15 academic year. *Id.* There were approximately 182 incoming PMBA students in 2015-16, which was 94 more than in 2014-15; 166 incoming PMBA students in 2016-17, which was 78 more than in 2014-15; and 194 incoming PMBA students in 2017-18, which was 106 more students than in 2014-15. *Id.*

In total, therefore, the indictment alleges that Porat and his co-conspirators' alleged fraud on PMBA applicants and students led to an increase of 278 PMBA students at Fox in just three years. The PMBA tuition varied over time and was approximately $58,755 in the 2016-17 academic year. *Id.* at 5, ¶ 25. Even if one were to assume that the average over the three-year period was $58,000, the total additional tuition revenue generated for Fox's PMBA program as a result of Porat's alleged fraud was approximately $16,124,000.

Combining the OMBA and PMBA numbers, the indictment alleges that Porat and his co-conspirators succeeded in defrauding Fox applicants and students out of more than $39 million, a figure that does not include the amount of money obtained from Fox donors. The indictment states that under Temple's university-wide revenue-sharing policy, known as "Responsibility Centered Management," Fox would have kept approximately 87 percent of the

revenue generated as a result of the alleged fraud scheme, and 87 percent of $39 million is

slightly more than $34 million. The indictment further alleges that during the fraud scheme,

Porat personally received more than $2,270,920 in compensation from Temple. *Id.* at 21, ¶ 107.

These staggering figures belie Porat's suggestion that the money played "some bit part" in the

alleged fraud scheme.

      Porat's contentions that *United States v. Palma*, 2020 WL 6743144 (E.D. Mich.

Nov. 17, 2020), and *United States v. Berroa*, 856 F.3d 141 (1st Cir. 2017), counsel dismissal of

his indictment, *see* Mot. at 11-12, are similarly flawed. In *Palma*, an automobile engineer moved

to dismiss charges alleging that he had participated in a conspiracy to mislead federal regulators

and the public about emissions control systems in certain diesel vehicles in order to accomplish

three goals: (a) obtain regulatory approval for the vehicles, (b) make and cause others to make

false representations to the public to increase sales of the vehicles, and (c) to enrich himself and

co-conspirators through the continued receipt of compensation and other benefits. *Palma*, 2020

WL 6743144, at *2. The defendant asserted that the indictment did not allege that he had any

control over how the vehicles were marketed and did not indicate how he sought to obtain

customers' money. *Id.* at *3. Additionally, none of the charged wires in the indictment were

communications with customers. *Id.*

      The government responded that regulatory approval of the vehicles was a means

to a financial end, and that the alleged wire fraud scheme included an object of obtaining money

from potential purchasers of the vehicles, but the court found that the connection between the

defendant's alleged deceit and the customers' loss of money was "tenuous at best." *Id.* at 4

(citing *Kelly*, 140 S. Ct. at 1571, 1573, and *Berroa*, 856 F.3d at 149-152). The court then

dismissed the wire fraud charges and a conspiracy charge to the extent it charged conspiracy to

commit wire fraud. *Id.* at *10. The government has both appealed this ruling to the Sixth Circuit Court of Appeals and obtained a superseding indictment, which contains a new wire fraud charge that is the subject of a new motion to dismiss. *See* Case No. 19-20626-NGE-DRG (Docket Entry Nos. 61, 64, 74, 77-79).

But regardless, the allegations in Porat's indictment are quite different than the allegations in Palma's original indictment. In this case, the grand jury has alleged that: (a) Porat did have direct control over the marketing of Fox's OMBA and PMBA programs; (b) Porat frequently exercised that control; and (c) the charged wire is a direct communication to potential fraud victims. The connection between Porat's alleged deceit and his victims' alleged loss is not "tenuous."[4]

The *Berroa* decision, meanwhile, concerned a post-conviction challenge to the sufficiency of the evidence, not a pretrial challenge to the sufficiency of allegations in an indictment. In that case, the government presented evidence that five defendants who wanted to obtain medical licenses in Puerto Rico, but failed the initial entrance exams, obtained falsified scores on those exams, which enabled each of them to become licensed medical doctors. 856 F.

---

[4] Porat claims that the "indictment concedes that the connection between rankings and enrolment is tenuous at best." Mot. at 12-13 (citing the allegations in the indictment that higher rankings "can" lead to increased tuition revenues and noting that Fox decreased tuition for its OMBA program from $62,208 to $59,760 during the charged conspiracy). The indictment contains no such concession. To the contrary, as stated in the text, the indictment alleges that at Fox, higher rankings for the OMBA and PMBA programs led to dramatic increases in enrollment in both programs, which in turn led to more than approximately $39 million in increased tuition revenues.

In any event, this challenge would present an issue for the jury, not a basis for dismissal. The indictment plainly alleges that the defendants endeavored to fraudulently elevate the U.S. News rankings as a means to obtain more money from students and donors. A jury could find an absence of such intent, perhaps based on the defendant's arguments presented here. But that is a factual issue, not an appropriate subject of a motion to dismiss.

3d at 147. All five defendants were charged with conspiracy to commit honest-services mail fraud in obtaining their medical licenses; mail fraud by using the resulting licenses to practice medicine for financial gain; and aggravated identity theft by issuing prescriptions to patients. *Id.* Four were convicted of honest-services mail fraud conspiracy; three were convicted of mail fraud; and two were convicted of aggravated identity theft. *Id.* The First Circuit affirmed each conviction for honest-services mail fraud conspiracy but reversed the convictions on the other charges. *Id.*

With regard to the mail fraud charges, the First Circuit rejected the government's argument that by obtaining the fraudulent medical licenses, the defendants sought to deprive unsuspecting consumers of health care services, health care benefit programs, and health care providers of money and property. *Id.* at 149-50 (citations omitted) ("the defendants' alleged fraud in obtaining their medical licenses cannot be said to have 'naturally induced' health care consumers to part with their money years later."). In this case, by contrast, the alleged fraud scheme is alleged to have naturally induced Fox students and donors to part with money during the scheme itself. Porat's reliance on *Berroa* is misplaced.

In sum, contrary to what Porat argues, an "object of the fraud" charged in his indictment – indeed, the "object of the fraud" charged in the indictment – was the deprivation of money. Under *Kelly* and all of the other cases cited by Porat, the indictment has alleged facts that, if proven, would support convictions for conspiracy to commit wire fraud and wire fraud.

### b)      The Indictment Alleges a Scheme to Defraud

Porat's secondary argument for dismissing the indictment is based on a claim that it does not allege that Porat intended to defraud anyone. *See* Mot. at 14-18. Citing *United States v. Takhalov*, 827 F.3d 1307 (11th Cir. 2016), *Sadler*, and *United States v. Shellef*, 507 F.3d 82

(2d Cir. 2007), Porat contends that he cannot be convicted of defrauding Fox students or donors of anything if those students and donors got exactly what they paid for. *See generally id.* He then asserts that students who enrolled at Fox "received everything that was promised them, and donors' funds were directed precisely as represented." Mot. at 16.

There are numerous flaws with Porat's logic. Most fundamentally, the indictment contains allegations that the Fox students and donors did not get what they paid for: i.e., an opportunity to earn an MBA at one of the top-ranked business schools in the country. Instead, they got degrees from unranked programs. *See, e.g.,* Indictment at 4, ¶¶ 16-17, 23-24. In short, these allegations state a scheme to defraud. The government will prove at trial what the indictment alleges: the defendants believed that enrollment at or affiliation with a school with a higher U.S. News ranking is more desirable and valuable, such that they went to great lengths to artificially increase those rankings.

In terms of the charge, returning to our example of a fraudulent land sale, hypothesize the promoter who sells a piece of land at an inflated price by falsely stating that it has advantages that do not actually exist, say, particular zoning permits or development rights. It is not a defense in such a case to state that the victim was not defrauded because he in fact received the precise piece of land that he was offered. In this case, essentially, the government has charged that students and donors agreed to pay for association with an institution that artificially inflated its value and received less than what they were promised. That is textbook fraud.

In fact, the notion is not hypothetical; it was resolved by the Supreme Court more than a century ago, in a decision that decisively rejects the defendant's claim. In *United States v. New S. Farm & Home Co.*, 241 U.S. 64 (1916), promoters of land in Florida issued a bevy of

"oral statements, circulars, maps, advertisements, photographs, etc." to induce the purchase of 10-acre farms, that were replete with "false and fraudulent representations concerning the title, fertility, value, drainage, location, environs, and survey of the farms, and the improvements made or to be made thereon." *Id.* at 68. The trial court did what Porat asks here and sustained a demurrer to the indictment charging a violation of a predecessor version of the mail fraud statute. The court stated: "There is no denial of the facts of the ownership of the lands, although there is a denial that all the titles were perfect. Nor is there denial that the land was worth fully as much as was to be obtained therefor. For aught that appears in the indictment, the lands to be obtained were worth fully as much as was to be paid by the parties purchasing; that the parties engaged in the sale were legitimately engaged in the sale of the lands." *Id.* at 70.

The Supreme Court reversed, because there, as here, the defendants made false representations in an effort to persuade buyers that the property had greater value than it actually did. The Court explained that some measure of advertising puffery is allowed,

> but when a proposed seller goes beyond that, assigns to the article qualities which it does not possess, does not simply magnify in opinion the advantages which it has, but invents advantages and falsely asserts their existence, he transcends the limits of 'puffing' and engages in false representations and pretenses. An article alone is not necessarily the inducement and compensation for its purchase. It is in the use to which it may be put, the purpose it may serve; and there is deception and fraud when the article is not of the character or kind represented and hence does not serve the purpose. And when the pretenses or representations or promises which execute the deception and fraud are false, they become the scheme or artifice which the statute denounces.

*Id.* at 71. As another court summarized, citing many other examples, "promotion of an inherently useful item may also be fraud when the scheme of promotion is based on claims of additional benefits to accrue to the customer, if the benefits as represented are not realistically attainable by the customer." *United States v. Regent Off. Supply Co.*, 421 F.2d 1174, 1180 (2d Cir. 1970).

Here, the indictment alleges that Porat engaged in an extensive scheme to make specific misrepresentations that falsely depicted the Fox school as much more prestigious than it was, to persuade students to attend and donors to support it. This conduct, if found by the jury, falls squarely within the wire fraud statute.

Moreover, Porat's central premise – that lying to obtain money from someone cannot be wire fraud if the person gets what he or she paid for – is contradicted by the Third Circuit's Model Jury Instructions on mail and wire fraud. *See* 3rd Circuit Model Criminal Jury Instructions, No. 6.18.1341-1 (2021) ("it is not necessary that the government prove … that the intended victim actually suffered any loss."). Thus, even if *Takhalov*, *Sadler*, and *Shellef*, the cases from other circuits that Porat attempts to rely on, would support Porat's premise in the other circuits, which they do not, they would not apply in this circuit, or to the indictment here.

Porat, however, is misreading those opinions to the extent he thinks any of them stands for the proposition that a person who obtains money from another person or entity through material misrepresentations cannot be guilty of federal fraud if the other person or entity ultimately was made whole. Under that logic, a pyramid schemer who keeps defrauding new victims and using the proceeds to repay his earlier fraud victims would be immune from prosecution for his fraud against the earlier victims since they had been made whole.

Nor does it matter whether Porat or any other Fox administrator "believed a Fox School business education was subpar or less valuable than the asking price," Mot. at 16, or that "the rankings themselves were flawed and based on arbitrary criteria." Mot. at 16-17.[5] All that

---

[5] The indictment does not allege such facts, so Porat is presumably referencing evidence that he intends to present at trial. Such theoretical "evidence" cannot be considered at this stage of the proceedings.

matters is whether Porat and his co-conspirators thought high rankings would be material to business school applicants, students, and donors in deciding whether to send money to Fox. The indictment alleges that Porat thought the rankings were so material that he: (a) personally directed O'Neill to make false representations to U.S. News about Fox's OMBA and PMBA programs in order to inflate Fox's rankings; (b) personally directed other people to market the high rankings to potential applicants and students; (c) personally referenced the No. 1 ranking at a champagne toast to incoming OMBA students; (d) personally sent out marketing materials to Fox donors and potential donors boasting of the high rankings; (e) personally lied to Temple's president and provost about Fox's false submissions to U.S. News; and (f) personally lied to outside investigators about the false submissions.

In sum, Porat's entire argument that there is a distinction between a scheme to deceive and a scheme to defraud is irrelevant in the present context because the indictment alleges a scheme to defraud.[6]

### c)   The Indictment Alleges Porat Intended to Defraud

Porat's third argument for dismissal is based on a claim that the indictment does not allege that he acted with the specific intent to defraud anyone. Mot. at 18-20. To support this

---

[6] Neither *Takhalov*, nor *Sadler*, nor *Shellef* suggests anything to the contrary. All three opinions were actually decided in connection with post-conviction procedures, not pre-trial challenges to the sufficiency of an indictment. *See Takhalov*, 827 F.3d at 1310 (question presented is whether the district court abused its discretion when it refused to give a jury instruction requested by the defendant); *Sadler*, 750 F.3d at 590-92 (considering challenge to sufficiency of evidence supporting wire fraud conviction); *Shellef*, 507 F.3d at 110 (vacating convictions because some charges had been improperly joined with remainder of charges in indictment). In *Shellef*, the Second Circuit added dicta that with regard to a wire fraud charge in the indictment, one of the two prosecution theories was invalid and should not be presented to a jury upon retrial, *id.* at 109, but the Court issued that statement in the form of an advisory opinion stating in part that wire fraud does not apply "where the alleged victims received exactly what they bargained for," *id.* at 108 (internal citation and quotation omitted), and it has no bearing on the indictment in the present case.

contention, Porat states that the indictment uses the word "intent" only five times, three of which were in the context of allegations involving O'Neill and dedicates just two paragraphs to Porat's "knowledge" in 2014. *Id.* at 19. Porat also states that the indictment fails to allege that he knew the precise information that O'Neill submitted to U.S. News about Fox's OMBA and PMBA programs, or that "the No. 1 ranking actually conferred by U.S. News … was false." *Id.* at 19-20. Lastly, Porat contends that since U.S. News did not withdraw the No. 1 ranking for Fox's OMBA program until January 24, 2018, any statement Porat made about Fox being ranked No. 1 prior to that date was "literally true." *Id.* at 20.

Each of these arguments is specious. The indictment is filled with allegations that Porat acted with specific intent to defraud Fox applicants, students, and donors out of money, regardless of how many times the words "intent" or "knowledge" appear in the text. *See, e.g.,* Indictment ¶¶ 43-45 (Porat and others conspired and agreed to defraud and deceive others); ¶ 46 (Porat and others conspired to "fraudulently" represent to U.S. News that all OMBA students had taken the GMAT); ¶¶ 50-51 (O'Neill told Porat that only 8 of 70 OMBA entrants had taken the GMAT; that Fox would not get full credit if it reported the truth; that Fox would get full credit if it instead reported that all 70 OMBA students had taken the GMAT; and Porat told O'Neill to "report it that way" or words to that effect); ¶ 53 (Porat reviewed a draft submission containing the false and fraudulent representation that all OMBA students had reported GMAT scores); ¶ 64 (Porat announced that Fox had been ranked No. 1 to new OMBA students, even after he was told the ranking appeared to be based on false and inaccurate data); ¶ 65 (Porat approved a marketing email to recruiters which contained the same misleading misrepresentation); ¶ 72 (Porat lied to Temple's president and provost about Fox's false submission); ¶¶ 73-74 (Porat agreed with Gottlieb that they should not reach out to U.S. News); ¶ 75 (Porat directed others to send a

marketing email to Fox donors boasting about rankings, at a time that "he knew that: (a) the U.S. News rankings had been based, at least in part, on false information; and (b) according to Gottlieb, Fox would have been ranked No. 6 if the correct information had been submitted to U.S. News."); ¶ 77 (Porat conspired with others to make false representations to U.S. News about average work experience of incoming PMBA students and the percentage of Fox's MBA students who were part-time MBA students); ¶ 82 (Porat and others agreed to combine the OMBA, EMBA, and PMBA students in response to a survey about PMBA students); ¶¶ 89-92 (Porat and others agreed to provide false information about Fox's PMBA to U.S. News again in 2015, with Porat sending an email to O'Neill, stating: "Marjie, Use whatever comes out better, but we must be consistent); ¶¶ 109-114 (Porat personally made several false and misleading statements to Temple's president, provost, and an outside law firm, in an attempt to cover up and perpetuate the fraud).

Nor does it matter whether Porat knew the precise false information that O'Neill sent to U.S. News about Fox's OMBA and PMBA programs. The indictment alleges that Porat directed O'Neill to report that all OMBA students had taken the GMAT despite being told that only 8 out of 70 students had taken the GMAT, *Id.* ¶¶ 50-51, and to "use whatever comes out better" with regard to her submission of average work experience for PMBA students. *Id.* ¶ 91.

Lastly, it does not matter whether Porat's statements that U.S. News had ranked Fox's OMBA program No. 1 were still "literally true" until January 24, 2018. The indictment alleges that Porat knew that the No. 1 ranking had been based in part on false and inaccurate data submitted by Fox, when he boasted about the ranking at the champagne brunch on January 9, 2018; in the email he approved to be sent to recruiters on January 9, 2018; and in the email he approved for transmittal to donors and potential donors on January 22, 2018. Those are sufficient

allegations that Porat acted with specific intent to defraud. *See United States v. Bryant*, 655 F.3d 232, 249 (3d Cir. 2011) (citation omitted) (fraudulent representations, as the term is used in the federal fraud statutes, "may be effected by deceitful statements of half-truths or the concealment of material facts and the devising of a scheme for obtaining money or property by such statements or concealments.").

### d)    Porat's Convergence Argument is a Red Herring

Porat's final argument for dismissing the indictment is based on what he describes as "convergence," the notion that to prove wire fraud, the government must prove that "the party to whom the fraudulent pretenses were made" is "the same as the party from whom money or property would have been taken." Mot. at 21-22 (quoting *Bryant*, 655 F.3d at 249). Porat states that there is a circuit split between the Ninth Circuit, which requires convergence for a wire or mail fraud conviction, and the First Circuit, which does not. *Id.* at 21 (citing *United States v. Lew*, 875 F.2d 219, 221 (9th Cir. 1989), and *United States v. Christopher*, 142 F.3d 46, 54 (1st Cir. 1998)). Porat notes that the Third Circuit in *Bryant* declined to take a position on whether to require convergence, *id.*, but he urges this Court to do so and dismiss the indictment based on a theory that the false statements were allegedly made to U.S. News, and the parties allegedly deprived of money or property were Fox students and donors. *Id.* (citing *McNally v. United States*, 483 U.S. 350, 358 (1987)).

The case on which the defendant relies does not state as broad a proposition as he claims. In *United States v. Lew*, 875 F.2d 219 (9th Cir. 1989), the defendant, an attorney, made false statements on behalf of clients to the Department of Labor, to assist his clients in obtaining permanent resident status. The government charged that the attorney had engaged in a scheme to deprive the clients of attorney fees. The court reversed convictions for mail fraud, because the

only false representations were made to the government, and "there was nothing in the jury charge that required" a finding that misrepresentations were made to the clients. *Id.* at 222. It appears there was no evidence that the clients were deceived or targeted in any way.

In contrast, numerous courts have rejected a "convergence" requirement, cogently explaining that the broad fraud provisions readily apply where a defendant makes false representations in order to obtain money or property from a third party. *See United States v. Greenberg*, 835 F.3d 295, 306 (2d Cir. 2016) ("in this case we join at least four sister circuits and make clear that we reject the requirement of convergence urged by Greenberg: wire fraud does not require convergence between the parties intended to be deceived and those whose property is sought in a fraudulent scheme.") (citing cases from the First, Fifth, Seventh, and Eighth Circuits).

But in any event, this entire argument is a red herring in this case, one that is again based on Porat's mischaracterization of the indictment. As stated earlier, the indictment alleges that Porat and his co-conspirators sought to defraud Fox applicants, students, and donors, which are the same parties from whom the money was sought. Additionally, although the indictment contains allegations that the conspirators made false representations to U.S. News, it also contains allegations that Porat made additional false and misleading statements directly to Fox students and donors, such as in marketing materials, at the champagne brunch, and in the January 22, 2018 email from Fox to donors and potential donors. As such, this is a case like *Bryant* in which the Court does not have to decide whether to adopt a convergence requirement (though that requirement may readily be rejected based on the strong weight of authority).

## III.    CONCLUSION

For all the foregoing reasons, the government respectfully submits that the

defendant's motion to dismiss the indictment should be denied.


Respectfully yours,

JENNIFER ARBITTIER WILLIAMS
Acting United States Attorney


*/s/ Mark B. Dubnoff*
MARK B. DUBNOFF
MARYTERESA SOLTIS
Assistant United States Attorneys

## CERTIFICATE OF SERVICE

I hereby certify that this pleading has been served on the Filing User identified below

through the Electronic Case Filing (ECF) system:

Michael A. Schwartz, Esq.
Richard J. Zack, Esq.
Tiffany Nichols Bracewell, Esq.
Troutman Pepper Hamilton Sanders LLO
3000 Two Logan Square
18th And Arch Streets
Philadelphia, Pa 19103

Jay P. Lefkowitz, Esq.
Robert Allen, Esq.
Kirkland & Ellis
601 Lexington Ave
New York, Ny 10022

*/s/ Mark B. Dubnoff*
MARK B. DUBNOFF
MARYTERESA SOLTIS
Assistant United States Attorneys

Dated:  July 9, 2021.