**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| Plaintiff, | : | CRIMINAL ACTION |
| v. | : | NO. 2:21-CR-00170-GJP-1 |
| MOSHE PORAT, | : | |
| Defendant. | : | |

## <u>ORDER</u>

AND NOW, this _____ day of _____, 2021, upon consideration of Defendant Dr.

Moshe Porat's Motion for Judgment of Acquittal, it is ORDERED that the Motion is GRANTED

and a judgment of acquittal is entered on all counts.


BY THE COURT:


_____
HONORABLE GERALD J. PAPPERT
*Judge, United States District Court*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| UNITED STATES OF AMERICA, | : |
| Plaintiff, | : CRIMINAL ACTION |
| | : |
| v. | : NO. 2:21-CR-00170-GJP-1 |
| | : |
| MOSHE PORAT, | : |
| Defendant. | : |

## DEFENDANT DR. M. MOSHE PORAT'S
## MOTION FOR JUDGMENT OF ACQUITTAL

Defendant Dr. M. Moshe Porat, by and through his undersigned counsel, hereby moves

for judgment of acquittal on all counts pursuant to Fed. R. Crim. P. 29.  In support of this

motion, Dr. Porat relies on the memorandum of law incorporated herein.

WHEREFORE, Dr. Porat respectfully requests that this Court enter the attached Order

granting his motion for judgment of acquittal.

Dated: November 22, 2021                           Respectfully submitted,

/s/ Jay P. Lefkowitz                                        /s/ Brian M. Nichilo
Jay P. Lefkowitz, P.C.                                  Brian M. Nichilo (PA 313786)
Robert W. Allen, P.C.                                  Michael A. Schwartz (PA 60234)
(admitted *pro hac vice*)                            Richard J. Zack (PA 77142)
KIRKLAND & ELLIS LLP                           TROUTMAN PEPPER HAMILTON
601 Lexington Avenue,                               SANDERS LLP
New York, NY 10022                                 3000 Two Logan Square
(212) 446-4800                                           Eighteenth & Arch Streets
lefkowitz@kirkland.com                             Philadelphia, PA 19103-2799
                                                                (215) 981-4494
                                                                brian.nichilo@troutman.com

*Attorneys for Defendant Dr. M. Moshe Porat*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| | : | |
| Plaintiff, | : | CRIMINAL ACTION |
| | : | |
| v. | : | NO. 2:21-CR-00170-GJP-1 |
| | : | |
| MOSHE PORAT, | : | |
| | : | |
| Defendant. | : | |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT**
**DR. M. MOSHE PORAT'S MOTION FOR JUDGMENT OF ACQUITTAL**

**I.      INTRODUCTION**

Dr. Porat worked at Temple University's Fox School of Business for over 40 years, including 22 years as dean.  As multiple former colleagues testified, many of whom he worked closely with for more than a decade, he was passionate about Fox and, like them, was constantly seeking to improve all aspects of the school and its programs.  One former Fox employee, Marjorie O'Neill, who for many years was in charge of collecting and submitting Fox's data to various rankings publications, took it upon herself (for reasons unknown) to submit inaccurate information about Fox's online and part-time MBA programs to U.S. News & World Report.

Based on these submissions, and Ms. O'Neill's allegation that the inaccuracies were submitted at Dr. Porat's instruction, an allegation she only made after her conduct was publicly revealed (and which was not admitted as substantive evidence in this case), Dr. Porat has been charged with knowingly and intentionally conspiring to defraud Temple applicants, students, and donors in violation of 18 U.S.C. § 371, as well as knowingly devising and specifically acting upon a scheme to defraud applicants, students, and donors in violation of 18 U.S.C. § 1343.

In its opening statement, the government promised the jurors a "case about cheating for money, power, and prestige[,]" with evidence demonstrating that Dr. Porat had "instructed [Fox] employees to lie to the ranking organizations," and that he had "cheated to get higher school rankings, to increase his influence, to polish his reputation, and to take money." *See* Govt. Opening Stmt. Tr. 2:1-6, 2:20-21. The government led the jurors to believe that Dr. Porat was the puppet master pulling the strings of Ms. O'Neill's multi-year deception to enrich himself at the expense of the school to which where he had devoted his entire professional life.

But, what the government actually presented to the jurors was testimony from numerous former colleagues, along with dozens of emails and other documents, that showed open discussions over the course of many years among Fox's senior leadership, faculty, and staff strategizing and jointly deciding upon ways that Fox could improve the different metrics that were part of the rankings submissions. None of these discussions or decisions were out of the ordinary, made in the dark or by Dr. Porat alone (if he even made the decision at all). Instead, the government's case is built entirely by "'piling inference upon inference,'" and that is not sufficient to submit this case to the jury. *See United States v. Coleman*, 811 F.2d 804, 808 (3d Cir. 1987).

For the conspiracy charge, the government has failed to produce evidence sufficient to prove that Dr. Porat knowingly and intentionally entered into an agreement with Ms. O'Neill and former Temple professor and alleged co-conspirator Isaac Gottlieb with the objective of defrauding Temple applicants, students, and donors by submitting inaccurate information to U.S. News regarding Fox's 2014-2018 online and part-time MBA programs. Notably, despite investigations by both a national law firm and the government over the course of many months and years, respectively, including multiple interviews of nearly every witness who testified in

this case and the review of tens of thousands of emails and other documents, there is not a single piece of direct evidence demonstrating that Dr. Porat knowingly and intentionally instructed Ms. O'Neill to ever inaccurately report Fox's data to U.S. News or any other rankings publication. The government tries to overcome this deficiency by attempting to criminalize the routine rankings processes and procedures in which Dr. Porat and other Fox senior administrators and staff were involved, and by reliance on a passing email reference to a single meeting Ms. O'Neill purportedly had with Dr. Porat at the very beginning of the alleged four-year conspiracy. While at the same time ignoring the fact that Ms. O'Neill not only undisputedly falsified data on her own both before and after the alleged conspiracy began, but that Dr. Porat was repeatedly assured by Ms. O'Neill and others in senior leadership that the data she was maintaining and submitting was accurate and supported by reliable records. Dr. Porat cannot be convicted of criminal conspiracy without the requisite state of mind. And, when the government is unable to produce evidence demonstrating beyond a reasonable doubt that Dr. Porat did anything other than engage in discussions with, and act in reliance upon, the many Fox colleagues he had worked with for years and who were directly responsible for the rankings submissions, the government has failed to meet its burden of proof.

Similarly, for the wire fraud charge, the government's failure to produce sufficient evidence of a criminal conspiracy also applies to the government's allegation that Dr. Porat himself knowingly and with specific intent defrauded Temple applicants, students, and donors based on Ms. O'Neill's inaccurate 2014-2018 submissions to U.S. News. The government understood this, and so it alleged Dr. Porat's scheme to defraud actually began in 2010 with a submission to Financial Times involving Fox's executive MBA program. Again, while the government promised the jury a tale of "lie[s]," *see* Govt. Opening Stmt. Tr. 5:18-6:3, what the

government delivered was another open discussion and decision among Fox's senior leadership, one with which Dr. Porat's former colleague and now government witness merely disagreed. Nor was this alleged inaccurate submission to the Financial Times in 2010, or the 2014-2018 inaccurate submissions to U.S. News made by Ms. O'Neill, in any way furthered by the January 22, 2018 email that Dr. Porat sent following review and approval by two of his senior leadership team at Fox.  Consequently, the government has failed to meet its burden of proof on the charged wire fraud.

Additionally, pursuant to the doctrine of convergence, both the conspiracy and wire fraud charges fail because the party who received the inaccurate information (U.S. News) was not the same as the party allegedly defrauded of money (Temple students, applicants, or donors)

Because no reasonable juror could accept the evidence presented by the government as sufficient to support the conclusion of Dr. Porat's guilt beyond a reasonable doubt, a judgment of acquittal must be entered on the alleged conspiracy to commit wire fraud (Count I), and the alleged wire fraud (Count II).

## II.    LEGAL STANDARD

When a defendant moves for judgment of acquittal under Federal Rule of Criminal Procedure 29, a district court "must enter judgment of acquittal for any offense for which the evidence is insufficient to sustain a conviction."  Fed. R. Crim. P. 29(a).  In deciding the motion, a district court must "review the record in the light most favorable to the prosecution to determine whether any rational trier of fact could have found proof of guilt beyond a reasonable doubt based on the available evidence."  *United States v. Smith*, 294 F.3d 473, 476 (3d Cir. 2002).  The record includes "'evidence elicited on cross-examination of the government witnesses.'"  *United States v. Tyson*, 653 F.3d 192, 200 (3d Cir. 2011) (citation omitted).  A judgment of acquittal should be entered "'if no reasonable juror could accept the evidence as

sufficient to support the conclusion of the defendant's guilt beyond a reasonable doubt.'" *United States v. Coleman*, 811 F.2d 804, 807 (3d Cir. 1987) (citation omitted).  And, that requires the government to "prove *every element* of the offense beyond a reasonable doubt." *Id.* at 808 (emphasis added).

 "'[W]hen a conspiracy conviction is at issue, [the court] must closely scrutinize the sufficiency of the evidence.'" *United States v. Davis*, 458 F. App'x 152, 157 (3d Cir. 2012) (citation omitted).  "This close scrutiny is necessary because although a conspiracy charge requires consideration of whether there is evidence of an alleged agreement between two or more persons, 'a defendant's guilt must always remain individual and personal.'" *Id.* (citation omitted).

Moreover, "[a]lthough the Government is entitled to every reasonable inference from the evidence, a conviction may not be based on mere speculation." *United States v. Katakis*, 800 F.3d 1017, 1024 (9th Cir. 2015).  "'[A] reasonable inference is one that is supported by a chain of logic, rather than mere speculation dressed up in the guise of evidence.'" *Id.* (citation omitted).  "[A]t the end of the day, 'if the evidence viewed in the light most favorable to the prosecution gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence, then a reasonable jury must necessarily entertain a reasonable doubt.'" *United States v. Cassese*, 428 F.3d 92, 99 (2d Cir. 2005) (citation omitted).

## III.   ARGUMENT

### A.   The government has failed to produce sufficient evidence that a reasonable juror could find beyond a reasonable doubt that Dr. Porat conspired to commit wire fraud (<u>Count One – 18 U.S.C. § 371</u>).

The government alleges that, from July 2014 through July 2018, Dr. Porat conspired to defraud Temple applicants, students, and donors by providing false information to U.S. News so that it would treat the Fox School more favorably in its annual rankings.  To convict Dr. Porat of

conspiring to commit wire fraud in violation of 18 U.S.C. § 371, the government must prove that: (1) two or more persons agreed to commit wire fraud; (2) Dr. Porat was *a party to or member of that agreement*; (3) Dr. Porat *joined the conspiracy knowing of its objective* to commit wire fraud; and (4) at some time during the existence of the conspiracy, at least one of its members performed an overt act in order to further the objectives of the conspiracy.  *See* Mod. Crim. Jury Instr. 3d Cir. 6.18.371A.

    To prove that Dr. Porat *knowingly and intentionally* joined the conspiracy (i.e., the second and third elements), it is not sufficient to show that Dr. Porat only knew about the conspiracy, or only kept "bad company" by associating with members of the conspiracy, or was only present when it was discussed or when a crime was committed.  *See* Mod. Crim. Jury Instr. 3d Cir. 6.18.371D.[1]  Nor is it sufficient even if Dr. Porat approved of what was happening or did not object to it.  *See id.*  Rather, the government must prove beyond a reasonable doubt that: Dr. Porat knew of the objectives or goals of the conspiracy, that is, to defraud Temple applicants, students, and donors of money; Dr. Porat joined the conspiracy intending to help further or achieve its goals or objectives; Dr. Porat and at least one other alleged conspirator shared a unity of purpose toward those objectives or goals.  *See* Mod. Crim. Jury Instr. 3d Cir. 6.18.371E; *see also Kelly v. United States*, 140 S. Ct. 1565, 1571-73 (2020) (scheme must "have had the 'object'

---

[1] For purposes of this motion, Dr. Porat will refer to elements two and three together, which is generally consistent with Third Circuit Model Criminal Jury Instruction 6.18.371D, and also, at times, the Third Circuit's description of conspiracy as having three, instead of four, elements.  *See, e.g., Davis*, 458 F. App'x at 156 ("'The government must show: (1) the existence of an agreement to achieve an unlawful objective; (2) the defendant's knowing and voluntary participation in the conspiracy; and (3) the commission of an overt act in furtherance of the conspiracy.'") (citation omitted); *United States v. Bobb*, 471 F.3d 491, 494 (3d Cir. 2006) ("The essential elements of conspiracy are (1) a shared unity of purpose, (2) intent to achieve a common goal, and (3) an agreement to work together toward the goal.").

of obtaining [alleged victim's] money or property," meaning that money or property must have been more than 'an incidental (even if foreseen) byproduct' of a scheme).

Put simply, "the existence of an agreement is 'the essence of the [conspiracy] offense.'" *Davis*, 458 F. App'x at 160 (citation omitted). "'It is, in other words, the sine qua non of the crime itself.'" *Id.* (citation omitted). And, here, the government has failed to produce evidence sufficient to prove that Dr. Porat knowingly and intentionally entered into an agreement with Ms. O'Neill and Dr. Gottlieb with the objective of defrauding Temple applicants, students, and donors by submitting inaccurate information to U.S. News regarding Fox's online and part-time MBA programs.

  **1.**  **Dr. Porat did not instruct Marjorie O'Neill to provide U.S. News with false information on the number of Fox's online MBA students who had reported GMAT scores.**

In 2014, 2015, 2016, and 2017, Marjorie O'Neill reported to U.S. News that Fox's incoming online MBA students had all submitted GMAT scores as part of their application, which was not accurate. But, despite the government's review of tens of thousands of emails and other documents received from Temple, and the testimony of numerous Temple and Fox current and former employees, there is not a single piece of direct evidence (other than the allegation Ms. O'Neill made after her conduct was publicly exposed which was not admitted for the truth of what Ms. O'Neill allegedly asserted) that Dr. Porat ever instructed Ms. O'Neill to inaccurately report this GMAT statistic. Said differently, not even one Fox employee who testified, many of whom had worked closely with Dr. Porat for over a decade, ever heard Dr. Porat give, or even allude to, such an instruction. Nor is there even a single sentence with this instruction among the many thousands of emails exchanged over the four-year period of time that Ms. O'Neill was providing U.S. News with inaccurate information. That is, of course, because it did not happen.

- 7 -

Instead, the government's conspiracy charge is built entirely upon circumstantial evidence. While a "conspiracy may be proven by circumstantial evidence and reasonable inferences drawn from such proof," those "inferences 'must have a logical and *convincing connection* to the facts established.'" *Davis*, 458 F. App'x at 159-60 (citation omitted) (emphasis in original). A "conspiracy cannot be proven . . . 'by piling inference upon inference[.]'" *Coleman,* 811 F.2d at 808 (citation omitted). But, that is precisely what the government is attempting to do here.

### (a) The government's suggestion that Fox's rankings processes and procedures were improper has no logical or convincing connection to the facts established.

It begins with the government's "attempts to cast a pall of suspicion" over what were otherwise completely normal and appropriate activities for Dr. Porat and others at Fox to be engaged in, namely, changing how rankings submissions were handled, strategizing on ways that Fox could improve the different metrics that were part of the rankings submissions, and advertising and celebrating rankings results. *See Tyson*, 653 F.3d at 209; *see also* Govt. Opening Stmt. Tr. 6:20-21 ("[T]he defendant quietly started taking away the Rankings Committee responsibility to review rankings."); *id.* at 7:12-14 ("[Dr. Gottlieb] shared his analysis with defendant. He shared it with other Fox employees. He gave the defendant the tool he needed to know how to cheat to win."). "But applying labels is insufficient." *See Tyson*, 653 F.3d at 209*.*

As Diana Breslin Knudsen, who chaired the rankings committee, testified, the transition from ten or so rankings committee members handling the rankings submissions to a single person (Ms. O'Neill) having primary responsibility was a change with which she (and others) agreed. *See also* Def. Ex. 6 (Dec. 13, 2010 Email from Ms. Breslin Knudsen to Rajan Chandran and William Aaronson, copying Dr. Porat, explaining that "[t]he goal is to get the information flowing directly to Marjie so we do not need to discuss it [in] the larger meetings"). In fact,

- 8 -

rankings committee member Christine Kiely testified that having one person in the dean's office who was responsible for compiling all of the rankings data and drafting all of the submissions was exactly how it had been handled at her previous employer, George Washington University.

Ms. Breslin Knudsen, Ms. Kiely, and others also testified that there was nothing improper about analyzing the rankings data, or using the analyses that, for example, Dr. Gottlieb prepared to help Fox determine how to invest its resources and make changes to admissions criteria that could help rankings.  *See also* Def. Ex. 12 (Apr. 28, 2010 Email from Ms. Breslin Knudsen to Dr. Porat explaining her request that Dr. Gottlieb conduct an analysis "so we can once and for all know what is important to concentrate on in the long term").  As Ms. Kiely explained, Fox employees always had their eyes on continuous improvement for the benefit of their students. *See also* Def. Ex. 27 (Oct. 14, 2014 Email from Ms. Kiely to Ms. Breslin Knudsen and others explaining that after it was discovered that the part-time MBA ranking was sensitive to changes in the GMAT and GPA metrics "we knew that we would have to start watching PMBA a bit closer").

Nor was there anything unusual about Fox advertising rankings results or Ms. Breslin Knudsen, Ms. Kiely, Dr. Porat, and dozens of other Fox faculty and staff jointly celebrating the results of a school and its programs that they deeply cared about, despite the government's attempts to suggest otherwise by repeatedly displaying photos (from different angles) of Dr. Porat at one such Fox event.  *See, e.g.*, Govt. Exs. 26-40, 46-48.  As journalist John Byrne testified, while rankings are severely flawed and at times put together by click hungry editors, the rankings process is an everyday part of operations at colleges and universities throughout the country.

In sum, while the government has attempted to portray these facts as nefarious, they have turned out to be rather ordinary and innocuous, and thus they cannot form a logical and convincing connection to the government's suggested inferences of impropriety.  *See Tyson*, 653 F.3d at 209 ("Unfortunately, the government makes little attempt to explain what is so 'unusual' about the conduct at issue.  The government does not argue, for instance, that the behavior of [defendant] and [alleged co-conspirator] deviated from some baseline norm.  Nor can they. Almost all of the facts highlighted by the government focus upon lawful conduct.").

> **(b)** **The government's attempt to show that Dr. Porat knowingly conspired with Ms. O'Neill based on the September 3, 2014 email has no logical or convincing connection to the facts established.**

The only contemporaneous piece of evidence the government has presented to support its theory that Dr. Porat instructed Ms. O'Neill to inaccurately report to U.S. News (for four years) that all of Fox's incoming online MBA students had submitted GMAT scores is a *single* email between alleged co-conspirators Ms. O'Neill and Dr. Gottlieb on September 3, 2014.  *See* Govt. Opening Stmt. Tr. 2:19-22 ("And then the defendant, who you will hear . . . instructed those employees to lie to the ranking organizations, to give false information that he knew would falsely inflate Fox's rankings.").  But, in this email (which Dr. Porat did not receive), there is no mention of GMAT scores, or any instructions on how such scores should be reported, much less sufficient evidence in which to find beyond a reasonable doubt that Dr. Porat shared a unity of purpose with Ms. O'Neill and Dr. Gottlieb in achieving the alleged goals of the charged conspiracy, that is, to defraud Temple applicants, students, and donors of money by submitting to U.S. News inaccurate information about Fox's online MBA program.  *See Tyson*, 653 F.3d at 210 ("[T]here must be some link between the co-conspirators' conduct that suggests integration or unity of purpose.").

More specifically, on September 3, 2014, Ms. O'Neill emailed Dr. Gottlieb stating: "Attached is the [2014] survey submission for the US News OMBA program. . . . I met with Drs. Porat and Chandran this afternoon and Moshe asked me to share this with you for your opinion." *See* Govt. Ex. 75.  And, the attachment Ms. O'Neill referenced was an Excel spreadsheet with over 700 lines (a 19-page document when converted to PDF by the government).  *See* Govt. Ex. 76.  That is it.  And, that is not enough.

In this email, Ms. O'Neill did not provide any details whatsoever about the meeting with "Drs. Porat and Chandran," nor did she reference survey question 42c on line 259 (total number of entrants) and question 51a on line 308 (how many provided GMAT scores), which, only when taken together, could possibly inform a reviewer that Ms. O'Neill was reporting that all new entrants provided GMAT scores.  *See id.* at 8, 9.  In fact, Ms. O'Neill did not mention any specific aspect of the 2014 survey submission when she emailed Dr. Gottlieb on September 3, 2014.  And, for whatever strategic reason, the government failed to call Ms. O'Neill as a witness at trial.[2]

And, the government has not alleged, nor has any evidence shown, that Ms. O'Neill ever even attempted to again speak with Dr. Porat in the years that followed regarding this online

---

[2] Dr. Porat renews his objection to the admissibility of Govt. Exhibits 72-77, which were only conditionally admitted as communications between alleged co-conspirators Ms. O'Neill and Dr. Gottlieb pursuant to Rule 801(d)(2)(E).  But, without the testimony of Ms. O'Neill (who signed a cooperation plea agreement) or Dr. Gottlieb (who did not agree to cooperate), and for the reasons explained in this memorandum (Sect. III), the government has failed to demonstrate by a preponderance of the evidence, as it must, that Dr. Porat knowingly and intentionally entered into an agreement with Ms. O'Neill and Mr. Gottlieb with the objective of committing wire fraud, and therefore the out of court statements of Ms. O'Neill and Dr. Gottlieb are inadmissible hearsay.  *See United States v. McGlory*, 968 F.2d 309, 334 (3d Cir. 1992) (citing *United States v. Bourjaily*, 483 US. 171, 175 (1987)).  And, without the admission of Govt. Exhibits 72-77, there is absolutely nothing that even purports to connect Dr. Porat to the submission of inaccurate data related to Fox's online MBA program (other than Ms. O'Neill's supposed after-the-fact attempt to implicate him, which was not admitted for the truth).

MBA rankings submission.  That includes when, on November 1, 2016, U.S. News emailed Ms.

O'Neill asking how it was possible that all of Fox's incoming online MBA students had

submitted GMAT scores given Fox's waiver policy (the metric at the very heart of the alleged

conspiracy) – no conversation with Dr. Porat.  *See* Govt. Ex. 82.  Instead, Ms. O'Neill provided

U.S. News with a non-responsive answer within minutes, copying Temple's Institutional

Research & Assessment ("IRA") contact.  *See id.*  The next year, in September 2017, when, as

Will Reith testified, Ms. O'Neill was confronted about problematic data in her online MBA draft

submission – no conversation with Dr. Porat.

Instead, what was being discussed with Dr. Porat, both before the alleged conspiracy

began and throughout its existence, was that, as her supervisor Ms. Breslin Knudsen stated,

"Marjie is doing a good job to make sure that we are accurate and consistent in our data

reporting."  Def. Ex. 1 (Jan. 2, 2013 Email from Ms. Breslin Knudsen to Dr. Porat and others).

In fact, less than two months before the September 3, 2014 meeting, Ms. Breslin Knudsen

emailed Dr. Porat and others saying she was "very thankful that Marjie is maintaining excellent

records on all the rankings."  *See* Def. Ex. 3.  And, about a month after the government alleges

the conspiracy was born, Dr. Porat was informed through Ms. Breslin Knudsen that, at the

direction of then-provost Hai-Lung Dai, Temple's "IRA will run an independent check of each

submission."  *See* Govt. Ex. 107 (Oct. 29, 2014 Email from Ms. Breslin-Knudsen to Dr.

Chandran and Dr. Porat, copying Ms. O'Neill).  Ms. Breslin Knudsen assured Drs. Chandran and

Porat that "[w]e have very good back up for any survey we respond to[.]"  *See id.*

Moreover, the following year, Ms. O'Neill herself informed Dr. Porat and others:

"Moshe, as I've always promised you I will never do anything that will have your name, Fox, or

my name published for any unethical survey submissions.  I have backup for each metric

submitted." *See* Def. Ex. 2 (Feb. 19, 2015 Email from Ms. O'Neill to Dr. Porat and others).  The

next month, Ms. O'Neill's supervisor again reiterated to Dr. Porat and others that "Marjie keeps

very good back up on every metric that is forwarded to a ranking agency." *See* Def. Ex. 5 (Mar.

18, 2015 Email from Ms. Breslin Knudsen to Dr. Porat and others).

Dr. Porat was told over and over again that Ms. O'Neill was doing a good job and that

her work was accurate and supported by the records.  Those were the facts and circumstances

both before and after Dr. Porat's one supposed meeting with Ms. O'Neill on September 3, 2014

to discuss Fox's online MBA submission, a meeting whose length and content are entirely

unknown.  The government's claim that Dr. Porat knowingly and intentionally conspired with

Ms. O'Neill and Dr. Gottlieb to defraud Temple applicants, students, and donors of money as a

result of this one meeting has no logical or convincing connection to the actual facts and

circumstances established in the government's case, and thus cannot form the basis of a

conspiracy conviction.  *See* Mod. Crim. Jury Instr. 3d Cir. 5.02 (proving defendant acted

"knowingly" requires the government to "prove beyond a reasonable that [the defendant] was

conscious and aware of the nature of his actions and of the surrounding facts and circumstances,

as specified in the definition of the offense charged").

> **2.      Dr. Porat did not knowingly direct Marjorie O'Neill to provide
> U.S. News with false information on the percentage of Fox's
> MBA students who were part-time.**

The facts established in the government's case-in-chief also fail to prove beyond a

reasonable doubt that Dr. Porat knowingly directed Ms. O'Neill to provide U.S. News with false

information on the percentage of Fox's MBA students who were part-time, specifically, by

combining the part-time, online, and executive MBA students for purposes of defining a part-

time student.  While the government initially told the jury that Dr. Porat "kept the lies going,

sending the lies to the ranking organizations," based on his July 16, 2015 email to Ms. O'Neill,

in which he states "[u]se whatever comes out better, but we must be consistent[,]" the actual facts simply do not support such an inference. *See* Govt. Opening Stmt. 11:8-11.

In reality, Dr. Porat's statement came *after* the decision had been made on how to define a part-time student following an open discussion in 2014 and 2015 between, among others, Ms. Breslin, Ms. O'Neill, Dr. Gottlieb, and Phyllis Tutora, that is, the Fox administrators and staff directly responsible for preparing and approving the part-time MBA ranking survey submission. *See* Govt. Ex. 130 (July 15, 2015 Email from Ms. Tutora to Ms. O'Neill and Dr. Gottlieb, copying Dr. Porat, Ms. Breslin Knudsen, Dr. Chandran, and Ms. Kiely, stating that "[w]hen you combine all three, which we have agreed makes up a part-time student, of course the average in months will increase"); Def. Ex. 24 (Sept. 10, 2014 Emails from Ms. Breslin Knudsen to Ms. O'Neill, Dr. Chandran, and Dr. Gottlieb, explaining that, "We have determined that the definition that we think most schools are using for PT is that the student is fully employed in a job while taking the program and therefore attend school PT. . . . We just failed to follow this definition the last time data was presented so we need to make sure we use this definition this time.").

For reasons explained above, Dr. Porat's statement also was made within the context of an entirely appropriate discussion among Fox faculty and staff about ways in which to improve the school's rankings, and after the many assurances that Ms. Breslin Knudsen and Ms. O'Neill had provided to Dr. Porat and others on the quality and accuracy of the rankings submissions prepared by Ms. O'Neill.  Consequently, Dr. Porat's cautionary instruction to Ms. O'Neill to "be consistent" across years, after Ms. Tutora had already expressly informed the group that combining "all three" student groups would produce the better result, cannot possibly support the inference of criminal conduct that the government suggests. *See* Govt. Ex. 130.

3.      Dr. Porat's *response* to the problems that arose as a result of
the inaccurate U.S. News submissions is not sufficient to show
beyond a reasonable doubt that he knowingly joined the
alleged conspiracy that *caused* the problems.

On January 9, 2018, journalist John Byrne questioned the GMAT statistic reported in

Fox's online MBA submission to U.S. News.  *See* Govt. Ex. 2 (Poets & Quants article).  And, in

a matter of just over two weeks, between January 9, 2018 and January 27, 2018, Ms. O'Neill's

four-year submission of inaccurate GMAT data for Fox's online MBA program was: publicly

revealed (*see* Govt. Ex. 2); internally discussed and debated (*see, e.g.*, Ms. Kiely Tr. 46:13-17

(explaining that when revealed "there was a lot confusion, like, where did this mistake occur? Is

this a U.S. News problem? Was this a John Byrne problem with the reporting? Where did this

error, you know, where did this error happen?"); self-reported to U.S. News, as Debbie Campbell

testified; and made known to Temple's Provost (*see* Govt. Ex. 134)—all done with Dr. Porat's

knowledge and approval.

Several days before the end, on January 22, 2018, with the approval of Ms. Breslin

Knudsen and Ms. Campbell, Dr. Porat admittedly exercised poor judgment by sending an email

that touted the online MBA ranking.  *See* Govt. Ex. 100.  Dr. Porat could have moved more

quickly in handling the problem; he could have been more transparent with Temple's leadership

about the nature and extent of the potential damage that was on the horizon; and, as Fox's Dean,

he could have taken greater responsibility for the problem that occurred under his leadership.

That is why, as former Temple Provost JoAnne Epps testified, Dr. Porat lost his job as Dean –

Temple's senior administrators lost confidence in his leadership abilities.  But, while Dr. Porat

may have minimized the *extent* of the damage in 2018, neither a months-long internal

investigation conducted by Jones Day nor the government's multi-year investigation has

produced sufficient evidence to demonstrate beyond a reasonable doubt that he *caused* the

damage that resulted from Ms. O'Neill's inaccurate online and part-time MBA submissions in 2014, 2015, 2016, and 2017.

Rather, what the evidence has shown is that it was Ms. O'Neill who, as Ms. Tutora confirmed, improperly rounded up GPAs to improve Fox's rankings submissions in 2013—actions she took *on her own* and *before* the alleged conspiracy supposedly began.  And, as Mr. Rieth testified, it was Ms. O'Neill who, at times throughout 2014-2017, submitted a number of inaccurate selectivity metrics – again, actions she took *on her own*.  *See, e.g.*, Govt. Exs. 84, 85 (Sept. 21-29, 2017 Email exchanges between Mr. Rieth, Darin Kapanjie, and Ms. O'Neill stating, among other things, Ms. O'Neill's "mean undergrad GPA" cannot be "true"); Govt. Ex. 134 (Jan. 27, 2018 Email from Ms. Breslin Knudsen to Provost Epps, copying Dr. Porat, noting discovery of "additional problems with the data that was submitted to US News for the online survey").  At the same time, Ms. O'Neill was reassuring her supervisor Ms. Breslin Knudsen and others, including Dr. Porat, that her data was accurate.

It is within this context, and without the government's unreasonable inferences of impropriety regarding Fox's rankings process, that the September 3, 2014 and July 16, 2015 emails must be read.  And, when these emails (the only contemporaneous evidence presented) are placed "in the context of the record as a whole," it is clear that they are "simply too slim a reed upon which to hang a criminal conspiracy conviction."  *See Tyson*, 653 F.3d at 210. Because the government has failed to produce sufficient evidence for a reasonable jury to find beyond a reasonable doubt that Dr. Porat knowingly and intentionally conspired with Ms. O'Neill and Dr. Gottlieb to defraud Temple applicants, students, and donors of money, a judgment of acquittal must be entered on the charged conspiracy (Count I).

**B.      The government has failed to produce sufficient evidence that a reasonable juror could find beyond a reasonable doubt that Dr. Porat committed wire fraud (<u>Count Two – 18 U.S.C. § 1343</u>).**

The government also alleges that, from 2010 through July 2018, Dr. Porat knowingly devised a scheme to defraud Temple applicants, students, and donors.  To prove that Dr. Porat committed wire fraud, the government must prove that: (1) Dr. Porat *knowingly* devised a scheme to defraud or to obtain money by materially false or fraudulent pretenses, representations or promises; (2) Dr. Porat *acted with the specific intent* to defraud; and (3) Dr. Porat transmitted an interstate wire communication in *advancing, furthering, or carrying out* the scheme.  *See* Mod. Crim. Jury Instr. 3d Cir. 6.18.1343.  Here, the government has failed to produce evidence sufficient to prove beyond a reasonable doubt that Dr. Porat acted with the requisite intent to defraud Temple applicants, students, and donors, or that the January 22, 2018 email (the charged wire) was in furtherance of the alleged scheme to defraud.

**1.      Dr. Porat did not act with specific intent to defraud.[3]**

"Wire fraud is a specific intent crime."  *See United States v. Weaver*, 220 F. App'x 88, 91 (3d Cir. 2007).  The government must therefore prove beyond a reasonable doubt that Dr. Porat acted with the specific intent to defraud.  *See* Mod. Crim. Jury Instr. 3d Cir. 6.18.1341-4; *United States v. Dobson*, 419 F.3d 231, 237 (3d Cir. 2005) ("[I]t is not sufficient for the United States to prove merely that a defendant participated in a fraudulent scheme; rather, it must show that the defendant did so knowingly and 'in furtherance of the illicit enterprise.'") (quoting *United States v. Pearlstein*, 576 F.2d 531, 545 (3d Cir. 1978)); *see also United States v. Tiche*, 424 F. Supp. 996, 1001 (W.D. Pa. 1977) ("mere knowledge of shadowy dealings" is insufficient to establish

---

[3] Given the government's failure to produce sufficient state-of-mind evidence regarding elements one and two, and their overlapping nature, this section applies equally to both elements.

specific intent to defraud).  This means that the government must prove that Dr. Porat acted with the purpose of depriving applicants, students, and donors of money when engaging in the alleged scheme.  It is not enough that the scheme may have had the incidental effect of depriving others of money, even if that effect was foreseeable; again, the object must have been for Dr. Porat to deprive others of money.  *See Kelly*, 140 S. Ct. at 1571-73.

As an initial matter, for all the same reasons stated above, the government's failure to produce sufficient evidence that Dr. Porat knowingly and intentionally conspired with Ms. O'Neill and Dr. Gottlieb to defraud Temple applicants, students, and donors, also applies to the government's allegation that Dr. Porat himself knowingly and with specific intent defrauded Temple applicants, students, and donors based on Ms. O'Neill's inaccurate 2014-2018 submissions to U.S. News.

In tacit recognition of this lack of evidence, the government had to reach all the way back to a 2010 Financial Times rankings survey involving Fox's executive MBA program in an attempt to prove Dr. Porat somehow had the requisite intent to defraud.  The government told the jury that Dr. Porat "asked one of his employees to send falsely inflated numbers about the student body size in the Executive MBA program at Fox" and that he had asked this employee, Ms. Kiely, "to lie about the number of students" in the program.  *See* Govt. Opening Stmt. Tr. 5:18-6:3.  But, like the government's attempts to mischaracterize Dr. Porat's involvement in the U.S. News rankings submission process, the actual facts and circumstances do not support the government's claim of criminal conduct.

In 2010, as Ms. Kiely testified, Ms. Breslin Knudsen was the chair of Fox's rankings committee, which also included committee members Dr. Chandran and Dr. Aaronson. According to Ms. Kiely's testimony, Dr. Porat would stop by committee meetings from time to

time, but he rarely attended full sessions.  It was in this context that Ms. Breslin Knudsen, Dr.

Chandran, and Dr. Aaronson (not Dr. Porat) made the decision to combine the cohorts from

Fox's executive MBA programs in Japan and Philadelphia in response to the ranking survey

from Financial Times.  While Ms. Kiely disagreed with that decision, and made that

disagreement known in an email and, later, one meeting with Dr. Porat, the mere fact that Dr.

Porat chose to support the decision made by at least three of the Fox rankings committee

members, including the committee chair, over that of a single committee member who disagreed,

cannot be sufficient to demonstrate that he had the specific intent (or any intent at all) to defraud

Temple applicants, students, and donors.[4]

### 2. Dr. Porat's January 22, 2018 email was not in furtherance of the alleged scheme to defraud.

Even if the 2010 executive MBA rankings submission to Financial Times was inaccurate,

that alleged scheme to defraud was in no way furthered, advanced, or carried out, as the

government must prove beyond a reasonable doubt, by Dr. Porat's January 22, 2018 email

regarding the online MBA ranking in U.S. News.  *See* Mod. Crim. Jury Instr. 3d Cir. 6.18.1343-

1.

Nor was the January 22, 2018 email in furtherance of any other alleged scheme to submit

inaccurate information to U.S. News.  In considering the context of the January 22nd email and

the evidence of Dr. Porat's state of mind, it is important that Dr. Porat had the written approval

of that email by both Ms. Campbell and Ms. Breslin Knudsen.  *See* Def. Ex. 9 (Jan. 22, 2018

Email from Ms. Campbell to Dr. Porat, Ms. Breslin Knudsen, and others stating "it looks fine to

---

[4] In fact, the government has not produced any evidence (other than the lone dissenting opinion of Ms. Kiely) that the 2010 submission was inaccurate according to the actual purveyor of the survey, Financial Times.

me"); Def. Ex. 10 (Jan. 22, 2018 Email from Ms. Breslin Knudsen to Cynthia Smith stating,

"Looks good").  It also is important that the January 22nd email followed a Temple University

email sent on January 18, 2018 touting the same ranking.  *See* Def. Ex. 66 (Jan. 18, 2018 Email

from Temple Now re: "New year, same No. 1 ranking").  And, the January 22nd email was sent

to the Porat 100 and VIP list, not any current students or applicants.  Furthermore, the January

22nd email did not seek any donations nor did the government present any evidence from any

donors.  And, certainly the government failed to present any evidence about why donors decided

to give to Fox or that any donations were made relying on the January 22nd email, all of which

shows a lack of materiality.  *See Neder v. United States*, 527 U.S. 1, 25 (1999).  Based on all of

these circumstances, no reasonable jury can conclude that Dr. Porat send the January 22nd email

in furtherance of any scheme to defraud students, applicants, and donors of their money.

Because the government has failed to produce sufficient evidence for a reasonable jury to

find beyond a reasonable doubt that Dr. Porat knowingly and with specific intent devised a

scheme to defraud Temple applicants, students, and donors of money, a judgment of acquittal

must be entered on the charged wire fraud (Count II).

    **C.**    **Because the party who received the inaccurate information (U.S.
News) was not the same as the party allegedly defrauded (students,
applicants, or donors), the convergence doctrine requires a judgment
of acquittal on all counts (<u>Counts One and Two</u>).**

Additionally, a judgment of acquittal should be entered on all counts because the

recipient of the inaccurate information, U.S. News, was not the party who parted with any

money—a concept known as "convergence."  *See United States v. Bryant*, 655 F.3d 232, 249 (3d

Cir. 2011) (describing convergence as requiring that "the party to whom the fraudulent pretenses

were made" be "the same as the party from whom money or property would have been taken").

The federal courts of appeals are split on whether the federal wire and mail fraud statutes require

convergence, and the Third Circuit has yet to decide the issue.  *See id.*; *compare, e.g.*, *United States v. Lew*, 875 F.2d 219, 221 (9th Cir. 1989) (reading mail fraud statute to require convergence), *with United States v. Christopher*, 142 F.3d 46, 54 (1st Cir. 1998) (declining to read the mail and wire fraud statutes to require convergence).

    The best reading of the statutes, however, requires that the deceived party be the same as the party deprived of money.  As the Supreme Court explained in *McNally v. United States*, the federal fraud statutes import traditional concepts of fraud, and "the words 'to defraud' commonly refer 'to wronging one in *his* property rights by dishonest methods or schemes.'"  483 U.S. 350, 358 (1987) (quoting *Hammerschmidt v. United States*, 265 U.S. 182, 188 (1924)) (emphasis added).  In other words, "the intent must be to obtain money or property *from the one who is deceived*." *Lew*, 875 F.2d at 221 (emphasis added); *United States v. Shelton*, 848 F.2d 1485, 1495 (10th Cir. 1988) ("Under *McNally*, instructions on the elements of mail fraud must require the jury to find that the victim of the scheme was *itself* defrauded of money or property."); *Mylan Labs., Inc. v. Akzo, N.V.*, 770 F. Supp. 1053, 1074 (D. Md. 1991) ("This convergence of identity seems inherent in the idea of fraud as provided in the fraud statutes and defined by the Supreme Court in *McNally*.").  The Supreme Court's decision in *Cleveland v. United States* reinforces this understanding by requiring that the property taken be property "in the hands of the victim."  531 U.S. 12, 15 (2000).

    The necessity of convergence further follows from the Supreme Court's decision in *Neder,* which confirmed that materiality is a required element of federal mail and wire fraud. 527 U.S. at 25.  Drawing again on common law concepts of fraud, the court explained that a matter is material if a reasonable person would attach importance to it "in determining *his* choice of action" or the maker of a statement knows that "its recipient" regards it as important "in

determining *his* choice of action." *Id.* at 22 n.5 (quoting Restatement (Second) of Torts § 538 (1976)) (emphasis added); *see also id.* at 16 (holding that a "false statement is material if it has a natural tendency to influence, or is capable of influencing, the decision of the decisionmaking body *to which it was addressed*") (citations omitted) (emphasis added). In other words, materiality entails convergence between the party allegedly deceived and the party allegedly deprived of money or property. Moreover, to the extent the federal wire fraud statute is ambiguous with respect to the requirement of convergence, the rule of lenity counsels in favor of reading it more restrictively to import the concept of convergence. *See McNally*, 483 U.S. at 359-60 ("[W]hen there are two rational readings of a criminal statute, one harsher than the other, we are to choose the harsher only when Congress has spoken in clear and definite language.").

The government has not produced any evidence showing that the party allegedly intended to be deceived (U.S. News) was the same as the parties allegedly intended to be deprived of money (applicants, students, and donors). As a result, a judgment of acquittal must be entered on the charged conspiracy (Count I) and wire fraud (Count II). *See, e.g.*, *Lew*, 875 F.2d at 221-22 (attorney could not be convicted of mail fraud where misrepresentations were made to government, but money was obtained from clients); *Mylan Labs.*, 770 F. Supp. at 1073-74 (no wire and mail fraud RICO predicates where misrepresentations were allegedly made to FDA, but third party was deprived of market share).

- 22 -

## IV.    CONCLUSION

For the foregoing reasons, Dr. Porat respectfully requests that this Court grant his motion

for judgment of acquittal on all counts.

Dated: November 22, 2021                      Respectfully submitted,

/s/ Jay P. Lefkowitz                                    /s/ Brian M. Nichilo
Jay P. Lefkowitz, P.C.                                Brian M. Nichilo (PA 313786)
Robert W. Allen, P.C.                                 Michael A. Schwartz (PA 60234)
(admitted *pro hac vice*)                          Richard J. Zack (PA 77142)
KIRKLAND & ELLIS LLP                          TROUTMAN PEPPER HAMILTON
601 Lexington Avenue,                             SANDERS LLP
New York, NY 10022                               3000 Two Logan Square
(212) 446-4800                                        Eighteenth & Arch Streets
lefkowitz@kirkland.com                            Philadelphia, PA 19103-2799
                                                              (215) 981-4494
                                                              (800) 615-2315(fax)
                                                              brian.nichilo@troutman.com

*Attorneys for Defendant Dr. M. Moshe Porat*

<u>**CERTIFICATE OF SERVICE**</u>

I, Brian M. Nichilo, hereby certify that on November 22, 2021, I caused a true and

correct copy of the foregoing Defendant Dr. M. Moshe Porat's Motion for Judgment of Acquittal

and Memorandum of Law in Support to be served via ECF and email upon the following:

> Mark Dubnoff, Esq.
> MaryTeresa Soltis, Esq.
> Nancy Potts, Esq.
> Assistant U.S. Attorney
> 615 Chestnut Street, Suite 1250
> Philadelphia, PA 19106
> mark.dubnoff@usdoj.gov
> mary.soltis@usdoj.gov
> nancy.potts@usdog.gov
> (via email)

/s/ Brian M. Nichilo