IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>MOSHE PORAT | CRIMINAL ACTION<br>NO. 21-170 |

**November 30, 2021**

## MEMORANDUM

The Court denied Defendant Moshe Porat's request to have Joel H. Slomsky, a sitting judge on this Court, testify as a character witness at Porat's trial. This Memorandum explains the Court's ruling.

I

The Grand Jury indicted Porat for conspiracy to commit wire fraud and wire fraud for his alleged role in defrauding Temple business school applicants, students and donors through falsely inflated rankings for the university's online and part-time MBA programs. *See* (ECF 1). Before trial, Porat filed a petition pursuant to Local Rule of Civil Procedure 45.1.1 for special allowance of a subpoena compelling Judge Slomsky to testify as a character witness. (ECF 55.)[1]

With that petition, Porat included a copy of a letter his lawyer had previously written to Judge Slomsky citing the relationship the judge and Porat developed over many years. (*Id.* at 6.) Porat believed Slomsky's character testimony would not be cumulative and would be "very important" to his defense given Porat's alleged intent to

---

[1] The rule applies in criminal cases under Local Criminal Rule 1.2.

commit the crimes charged.  (*Id.*)  Judge Slomsky responded that he was required to discourage defense counsel from requesting him to testify "unless there are 'unusual circumstances when the demands of justice require.'"  (*Id.* Ex. B. (quoting Canon 2B of the Code of Conduct for United States Judges & accompanying Commentary).)  He nonetheless went on to state that defense counsel's letter "does appear to support the notion" that such circumstances were present but that he could testify only in response to a subpoena in accordance with Local Civil Rule 45.1.1.  (*Id.* Ex. B.)  In opposing Porat's petition, the Government argued Porat had not met the "exacting standard" applicable to judicial character testimony or presented the requisite "exceptional or unusual circumstances."  (ECF 61 at 2–6.)  It claimed Porat failed to show Judge Slomsky's testimony would not be cumulative or that Porat would be unduly prejudiced in its absence.  (*Id.* at 5.)

Pursuant to Local Civil Rule 45.1.1(d), Porat's petition was referred to a committee of this Court composed of Chief Judge Sánchez and Judges Bartle and McHugh.  (ECF 63.)  The committee subsequently granted the petition without prejudice to the Court's inherent authority to determine the admissibility of Judge Slomsky's proposed testimony.  (ECF 67.)  At the final pretrial conference, the Court explained it would follow the procedure prescribed by the Third Circuit Court of Appeals in *United States v. Sullivan* and defer ruling on the admissibility of Judge Slomsky's testimony until after Porat presented all other character witnesses.  803 F.2d 87, 89–90 (3d Cir. 1986).  Porat subsequently filed a supplemental brief in support of having the judge testify.  (ECF 91.)

II

A

Judicial testimony is a "very delicate matter." *United States v. Frankenthal*, 582 F.2d 1102, 1107 (7th Cir. 1978). Judges are generally competent to testify in cases they are not presiding over. *United States v. Munoz-Franco*, 203 F. Supp. 2d 102, 106 (D.P.R. 2002) (collecting cases). But there is a presumption against such testimony that "warrants heightened scrutiny." *See United States v. Roth*, 332 F. Supp. 2d 565, 566–67 (S.D.N.Y. 2004). Canon 2B of the Code of Conduct for United States Judges states judges should not testify voluntarily as character witnesses. Its official commentary makes clear that such testimony should be reserved for "unusual circumstances when the demands of justice require" and further explains that this testimony "injects the prestige of the judicial office" into the case and could heighten jurors' perception of it as an "official testimonial." Canon 2B Commentary; *see also Roth*, 332 F. Supp. 2d at 566–67 (construing state code with similar language about judicial character testimony).[2]

Moreover, courts can forbid judicial character testimony if it is cumulative of testimony from non-judicial character witnesses. *See Sullivan*, 803 F.2d at 89–90 (concluding the district judge did not abuse his discretion in denying defendant's request for character testimony from ten state court judges on the ground that it would

---

[2] While *Roth* concerned a request for a judge to testify as a fact witness, its reasoning further explains the presumption against judicial testimony. The court stated judges can serve as fact witnesses only in "limited circumstances" when the testimony is "so essential" in that it is both "highly pertinent to the jury's task" and the "only possible source" of testimony on the issue. *Id.* at 568 (citing *Frankenthal*, 582 F.2d at 1108). The court granted the government's motion to quash the subpoena issued to secure the judge's testimony, concluding neither prong was satisfied and rejecting defendants' argument that the constitutional right to present a defense compelled the opposite result. *Id.* at 568–70.

3

have been cumulative); *see also Munoz-Franco*, 203 F. Supp. 2d at 110 (relying on *Sullivan* in excluding a district judge's character testimony in part because of the availability of other witnesses to provide similar testimony).

Criminal defendants have the right under the Fifth Amendment Due Process and Sixth Amendment Compulsory Process Clauses to present witnesses as part of their defense. *See Taylor v. Illinois*, 484 U.S. 400, 408–09 (1988) (citing *Chambers v. Mississippi*, 410 U.S. 284, 302 (1973) and *Washington v. Texas*, 388 U.S. 14, 19 (1967)). But this right is a qualified one; it does not extend to all types of testimony, including testimony excludable under the Federal Rules of Evidence. *See id*. at 410, 411 n.15 (explaining that criminal defendants need to abide by evidentiary rules "designed to assure both fairness and reliability in the ascertainment of guilt and innocence" (quoting *Chamber*s, 410 U.S. at 302)). When considering whether excluding a judge's character testimony after allowing non-judicial character testimony violates the Sixth Amendment, the "operative question" for the Court is whether it "would be cumulative." *Sullivan*, 803 F.2d at 89.

Rule 403 authorizes courts to exclude relevant evidence whose "probative value is substantially outweighed" by dangers including unfair prejudice and cumulativeness. District courts have "broad discretion" to exclude evidence under this rule, after conducting a "fact-intensive" analysis. *United States v. Heinrich*, 971 F.3d 160, 163 (3d Cir. 2020) (noting that a court's ruling is "rarely disturbed" when it describes its 403 balancing and rationale on the record); *Munoz-Franco*, 203 F. Supp. 2d at 108.

B

Porat gave six specific reasons, based on knowing him for roughly twenty years, why Judge Slomsky should be permitted to testify as one of his character witnesses: Porat and the judge live next to each other at the Jersey Shore, they attended the same social events, shared meals, traveled together, belonged to the same book club for about fifteen years, and Judge Slomsky once attended the Fox School's Musser Dinner. (ECF 55 at 6, Ex. A.) At the final pretrial conference, counsel elaborated, stating his client and Judge Slomsky interacted during the summer and on weekends at the Jersey Shore as neighbors in a beachfront condo in Ventnor; that the book club contains about fourteen members; that Porat and Slomsky have traveled to New York on multiple occasions; and that Slomsky has "come to Temple." (Final Pretrial Conf. Hr'g Tr. 118:7–15, 119:8–16, 129:3–5, ECF 92.)

Porat argued Judge Slomsky's testimony would be "significant" to Porat's defense given intent would be a "central issue." (ECF 55 at 7); *see also* (Trial Tr. Day 8 Aft. Sess. 71:11–21 (explaining his testimony would be even more important given the "character attacks" leveled at Porat during the trial and "attempt to portray [Porat] in the worst light possible with every witness")). According to Porat, because of the "length and breadth" of his relationship with Judge Slomsky, the judge's testimony would "not be cumulative" and Porat would be "unduly prejudiced" without it. (ECF 55 at 7.) Porat also placed great weight on Slomsky's comment that the "unusual circumstances" the Canon 2B commentary contemplate for judicial character testimony appeared to be present. (*Id.*)[3]

---

[3] To the contrary, Judge Slomsky's opinion that Porat's case appeared to present "unusual circumstances" required by the "demands of justice" adds nothing to the mix. (ECF 55 Ex. B at 3

In his supplemental brief, Porat argued Judge Slomsky's testimony would not be cumulative because the judge is one of only a few people with "insight into" Porat's character over a "long period of time <u>and</u>" in a "broad array of personal <u>and</u> professional circumstances." (ECF 91 at 4 (underlines in original).) He contended Porat's non-judicial character witnesses do not possess the "breadth and depth" of insight Judge Slomsky has into Porat's character. (*Id.*) After Porat's non-judicial character witnesses had all testified and the Court, pursuant to *Sullivan*, asked for an offer of proof as to what Judge Slomsky would say, counsel relied on this part of his supplemental brief. (Trial Tr. Day 8 Aft. Sess. 72–73.)

C

Judge Slomsky's character testimony would have been cumulative of that provided by Porat's ten non-judicial character witnesses. Individually and collectively, these witnesses testified about Porat's character in all the ways Judge Slomsky could have—many with more detail and insight and based on longer and closer personal or professional relationships. As such, Porat did not overcome the presumption against judicial testimony, and any probative value of Judge Slomsky's proposed testimony would have been "substantially outweighed" by a danger of Porat "needlessly presenting cumulative evidence." *See Roth*, 332 F. Supp. 2d at 566–67; Fed. R. Evid. 403; *see also Sullivan*, 803 F.2d at 89–90; *Munoz-Franco*, 203 F. Supp. 2d at 110 (invoking Rule 403).

---

(quoting Canon 2B Commentary).) When he said this, several months before trial, Judge Slomsky had no way of knowing that Porat's non-judicial character witnesses would cover, in spades, the areas Porat felt necessary to have the judge talk about.

Porat argued Judge Slomsky should be allowed to testify as a character witness in part because he and Porat have a personal relationship that goes back about twenty years. (ECF 55 at 6). Five of Porat's character witnesses have known him for more than twenty years, including two who have known him twice that long. (Trial Tr. Day 8 Morn. Sess. 98:11–12, 109:13–16, Aft. Sess. 22:4–5, 34:18–19, 60:18–25.)

With respect to Porat and Judge Slomsky living next to each other at the Jersey Shore, (ECF 55 at 6), two of Porat's character witnesses are close friends with whom he has socialized extensively at the Shore. Daniele Grossman testified that she and her husband invited Porat and his wife to the Shore after they met at a dinner hosted by the consulate general of Israel about twenty-five years ago. *See* (Trial Tr. Day 8 Aft. Sess. 22–23). They went on long walks together along the water or on the boardwalk, and the Porats later moved into an apartment in the Grossmans' building. (*Id.* at 23–24.) Additionally, Harriet Weiss testified that after meeting Porat's wife at a luncheon approximately six years ago, Weiss and her husband "clicked" with Porat and his wife at a breakfast in Margate, New Jersey. (*Id.* at 65:3–9.) The couples have continued to socialize at the Shore: they live in the same neighborhood, take walks on the boardwalk together and have shared many meals. (*Id.* at 65–66, 68–69.)

Porat also noted he and Judge Slomsky attended social events together. (ECF 55 at 6.) Porat had countless social interactions with many of his character witnesses. Jagbir Singh, a former Temple professor and department head under Porat's deanship who has known Porat for about forty years, testified he has invited Porat to his home for social gatherings with graduate students, and Porat has also joined Singh and other faculty members on Zoom meetings. (Trial Tr. Day 8 Aft. Sess. 58:7–21, 60:13–25,

7

61:5–10, 20–23.) Porat and his wife met with Grossman and her husband for a private dinner the night after they met at the Israeli-consulate-general dinner; the couples have often socialized while living in the same building at the Shore, including taking long walks. (*Id.* at 22–24.) And Weiss and her husband have also taken walks with Porat and his wife while living in the same neighborhood at the Shore. (*Id.* at 65:10–12, 68–69.)

Porat claims he and Judge Slomsky have shared meals. (ECF 55 at 6.) Presumably one of the meals they "shared" was the Musser Dinner, an event attended by hundreds of people. *See infra* Section II.C. Even if Judge Slomsky has dined with Porat in smaller settings, so have several of Porat's character witnesses. Alex Vaccaro, president of the Rothman Institute at Thomas Jefferson University Hospitals, testified he had multiple breakfasts with Porat, whom he met around 2012. (Trial Tr. Day 8 Aft. Sess. 13–14, 16:10–11.) Porat also used to have monthly lunches with Arvind Phatak— a former Temple professor and department chair who had a "very cordial relationship" with Porat and has known him as a professor, student, friend and boss (when Porat was dean) since they met more than thirty years ago. (*Id.* at 28–30, 32:17–18, 33:5, 34:18–19.) Moreover, Grossman testified about a private dinner she and her husband had with Porat and his wife. (*Id.* at 22–23.) Weiss and her husband "eat a lot" at the Shore with Porat and his wife, including many breakfasts and dinners. (*Id.* at 66:20.) Finally, Jane Goldblum—an immigration lawyer with more than forty years of experience who has known Porat for roughly twenty-two years—and her husband enjoyed dinners and wine with Porat and his wife during their biking trip through France's Loire Valley. (*Id.* Morn. Sess. 97–98.) The Goldblums and Porats have dined

8

together on other occasions as well; the couples are "close friends," and Goldblum stated she knows the "essence of" Porat. (*Id.* at 99:6–7, 101:7.)

Porat also asserted he and Judge Slomsky "traveled" together, later specifying they took more than one trip to New York and that Slomsky has "come to Temple." (ECF 55 at 6; Pretrial Conf. Hr'g Tr. 129:3–5.) Two of Porat's character witnesses have traveled far longer distances with him than Judge Slomsky has. Grossman and her husband went on a 10-to-12-hour car trip to Canada with Porat and his wife. (Trial Tr. Day 8 Aft. Sess. 24:13–16.) And again, Goldblum and her husband biked through the Loire Valley with Porat and his wife; they also traveled together to "Miramar," presumably in Florida. (*Id.* Morn. Sess. 98–99.)

Porat further pointed to he and Judge Slomsky belonging to the same book club for approximately fifteen years. (ECF 55 at 6.) Porat emphasized his belief in the significance of this connection, explaining that such a club is a "fairly unique activity" for people of Porat and Judge Slomsky's generation because of the "very candid and frank discussions" that take place. (Trial Tr. Day 8 Aft. Sess. 72:21–24.) While none of Porat's character witnesses stated they are members of that, or a different, book club with Porat, he has discussed books with Grossman and her husband, including on their long car ride to Canada—during which the couples "cover[ed] everything" and "solved the problems of the world," and Porat and Grossman's husband discussed their "favorite" topics: history and World War II. (*Id.* at 24–25.)

As an added point of emphasis, Porat highlighted how Judge Slomsky once attended the Fox School's Musser Dinner. (ECF 55 at 6, Ex. A.) But as Virginia Roth, who served as Porat's executive assistant for twenty-two years, told the jury, the

9

Musser Dinner is a sprawling event, which as many as five hundred or more people—divided into at least fifty tables of ten—have attended. Weiss has gone to the Musser Dinner when Porat was there on multiple occasions. (Trial Tr. Day 8 Aft. Sess. 65:15–17, 69:13.) The same is true of another of Porat's character witnesses, Harith Wickrema. (*Id*. Morn. Sess. 114–15.) He had "active" and "direct[]" engagement with Porat while working as a Temple professor for eleven years and serving on the board of visitors for a school Porat was dean of—the School of Sport, Tourism and Hospitality Management ("STHM")—after first meeting Porat when they were students more than forty years ago. (*Id*. at 109–11.) Wickrema also helped arrange Porat's daughter's wedding through the company he started, received advice from Porat's son on finding a doctor for a medical issue, has talked to Porat on a regular basis and made a six-figure donation to STHM because Porat inspired him. (*Id*. at 110:7–12, 112–13.)

The Musser Dinner was apparently Judge Slomsky's only "professional" connection to Porat. *See* (ECF 55 at 6). Several of Porat's character witnesses had far longer and more frequent interactions with Porat in his professional capacity. Larry Kaiser, a cardiothoracic surgeon, former dean of Temple's medical school and president and CEO of the Temple University Health System, went to council of deans meetings during the seven years he and Porat were both Temple deans primarily because Porat was there. (Trial Tr. Day 8 Aft. Sess. 36–38.) The two would frequently exchange advice. (*Id*. at 38.) Raza Bokhari, a pharmaceutical executive who has known Porat for roughly twenty years, interacted with Porat while working as an entrepreneur in residence at the Fox School, has remained in touch with Porat, attended "all" events at

which Porat was keynote speaker and, because he was inspired by Porat, made a $1 million donation to the Fox School's Alter Hall.  (*Id.* at 47–50, 52:6–7.)

Vaccaro discussed with Porat pursuing an online MBA over multiple breakfasts, obtained an OMBA from the Fox School and has sought business guidance from him.  (*Id.* at 13–14, 17:18–20.)  Vaccaro also set up a "micro MBA" program at the Rothman Institute that includes biweekly online lectures from Fox School professors, has asked Porat to serve as a guest speaker for medical residents and considers Porat "one of the most important characters in my life" because of his impact on the Rothman Institute's ability to provide care to patients in Philadelphia.  (*Id.* at 16–18.)  And at Porat's request, Michael Siegel, who met Porat eighteen or twenty years ago, taught at Temple for ten years while Porat was dean—regularly interacting and occasionally discussing ideas with "my boss"—and has remained in contact with Porat.  (*Id.* at 6–8, 10:16–18.)  Other former Temple business professors who worked under Porat also testified on his behalf: Wickrema, Phatak and Singh.

Taken together, these witnesses provided extensive insight into Porat's personal and professional life.  Based on Porat's own offer of proof as to what Judge Slomsky would speak to, these witnesses rendered cumulative the judge's proposed testimony.  *See* Fed. R. Evid. 403; *Sullivan*, 803 F.2d at 89–90.

D

Whatever probative value Judge Slomsky's testimony could have had would have been substantially outweighed by the danger of unfair prejudice.  Fed. R. Evid. 403.[4]

---

[4]   In his supplemental brief, Porat argued that in granting allowance of the subpoena, the three-judge committee limited the Court to determining whether or not Judge Slomsky's testimony would be cumulative because its lack of prejudicial effect "already ha[d] been decided." (ECF 91 at 1.)  The committee, of course, did no such thing.  To the contrary, it explicitly preserved the "inherent

11

The testimony would have "inject[ed]" his office's prestige into the case, and jurors may have understood it as an "official testimonial" for Porat. Canon 2B Commentary; *see also Munoz-Franco*, 203 F. Supp. 2d at 109 (excluding a judge's character testimony under Rule 403 in part because of the unfair prejudice stemming from the testimony being "unfairly enhanced by his judicial robe"). The latter was a heightened and acute risk in this case because Judge Slomsky sits on this Court. The presiding judge's colleague presenting a perceived official testimonial on the defendant's behalf, at minimum, would have unfairly prejudiced the proceedings and, at maximum, made light of them.

Finally, nowhere in all his filings—his lawyer's letter to Judge Slomsky, his petition for special allowance of subpoena, the brief supporting that petition or the supplemental brief—did Porat ever state that he wanted Slomsky to testify as anyone other than United States District Judge Joel Slomsky. (ECF 55, 55 Ex. A, 91.) After sensing the Court's skepticism of the request and to mitigate the Court's stated concerns about "inject[ing]" the prestige of Judge Slomsky's office into the case and him providing an "official testimonial" for Porat, Canon 2B Commentary, the defendant suggested cloaking the judge's identity. He proposed that defense counsel could avoid referring to Judge Slomsky's title and that the judge could be identified as a "trained lawyer" or a longtime member of the "Philadelphia legal community." (Trial Tr. Day 8 Aft. Sess. 76–77, 79–80; Final Pretrial Conf. Hr'g Tr. 125–26, 128–29, 133–34.) Porat's fallback plan merits little to no consideration. For one, allowing Judge Slomsky's

---

authority of the trial judge to determine the admissibility" of Judge Slomsky's testimony. (ECF 67.) The order did not cabin the term "admissibility" in any way.

testimony would have put the Government in the position of potentially having to restrict its cross-examination or divulge the judge's position, something Porat of course had no problem with. (Trial Tr. Day 8 Aft. Sess. 78–79.) Most importantly, whether or not Judge Slomsky testified incognito, what he proposed to say had already been thoroughly covered by the ten non-judicial character witnesses. *See supra* Section II.C. The only thing Judge Slomsky could have added to what the jury already heard (many times) is what Porat started this whole process wanting Slomsky to say: that he is a federal judge on this Court and that he thinks Porat is a really good, honest guy. The defendant may have wanted to use the imprimatur of one of the presiding judge's colleagues to bolster his case, but that is precisely what the presumption against judicial testimony is designed to avoid.

BY THE COURT:

*/s/ Gerald J. Pappert*
GERALD J. PAPPERT, J.