**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

UNITED STATES OF AMERICA,

v.

MOSHE PORAT

CRIMINAL ACTION
NO. 21-170

**PAPPERT, J.**                                                    **March 8, 2022**
<u>**MEMORANDUM**</u>

2018 was supposed to be a great year for Moshe Porat, dean of Temple University's Fox School of Business.  Fox's online MBA program, ranked ninth by *U.S. News & World Report* in 2014, had just been ranked first for the fourth consecutive year.  Its part-time MBA program, ranked fifty-third in 2014, rose to seventh the previous year.  Enrollment in both programs had skyrocketed.  2018 was on track to be "a terrific year of celebration of Fox's ascension as a really national player on the business school front."  (Trial Tr. Day 5 at 36:1–4, ECF 133.)

The celebration was short lived.  On January 9, 2018, Fox administrators learned that in its latest submission to *U.S News*, the school had reported that one hundred percent of its incoming online MBA students had taken the Graduate Management Admissions Test.  The real number was much lower.  But despite this concerning revelation, Porat tried to keep the party going as long as he could, attending a toast for the dubious ranking, touting it in emails to donors and recruiters, and resisting calls to report the inaccuracy or investigate it further.

But it was reported and investigated.  The false information in the most recent online MBA survey turned out to be the tip of the iceberg.  Fox's responses to *U.S. News*

surveys were riddled with falsehoods and fabrications.  Two in particular caught the eyes of federal prosecutors.  First, Fox falsely reported one hundred percent of its online MBA students had taken the GMAT in each of the four years the program was ranked first in the nation.  Second, during the same four years, it combined its online, part-time and executive MBA cohorts when reporting the number of students in its part-time program and calculating the average work experience of those students.

A grand jury indicted Porat for conspiracy to commit wire fraud and wire fraud on April 15, 2021.  The indictment alleged Porat had devised a scheme to defraud Fox students, applicants and donors of money by touting fraudulently obtained rankings, and that he conspired with Marjorie O'Neill and Isaac Gottlieb to perpetrate that scheme.  In November, a jury convicted him on both counts.

At the conclusion of the Government's case, Porat moved for a judgment of acquittal.  (Mot. J. Acquittal, ECF 109.)  The Court heard oral argument but reserved decision pursuant to Federal Rule of Criminal Procedure 29(b).  (Trial Tr. Day 8, Rule 29 Motion, at 31:10–11, ECF 113.)  Following the jury verdict, Porat moved again for acquittal or, in the alternative, a new trial.  (Mot. J. Acquittal or New Trial, ECF 139.) The Court now denies both motions.

Porat's motion for acquittal focuses almost entirely on evidence he thought favorable to him and asks the Court to draw inferences the jury rejected.  In support of his motion, he submitted heavily redacted trial transcripts and a careful curation of the documentary evidence, as if the Court should consider only the evidence he wanted the jury to hear, not what it actually heard.  Gone are the emails he exchanged with Isaac Gottlieb in January 2018 about the effect of the false information

2

on the ranking of Fox's online MBA program.  Gone are the lies he told his superiors and subordinates to conceal the nature of the inaccurate submissions and their impact on Fox's ranking.  Gone is his own sworn testimony, taken during five days of depositions in his defamation lawsuit against Temple and its former president.  The list of missing evidence—and it is a long one—goes on.  It is not the Court's role to waive away the evidence that convicted Porat.  It is to consider whether the evidence—all of it, taken together—supported his conviction.  Whether viewing the entire record in the light most favorable to the prosecution or assessing the weight of the evidence, the answer is clear: it did.

In addition to challenging the sufficiency of the evidence, Porat's motion for a new trial renews four objections he raised at trial.  They are no more successful now than they were then.

# I

## A

Rule 29 of the Federal Rules of Criminal Procedure provides that a court, "on the defendant's motion[,] must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction."  Fed. R. Crim. P. 29(a).  Evidence is insufficient if no "rational trier of fact could have found proof of guilt beyond a reasonable doubt based on the available evidence."  *United States v. Caraballo-Rodriguez*, 726 F.3d 418, 430 (3d Cir. 2013) (en banc) (quoting *United States v. Brodie*, 403 F.3d 123, 133 (3d Cir. 2005)).  This standard is "highly deferential."  *Id.*  It requires courts to view the entire record—not just isolated parts—"in the light most favorable to the prosecution."  *Id.* (quoting *Brodie*, 403 F.3d at 133).  Courts "must be ever vigilant

not to usurp the role of the jury by weighing credibility and assigning weight to the evidence." *Id.* (ellipsis omitted) (quoting *Brodie*, 403 F.3d at 133). To avoid "act[ing] as a thirteenth juror," a court must uphold any verdict that "does not 'fall below the threshold of bare rationality.'" *Id.* at 431 (quoting *Coleman v. Johnson*, 566 U.S. 650, 656 (2012)); *see also United States v. Jacobs*, 21 F.4th 106, 112 (3d Cir. 2021).

B

A more deferential standard of review applies to motions for a new trial under Rule 33. That rule permits district courts to "vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). Courts need "not view the evidence favorably to the Government," *United States v. Silveus*, 542 F.3d 993, 1004 (3d Cir. 2008) (quoting *United States v. Johnson*, 302 F.3d 139, 150 (3d Cir. 2002)). That said, Rule 33 motions are "disfavored and should be 'granted sparingly and only in exceptional cases.'" *Id.* (quoting *Gov't of Virgin Islands Y. Derricks*, 810 F.2d 50, 55 (3d Cir. 1987)). A court may "order a new trial on the ground that the jury's verdict is contrary to the weight of the evidence only if it 'believes that there is a serious danger that a miscarriage of justice has occurred—that is, that an innocent person has been convicted.'" *United States v. Salahuddin*, 765 F.3d 329, 346 (3d Cir. 2014) (quoting *Johnson*, 302 F.3d at 150). And a court may grant a new trial to cure an error at trial only if the error (or errors) "had a substantial influence on the outcome of the trial." *United States v. Greenspan*, 923 F.3d 138, 154 (3d Cir. 2019) (quoting *United States v. Thornton*, 1 F.3d 149, 156 (3d Cir. 1993)).

II

Porat begins with a two-pronged attack on his conspiracy conviction. He argues there was insufficient evidence O'Neill and Gottlieb agreed to submit false information to U.S. News with the intention of defrauding donors, students, and applicants, or that Porat intentionally joined their agreement. But the evidence presented by the Government demonstrated both the existence of an illicit agreement and Porat's membership in it.

A

A defendant is guilty of conspiracy under 18 U.S.C. § 371 if he agrees with another "to commit any offense against the United States" and one or more conspirator acts in furtherance of the conspiracy. The jury must find beyond a reasonable doubt the conspirators had "(1) a shared unity of purpose; (2) an intent to achieve a common illegal goal; and (3) an agreement to work toward that goal." *United States v. John-Baptiste*, 747 F.3d 186, 204–05 (3d Cir. 2014).

The elements of conspiracy "can be proven entirely by circumstantial evidence." *Brodie*, 403 F.3d at 134. In fact, "'it is not unusual that the government will not have direct evidence'" as "'[k]nowledge is often proven by circumstances.'" *Caraballo-Rodriguez*, 726 F.3d 431 (3d Cir. 2013) (en banc) (quoting *United States v. Iafelice*, 978 F.2d 92, 98 (3d Cir. 1992)). "Indeed, the very nature of the crime of conspiracy is such that it often may be established only by indirect and circumstantial evidence." *Brodie*, 403 F.3d at 134.

B

At trial, the Government argued Porat conspired with two other people at Fox: Marjorie O'Neill and Isaac Gottlieb.  O'Neill was the administrator who prepared Fox's survey submissions and "work[ed] with the dean on the rankings."  (Trial Tr. Day 6, Morning Session, at 32:11–14, 33:4–19, ECF 134 (Breslin-Knudsen Test.).)  Gottlieb was a Fox faculty member and "consultant" to Porat who "reverse-engineered the rankings and . . . advised [Fox] on how to do better."  (Trial Tr. Day 2, Kiely Direct, at 11:8–18, ECF 95.)  Porat contends that "while the evidence . . . may have established that Ms. O'Neill and Dr. Gottlieb agreed to submit false information to U.S. News," there was no evidence O'Neill and Gottlieb intended to defraud Fox students, applicants and donors of money.  (Mot. J. Acquittal or New Trial at 6–7.)

He is wrong.  The evidence showed Gottlieb understood "the financial value" of higher rankings.  (Gov't Ex. 66.)  In a January 18, 2015 email to Porat, Gottlieb explained that "being number one" in the online MBA ranking could "potentially add over 1-200 students a year" to the program.  (*Id.*)  Assuming tuition was forty-five thousand dollars a year, not being number one would result in "lost revenues of $4,500,000" annually.  (*Id.*)  He then suggested Porat "explain and add a financial value to the increase in ranking" so that others at the school would have an incentive to improve rankings metrics.  (*Id.*)  Gottlieb wanted Porat to "talk $s" when discussing rankings because he knew that higher rankings generated more revenue for the school. (*Id.*)

Gottlieb doubled down on this analysis in a September 2015 email to Fox's leadership—Diana Breslin-Knudsen, Rajan Chandran and Porat[1]—in which he predicted that moving the full-time MBA program into the top thirty in the *U.S. News* ranking would double enrollment. (Gov't Ex. 67.) He explained that Fox's "OMBA and PMBA doubled in intake numbers when we had a striking increase in rankings." (*Id.*) He estimated that doubling enrollment would "leave [F]ox with a **profit of over $700,000 a year**" after taxes and expenses. (*Id.* (emphasis in original).) He then suggested the school create a scholarship fund to use "ONLY when needed" to attract students with the GPA necessary to secure a higher ranking. (*Id.*) Gottlieb's reasoning demonstrated rankings were a means to an end: increased revenue and increased profits for the school.

The jury reasonably inferred Gottlieb joined the agreement to submit false information to *U.S. News* because he wanted to obtain money for Fox. He said as much. Doing so necessarily involved depriving students and applicants of money they would have spent elsewhere (or not at all) had they known Fox's true ranking. Given the ample evidence Porat knowingly and intentionally joined the agreement to defraud students and donors, *see infra* section II.C, this is enough to sustain his conspiracy conviction. *United States v. Allen*, 613 F.2d 1248, 1253 (3d Cir. 1980) ("[T]he question is not whether there was sufficient evidence [the defendant conspired with others named in the indictment], but whether there was sufficient evidence that he conspired with some other person.").

---

[1] Breslin-Knudsen, senior vice dean, oversaw the administrative aspects of the school. Chandran, the deputy dean, supervised the faculty. Along with Porat they formed a "triad" at the top of the business school's hierarchy. (Trial Tr. Day 2, Kiely Direct, at 7:15-8:19.)

There was also plenty of evidence from which the jury could have inferred O'Neill joined the agreement with the intention of defrauding donors, students, and applicants.  To begin, her fraudulent submissions were at the core of the conspiracy, and "a defendant's knowledge and intent may be inferred from conduct that furthered the purpose of the conspiracy."  *United States v. McKee*, 506 F.3d 225, 241 (3d Cir. 2007).  Nor did those submissions take place in a vacuum.  The evidence supported the inference O'Neill knew rankings were important because they increased revenue, and that she agreed to submit false data because she intended for Fox to use ill-gotten rankings to fill its coffers.

The significance of rankings to the school's finances was clear.  As Fox Vice Dean Christine Kiely explained, there was "absolutely" a financial benefit to being highly ranked.  (Trial Tr. Day 2, Kiely Direct, at 14:25.)  A high rank causes more students to apply, which results in more incoming students and ultimately more tuition revenue. (*Id.* at 14:22–25.)  Increasing enrollment "was a very big part" of the school's strategic plans, (Trial Tr. Day 5 at 113:6–8 (Tutora Test.)), and rankings were an important tool Fox used to pursue that goal, (Trial Tr. Day 6, Morning Session, at 23:1–3 (Breslin-Knudsen Test.)).  As Senior Associate Dean Aubrey Kent put it, "rankings were an important tactic in the overall strategy of the school to grow."  (Trial Tr. Day 7 at 148:12–14, ECF 148).  Porat himself talked about the link between rankings and growth.  (*Id.* at 148:22–149:9.)

The Government's evidence illustrated the many ways in which Fox "used rankings as a marketing technique to attract students to the school."  (Trial Tr. Day 4 at 73:4–6, ECF 132 (Reith Test.)); *see also* (*id.* at 148:3–20 (Campbell Test.)).  Fox

touted its *U.S. News* rankings on billboards, (Gov't Exs. 26–30), on buses, (Gov't Exs. 31–36), on newsstands, (Gov't Exs. 31, 37, 38), on trains, (Gov't Exs. 34, 35, 39), at transportation centers, (Gov't Exs. 37, 38, 39), and on the internet, (Gov't Exs. 41–46).

The jurors were not required to close their eyes to the atmosphere in which O'Neill worked.  It provided "a prism through which to assess all of the other circumstantial evidence." *Brodie*, 403 F.3d at 150.  Evidence that something was "widely known" at an organization is probative of the defendant's—and his co-conspirators'—knowledge on that point. *McKee*, 506 F.3d at 240.  The evidence supported the commonsense conclusion that by working at Fox, on rankings and in close proximity to the dean, O'Neill came to know the financial importance of rankings to the school. *See Caraballo-Rodriguez*, 726 F.3d at 433–344 (explaining that the jury can use its common sense, and infer the defendant did too).

For example, O'Neill attended a faculty and staff celebration of Fox's rankings where Porat held a banner that read "your stock is soaring." (Gov't Ex. 48); *see also* (Gov't Exs. 49–50); (Trial Tr. Day 3 at 103:17–21; 105:15–19, ECF 131 (Coughlin Test.)).  This banner, which Fox intended to incorporate into its marketing, (Gov't Ex. 49), employed a metaphor Porat "often" used to explain the value of a Fox degree. (Gov't Ex. 148.)  In a graduation speech the same year, he told students "your diploma is like a share of stock in an enterprise.  An enterprise in which you remain shareholders long after you have graduated." (*Id.*); (Trial Tr. Day 3 at 226:21–22 (Coughlin Test.)).  He immediately linked the value of that stock to Fox's rankings, saying, "many leading publications rank our programs among the best in the world." (Gov't Ex. 148.)  In other words, the publications "agree that our stock indeed has been

appreciating in value." (*Id.*)  Even if O'Neill was not present at the speech, it was reasonable to believe she was aware of and understood Porat's metaphor: she was photographed in a picture in which it was used.

The financial value of rankings to the school—their effect on its "stock"—was openly discussed.  The evidence supported the conclusion O'Neill knew the purpose of falsifying rankings submissions was to obtain money for the school by capitalizing on the inflated rankings to increase applications, enrollment, and donations, and that she agreed to participate in the conspiracy intending to further that purpose.  *See United States v. Klein*, 515 F.2d 751, 753 (3d Cir. 1975) ("Knowledge of the illicit purpose will also serve as the foundation for the required proof of specific intent.").

C

Porat next argues there was insufficient evidence he knowingly and intentionally joined the conspiracy to defraud students, applicants and donors.  He divides the evidence of his participation into three categories, each of which he contends is insufficient to support his conviction.  First, he fixates on the absence of "direct evidence" he instructed O'Neill to provide *U.S. News* with false information about the number of online MBA students who submitted GMAT scores.  (Mot. J. Acquittal or New Trial at 8.)  Second, he claims he did not knowingly direct O'Neill to provide false information regarding the percentage of Fox's students who were enrolled in its part-time MBA program.  (*Id.* at 22.)  Third, he argues his response to the revelation Fox had submitted false information was insufficient to prove his knowing and intentional participation in the conspiracy those submissions were intended to further.  (*Id.* at 22.)

The record puts the lie to all of this. Even if Porat was not involved in the conspiracy prior to January 2018, he joined the conspiracy when he agreed with Gottlieb to continue using rankings he knew to be misleading to recruit students and solicit donors. In any event, there was ample evidence from which the jury could have inferred Porat not only joined the conspiracy in 2014, he directed it.

As an initial matter, one of the overriding reasons Porat's motion for acquittal rings hollow is that some of the most damning evidence against him came from his own mouth. Porat did not testify at his criminal trial, but the Government played dozens of excerpts taken from his five days of sworn, videotaped deposition testimony in his ill-conceived defamation lawsuit against Temple. That testimony put Porat in a terrible bind in his criminal case. It was akin to a criminal defendant taking the stand but being allowed to say only what the prosecution wanted the jury to hear.

These videos allowed the jury to assess Porat's credibility. They enabled the jury to credit those aspects of his testimony that were consistent with the other evidence—testimony that in some instances amounted to confessions of criminal conduct. By the same token, the jury was free to disbelieve the rest, much of which was directly contradicted by documentary evidence, the testimony of every other witness to the events in question and plain common sense. Jurors could have considered his demeanor and what they were free to determine were evasions, half-truths and outright lies as evidence of his consciousness of guilt and his criminal intent. Those judgments belonged to the jury, and it is hard to imagine grounds on which the Court could upset them.

1

The day after Fox administrators discovered the school had inaccurately reported to *U.S. News* that one hundred percent of its online MBA students had taken the GMAT, O'Neill emailed Gottlieb to tell him Porat wanted him to determine where Fox would have been ranked had it reported the actual number of students who had taken the GMAT or GRE. (Gov't Ex. 92.) In his defamation case, Porat confirmed he asked O'Neill to reach out to Gottlieb. (Gov't Ex. 102M.) By that point, he knew Fox had made "a pretty big error" in reporting the number of students who had taken the GMAT. (Gov't Ex. 102N.)

At 6:30 the next morning, Gottlieb emailed Porat to tell him Fox would have been ranked sixth had it responded truthfully. (Gov't Ex. 93.) O'Neill then relayed another request from Porat to Gottlieb, this time for "a sensitivity analysis" showing how different reported percentages of GMAT and GRE takers would impact their overall rank. (Gov't Ex. 94.) Again, Porat confirmed he asked O'Neill to make this request. (Gov't Ex. 102S.)

Gottlieb responded at 5:59 a.m. on Saturday, January 13. (Gov't Ex. 95.) Just minutes later, O'Neill copied Porat on her response to Gottlieb. (*Id.*) Then, in response to inquiries from Porat, Gottlieb emailed him and O'Neill at 9:12 and 10:52 that morning to confirm that if Fox had responded honestly to the survey, it would have been ranked sixth. (Gov't Ex. 96.)

Two days later, on January 15, Gottlieb emailed Porat—and only Porat—to say Fox "should not reach out to U.S. News" because he believed *U.S. News* would not take

the initiative to investigate or act on the discrepancy themselves.  (Gov't Ex. 97.)  Porat agreed.  (*Id.*)

While "common sense suggests, and experience confirms, that illegal agreements are rarely, if ever, reduced to writing or verbalized with the precision that is characteristic of a written contract," *McKee*, 506 F.3d at 238, Gottlieb and Porat came close.

Despite knowing by January 13, 2018, that Fox's online MBA could not be ranked higher than sixth if it had accurately reported the number of students who had taken the GMAT or GRE, on January 22 Porat ordered his staff to send an email to the "Porat 100," a list that included donors to the school, touting the online MBA's number one ranking.  (Gov't Exs. 98, 100, 142, 102W, 104J); (Trial Tr. Day 3 at 223:23–24:1 (Coughlin Test.)).

Porat admitted that at the time he approved the final marketing email he knew Fox had reported false information and that Gottlieb had predicted their rank would have been lower if Fox had supplied accurate information.  (Gov't Exs. 102X; 104L; 104M.)  He ordered the email sent out against the advice of Fox staff and administrators.  Vice Dean Debbie Campbell said, "I think it's a mistake to send any more messages out until we know what *U.S. News* is going to do." (Trial Tr. Day 4 at 224:3–4.)  Others expressed the same sentiment, including Breslin-Knudsen and Assistant Dean Tom Kegelman.[2]  *See* (*id.* at 224:12–13.); (Trial Tr. Day 6, Morning Session, at 75:9–17, ECF 134 (Breslin-Knudsen Test.)).  His executive assistant, Virginia Roth, was "very concerned that we were going to send out an e-mail blast that

---

[2] Tom Kegelman was responsible for marketing, admissions, and communications.  (Trial Tr. Day 2, Kiely Direct, at 10:8–15.)

touted us being No. 1 when, in fact, we weren't No. 1." (Trial Tr. Day 7 at 127:12–16, ECF 125.) She told Porat, "let's hold off on this." (*Id*. at 127:17.) He did not.

He knew the January 22 email was going to donors. He said so under oath. (Gov't Ex. 102Z); *see also* (Trial Tr. Day 7 at 119:23–24 (Roth Test.) ("[N]o one was placed in the database . . . unless it came from Dr. Porat.")). When asked why he would broadcast to donors a ranking he knew was inaccurate and based on false information, Porat got defensive. He said, "what do you think, what a donor would do, would commit suicide? Stop sending . . . giving any money? For them it was one item in the entire portfolio of what the school is all about." (Gov't Ex. 102AA.) While Porat wanted to make it seem like his lie was trivial, his callous hyperbole corroborated the commonsense conclusion that rankings do matter to donors, that Porat knew this, and that he sent out the email celebrating the number one ranking because it was something donors cared about. Indeed, Porat subsequently acknowledged he used "all rankings" as fundraising tools. (Gov't Ex. 104K.)

When asked during his deposition whether he used "Fox's No. 1 Online MBA ranking as a vehicle to raise funds and moneys for the university," Porat paused before saying "not as a priority." (*Id*.) When counsel pressed him, he admitted he used the number one ranking "among many other things" to raise money. (*Id*.) It was reasonable to believe Porat when he admitted he used the online MBA ranking to raise money, but disbelieve him when he said it was not a priority. Porat undercut his credibility multiple times throughout his videotaped testimony, including when he claimed just seconds later that he "always" put Fox's research ranking first. (*Id*.) A glance at the January 22 email—or any of the other marketing emails and

advertisements in evidence—allowed the jury to conclude that was a lie.  (Gov't Ex. 100); *see also* (Gov't Exs. 26–35, 41–46, 69, 89–91).

Other events in January 2018 confirmed that Porat intended to tout rankings he knew to be based on false information.  Consider Porat's actions on January 9, the day other administrators discovered Fox had falsely reported that one hundred percent of its online MBA students had taken the GMAT.  That morning, Fox administrators assembled in the dean's conference room for the weekly "deans meeting." (Gov't Ex. 140); (Trial Tr. Day 2, Kiely Direct, at 40:6–43:14); (Trial Tr. Day 4 at 180:3–181:2 (Campbell Test.)).  At Kiely's prompting, Kegelman shared a *Poets & Quants* article highlighting the surprising and, to those familiar with Fox's programs, obviously false claim that one hundred percent of its online MBA students had taken the GMAT. (Trial Tr. Day 2, Kiely Direct, at 44:18–45:25); (Trial Tr. Day 4 at 181:4–182:10 (Campbell Test.)).  Instead of investigating how and why that false information was reported, Porat ended the meeting so they could attend a champagne toast with Fox's online MBA students; a toast celebrating the very ranking that had just been called into question.  (Gov't Ex. 87); (Trial Tr. Day 2, Kiely Direct, at 54:9–18); (Trial Tr. Day 6, Morning Session, at 51:6–52:9 (Breslin-Knudsen Test.)).  He did so even though participants in the deans meeting expressed concern about celebrating a "questionable accolade."  (Trial Tr. Day 8, Morning Session, at 126:4–25, ECF 126 (Kent Test.)); (Trial Tr. Day 4 at 184:18–22 (Campbell Test.)).

Porat seemed to know participating in this toast after learning of the inaccuracy suggested he intended to use the ranking to defraud students.[3]  During his sworn

---

[3]  At one point during his deposition, he mused, "how can you actually celebrate something based on a mistake?"  (Gov't Ex. 102I); *see also* (Gov't Ex. 104H).

testimony, he denied the toast took place after the revelation.  First, he claimed the toast had taken place a week earlier, during the "embargo period" when Fox knew its rank but before it had been officially announced.  (Gov't Exs. 101T; 102H.)  But documentary evidence established that the toast had indeed occurred on the ninth.  *See, e.g.*, (Gov't Ex. 87).  So Porat changed his story.  Still under oath, he claimed the deans meeting had resumed after the toast and it wasn't until the afternoon session that he learned about the inaccurate data Fox had sent to *U.S. News*.  (Gov't Exs. 103D; 105B.)  Other witnesses directly contradicted Porat's versions of events.  *See* (Trial Tr. Day 6, Morning Session, at 54:7–12 (Test. Breslin-Knudsen));[4] (Trial Tr. Day 8 at 21:11–22 (Test. Kent)).  The jury could have concluded Porat's repeated, contradictory efforts to deny he learned about the issue before the toast was powerful evidence Porat himself considered the toast proof of his culpability.  His lies, as much as his participation in the toast, demonstrated his intent to use the fraudulent ranking as a tool to defraud students, applicants and donors.

Events later the same day led to the same sequence of incriminating behavior followed by what the jury could have concluded were equally incriminating lies.  Just hours after he was informed Fox had overreported the number of GMAT takers in its online MBA program, Porat continued editing marketing emails to students highlighting the online MBA's fourth-consecutive number one ranking.  (Gov't Exs. 89–90, 140.)  He also approved a similar email to recruiters.  (Gov't Exs. 91, 140.)  He admitted under oath he approved the email to recruiters even though knew the

---

[4] Q:  Is it at all possible . . . the champagne toast preceded the announcement at the deans meeting that there was this Poets & Quants article reporting that Fox submitted a hundred percent of its OMBA students had taken the GMAT?
   A:   Absolutely not.

information Fox had submitted to *U.S. News* was incorrect.  (Gov't Ex. 101U);[5] (Gov't Ex. 102F).[6]

At some point in his deposition, however, it appeared to dawn on Porat that approving this email after learning of the inaccurate submission made it look like he intended to tout rankings he knew were based on false information.  When asked "is it correct that . . . within four hours of . . . [learning] false information had been reported to *U.S News & World Report*, you approved this proof to go out celebrating that you had ranked No. 1 in the nation," Porat said, "I think it slipped my mind."  (Gov't Ex. 102J.) Then, when asked again, he said, "At that time I thought it's a mistake."  (*Id.*)  But he could not explain why he would have approved the email despite knowing about the mistake: it was "a good question."  (*Id.*)  So he returned to his original story.  The inaccurate submission he had just learned about had "slipped [his] mind" when he approved the email.  (*Id.*)

Porat seemed to realize this was a sorry excuse. When opposing counsel followed up, asking, "You think the fact that . . . the Temple online MBA program had reported false information to *U.S. News & World Report* had slipped your mind between 11:00 and 2:30," Porat responded, "I don't want to put it that way."  (*Id.*)  The jury was free to infer why Porat did not want to put it that way.  It was not believable.  The jury could reasonably have concluded Porat's efforts to promote Fox's number one ranking on

---

[5] Q:   And after you knew the wrong number of, the wrong percentage of GMAT takers . . . [h]ad been reported to *U.S. News & World Report*, you nonetheless approved . . . this draft?
   A:   Yeah . . . the answer is yes.

[6] Q:   [T]he fact that it says hundred percent had GMAT . . . had GMATs or GREs, you knew that fact was incorrect on January 9th?
   A:   Yes.

January 9, and his subsequent lies about his state of mind when doing so, demonstrated his intent to use rankings he knew were based on false information to attract students, applicants and donors.

Then, on January 10, when confronted with evidence Fox had falsely reported one hundred percent of its online MBA students had taken the GMAT for several years, he said "if they"—meaning *U.S. News*—"haven't caught it before, what makes you think they're going to catch it now." (Trial Tr. Day 2, Kiely Direct, 53:5–6,); *see also* (Trial Tr. Day 4 at 224:3–4 (Campbell Test.)).

Later in January, when Will Reith, then senior director of graduate enrollment at Fox, informed Porat the survey submissions for Fox's part-time and full-time MBA programs contained similar inaccuracies regarding program selectivity and the percentage of students who had taken the GMAT, Porat did not want to withdraw those submissions from consideration. (Trial Tr. Day 4 at 91:3–92:19 (Reith Test.)); (Trial Tr. Day 6, Morning Session, at 81:10–17 (Breslin-Knudsen Test.)). It was only after others joined the meeting that he agreed Fox should pull its other programs from the 2019 rankings. (Trial Tr. Day 4 at 92:19–22 (Reith Test.).)

He also lied to his superiors about the nature and significance of the inaccurate data Fox had reported to *U.S. News*. On January 24, after *U.S. News* stripped Fox's online MBA program of its ranking, Porat told Temple University President Richard Englert and Provost JoAnne Epps that if accurate information had been provided, the program would have "remain[ed] #1 or perhaps slip[ed] to #2." (Gov't Ex. 132.) He described what happened as "an innocent mistake in data entry." (*Id.*) He made

similar statements to Provost Epps at a basketball game on January 13.  (Trial Tr. Day 5 at 40:6–24 (Test. Epps).)

But at that point, Gottlieb had already told Porat that Fox would have been ranked sixth if it had accurately reported the number of online MBA students who had taken the GMAT, (Gov't Exs. 93, 96),[7] and Porat had already heard O'Neill claim she had intentionally submitted the false information at his behest, (Trial Tr., Day 6, Morning Session, at 59:24–60:3, 60:21–61:11 (Breslin-Knudsen Test.)).  He told his subordinates at Fox the same thing: the inaccuracy was an "honest mistake," a "key stroke error," that would not have changed its ranking, even after he had reason to know the error was both intentional and significant.  (Trial Tr. Day 8, Morning Session, at 41:11–42:24 (Kent Test.).)   Porat's repeated lies about the nature and importance of the false data illustrate that even after others at Fox had discovered the inaccuracy, he intended to continue touting the online MBA's fraudulently obtained ranking.

Any reasonable jury could have convicted Porat of conspiracy and wire fraud on his words alone.  His emails and deposition testimony proved that in January 2018, he conspired with Isaac Gottlieb to defraud students, applicants and donors of money and property by touting inflated rankings based on false data.  The other evidence

---

[7] The following exchange took place during the fourth day of Porat's deposition:
> Q: You have the conversation on the 13th were you're told at best No. 6, correct?
> A: Yes.
> . . .
> Q: Then on January 24, 2018, and that is 11 days later, you send an update to Provost Epps, and in this update you say; "The recalculation of the rankings after providing the correct number of GMAT scores submitted would have resulted in us either remaining No. 1 or perhaps slipping to No. 2."  Did you write that?
> A: Sure.
> Q: Did you write that?
> A: Yes.

(Gov't Ex. 104M.)

illustrated the scope of the conspiracy and the extent of Porat's involvement, but it was not necessary to prove his knowing and intentional participation in it.

2

The jury did not, however, need to rely on Porat's post-2018 conduct to convict him. It could have reasonably concluded Porat was involved in the conspiracy from the very beginning. While Porat segregates the evidence relating to the online MBA submission, the part-time MBA submission, and the cover-up into separate categories, each of these categories must be viewed as part of "a comprehensive whole." *Brodie*, 403 F.3d at 135. When considering the reasonableness of the jury's inferences against Porat, "one should not miss the forest for the trees." *Id.* at 150. Similarly, evidence about the structure of Fox, the way it prepared rankings submissions, and Porat's role in that structure were all details the jury could use when assessing the evidence and drawing inferences. *Id.*

i

Porat's challenge to the sufficiency of the evidence showing his participation in the conspiracy collapses at the outset. It was reasonable to conclude Porat knowingly and intentionally participated in the decision to report one hundred percent of Fox's online MBA students had taken the GMAT.

On July 24, 2014, O'Neill emailed Gottlieb to request he review her draft submission for the upcoming *U.S. News* survey of online MBA programs. (Gov't Ex. 73.) She told Gottlieb, "the dean"—Porat—"wanted me to walk him through the US news survey submission to assure him that we will be better than last year's #9

ranking." (*Id.*)  She then asked Gottlieb if there was a way for her "to show the dean . . . what our ranking might be, if all schools remain the same." (*Id.*)

In an email the following day, O'Neill told Gottlieb, "I changed our response to include 100% entrants providing GMAT and GPA so we receive 100% credit for our GMAT and GPA scores." (*Id.*)  She explained Fox had previously been "dinged by saying 12/14 suppliers of GMAT supplied 619 giving us a lower score but we had 100% of GPA for a low 3.14. We have much higher test scores over last year and full response percentage so we do not dilute the credit for GPA and GMAT." (*Id.*)

A reasonable jury could have concluded from these emails that O'Neill had "walked" Porat through the draft survey to "assure him" Fox would rank more highly than it had the year before.  It would also have been reasonable to conclude that as part of that process, O'Neill and Porat would have discussed the fact that Fox was "previously . . . dinged" for indicating—truthfully—that a very small percentage of its incoming online MBA students reported GMAT scores.  One way to "assure" Fox would be higher in the next ranking would be to falsely report that all students had taken the GMAT.  Indeed, that O'Neill brought up this change without any prompting from Gottlieb suggests it was an important part of the plan to improve Fox's ranking.

O'Neill met with Porat to review the survey again at 1 p.m. on September 3, 2014, just days before Fox's survey response was submitted.  (Gov't Exs. 74, 52); (Trial Tr. Day 3 at 163:9–11 (Coughlin Test.)).  The purpose of the meeting was to review the "US News OMBA ranking survey."  (Gov't Ex. 74.)  At 2:06 p.m., O'Neill emailed Gottlieb.  (Gov't Ex. 75.)  She attached the draft survey submission for the online MBA program, which "compar[ed] last year's responses with this year's proposed responses."

(*Id.*)  She explained she had "met with Drs. Porat and Chandran that afternoon and [Porat] asked her to share" the survey submission with Gottlieb for his input.  (*Id.*)  The document showed that the previous year, Fox indicated twelve out of forty-eight entrants had reported GMAT scores.  (Gov't Ex. 76.)  In its next submission, Fox planned to report seventy of the seventy new entrants had reported GMAT scores.  (*Id.*)

These emails support the inference Porat knew the draft survey falsely claimed one hundred percent of online MBA students had reported GMAT scores.  Porat makes much of the fact that the draft survey submission was "a spreadsheet with over 700 lines."  (Mot. J. Acquittal or New Trial at 19.)  But the jury was not asked to conclude Porat personally deciphered the spreadsheet line-by-line.  Instead, it could reasonably have inferred O'Neill informed Porat of salient changes to the submission at their meetings.  This inference was supported by the format of the draft submission, which compared proposed responses with the previous year's responses, by Porat's request that Gottlieb review the submission as well, and by his request earlier in the summer that O'Neill "assure" him Fox would "be better than last year's #9 ranking."

This version of events is consistent with Diana Breslin-Knudsen's testimony concerning Porat's work with O'Neill on rankings matters.  She testified that O'Neill reported directly to the dean on issues related to rankings.  (Trial Tr. Day 6, Morning Session, at 33:14.)  "When she filled out the questionnaires, she gave him a spreadsheet, and he was the one that would approve if it could be submitted or not." (*Id.* at 33:14–17); *see also* (*id.* at 37:23–38:1.)  In fact, Porat told Breslin-Knudsen that O'Neill "needed to make sure that he had enough time to review" the spreadsheets before they were sent out.  (*Id.* at 19–22.).)  Tellingly, O'Neill referred to the large

binders in which he stored her survey data as "the dean's binders." (*Id.* at 34:3); *see also* (*id.* at 39:1–13). Breslin-Knudsen regularly observed Porat in O'Neill's office reviewing the contents of these binders with her. (*Id.* at 34:23–35:6.) She also reported that it was Porat who instructed O'Neill to work with Gottlieb on rankings. (Trial Tr. Day 6, Afternoon Session, at 36:3–6, ECF 124.)

It was reasonable "to give weight—indeed, substantial weight—"to the fact that Porat was the head of the organization engaged in unlawful activity. *Brodie*, 403 F.3d at 150. This is especially true where "the testimony tended to paint the [d]efendant as an active participant in company affairs, not as a corporate figurehead whom a jury might more readily infer was ignorant of the actions of his fellow officers and subordinates." *Id.* Here, there was abundant evidence of Porat's active involvement in activities at Fox, particularly rankings. Phyllis Tutora—another Fox administrator[8]— testified that Porat was "obsessed" with rankings. (Trial Tr. Day 5 at 118:21–22; 129:20.) Breslin-Knudsen concurred: Porat was "very, very focused on the rankings" and "spent a lot of time and a lot his efforts focusing on rankings." (Trial Tr. Day 6, Morning Session, 22:12–15.) According to Tutora, Porat was "a dictator," who took "micromanagement to the umpteenth level." (Trial Tr. Day 5 at 122:2–3.) If he did not get the answer he wanted on a rankings-related issue, he would bang on the table in frustration. (*Id.* at 120:11–19.)

---

[8] Until 2015, Tutora was director of graduate admissions at Fox. (Trial Tr. Day 5 at 113:9–16.) Then, after a confrontation in which Tutora implied O'Neill was manipulating the average GPA of Fox's MBA students at Porat's behest, she was given the choice either to report to a new director of graduate admissions or transition into a new role. (*Id.* at 135:1–138:12.)

Given this context, it was reasonable to infer that the July 24 and September 3 emails memorialize two of the many meetings in which O'Neill discussed her submissions with Porat and sought his approval for their contents.  The jury reasonably concluded Porat knew O'Neill falsely inflated the number of GMAT takers in Fox's online MBA program, and that Porat—who had ultimate authority over what Fox submitted to *U.S. News*—joined the conspiracy when he either ordered or blessed these changes in the summer of 2014.

Porat attempts to analogize this case to *United States v. Tyson*, 653 F.3d 192 (3d Cir. 2011).  There, the Third Circuit Court of Appeals affirmed a judgment of acquittal for conspiracy to traffic firearms because there was no evidence that suggested "coordinated action in support of a common goal."  *Id.* at 210.  Instead, the Government focused on "lawful conduct" and presented only "mundane" evidence about the interactions between the alleged co-conspirators.  *Id.* at 209.  There was "no link between the two men, nor anything to show that one is facilitating the handiwork of the other."  *Id.*  at 210 (3d Cir. 2011).

This case is nothing like *Tyson*.  Porat attempts to absolve himself by claiming that "strategizing regarding rankings was commonplace and appropriate."  (Mot. J. Acquittal or New Trial at 16.)  But there was ample evidence that Porat, Gottlieb and O'Neill's interactions involved more than simply "strategizing" about rankings.  *See supra* subsection II.C.2.i; *infra* subsection II.C.2.ii.b.  For example, even after Gottlieb and Porat knew that Fox could not be ranked higher than sixth if it submitted accurate information, they agreed they should not alert *U.S. News* of the false submission.  (Gov't Ex. 97.)  Nor is it plausible the three were merely involved in "parallel conduct."

*Tyson*, 653 F.3d at 210 (explaining that the evidence showed "at most . . . two individuals attempting to import firearms into the Virgin Islands").  All the false submissions to *U.S. News* ran through O'Neill.

Most importantly, *Tyson* was a case in which there was no proof of "a recurrent pattern of coordinated conduct."  *Tyson*, at 653 F.3d at 210.  The sole evidence of coordination was that the alleged co-conspirator picked the defendant up from the airport when he arrived in the Virgin Islands.  *Id.* at 197, 210.  Here, the evidence established Porat met regularly with O'Neill and Gottlieb to discuss rankings, including two meetings with O'Neill in the summer of 2014.  *See* (Trial Tr. Day 6, Morning Session, at 34:23–35:6 (Breslin-Knudsen Test.)); (Trial Tr. Day 7 at 118:5–22 (Campbell Test.)); (*id.* at 118:5–22 (Roth Test.)); (Gov't Exs. 73, 75).  These meetings took place in close proximity to (1) the original decision to falsify the number of GMAT takers and (2) the submission of the first fraudulent survey to *U.S. News* in September of 2014.  In addition, the emails between O'Neill and Gottlieb in the summer of 2014 are themselves strong indicia of coordinated conduct:  O'Neill sought the approval of both Gottlieb *and* Porat multiple times before submitting Fox's response to that year's survey of online MBA programs. (Gov't Exs. 73, 75.)

This pattern of coordination continued through January of 2018, when O'Neill served as a conduit for communication between Gottlieb and Porat about the ramifications of the false submissions—conversations in which no one else was included.  (Gov't Exs. 92, 94, 95.)  Given his subsequent lies about the impact of Fox's submission on its rankings, the jury could reasonably have inferred Porat would not have exposed himself to incriminating information among strangers to his scheme.  In

*Tyson*, the alleged co-conspirators worked together on a single day.  Porat, Gottlieb and
O'Neill worked together for years.

ii

Porat's knowing and intentional participation in the conspiracy was also shown
by numerous emails in 2014 and 2015 regarding the decision to combine the online
MBA, part-time MBA and executive MBA programs when reporting the number of Fox
MBA students in its part-time program and the average work experience of incoming
part-time MBA students.

a

Porat begins by asserting that the Government failed to prove that Fox's
definition of part time student was false or misleading.  (Mot. J. Acquittal or New Trial
at 22.)  Like much of Porat's motion, this argument boils down to the idea that if
everyone is lying to get ahead, it can't be wrong.  (*Id.* at 23.)  It may be that the opacity
of the rankings process—and the difficulty confronting students trying to discern the
quality of the programs to which they were applying—created powerful incentives for
schools to lie.  That others at Fox or in the business school community may have
succumbed to this pressure does not shield Porat from sanction.  The question is not
"what was everybody else doing," but whether the jury could reasonably have found
that in combining the online, executive and part-time MBA programs in its responses to
*U.S. News*, Fox crossed the line between "strategizing" and fraud.

Whether a statement is fraudulent is a "highly contextual inquiry" that the jury
is "particularly well-suited to assess."  *United States v. Ferriero*, 866 F.3d 107, 120, 122
(3d Cir. 2017).  A statement "need not be fraudulent on its face" as long as it is

26

"reasonably calculated to deceive persons of ordinary prudence and comprehension." *United States v. Pearlstein*, 576 F.2d 531, 535 (3d Cir. 1978). A fraudulent representation "may be effected by deceitful statements of half-truths or the concealment of material facts." *Ferriero*, 866 F.3d at 120 (quoting *United States v. Bryant*, 655 F.3d 232, 249 (3d Cir. 2011)).

*U.S. News*' annual survey of MBA programs did not specifically ask what percentage of the school's students were part-time. Instead, it asked for the "total number of new entrants" in the school's "full-time program," "part-time program," and "executive degree program." (Gov't Exs. 57 at 8, 58 at 9, 59 at 10, 60 at 10.) On the front page of the survey, in a bolded section labelled "Important Notes," the instructions explained that "[q]uestions regarding part-time program should be answered in regards to the part-time evenings and weekends program." *See, e.g.*, (Gov't Ex. 56). In other words, the survey was asking for the number of students in the school's part-time MBA *program*, not the number of students the school considered "part time," and it necessarily excluded executive MBA students, who were counted separately. Similarly, simple logic would dictate online MBA students should not be included in the response to this question either—there was an entirely different survey for that program. *See* (Gov't Exs. 52–56). While reading comprehension and logic were not the skills Fox administrators turned to first when answering surveys, the jury was entitled to use them when deciding whether Fox's representation of total enrollment in its part-time MBA program was fraudulent.

Other evidence in the record supported that conclusion. First, O'Neill and Breslin-Knudsen realized that counting online MBA students as part-time students

was disingenuous.  O'Neill told Gottlieb it would be "pushing the ethics" to include online MBA students in the figures because Fox's online MBA students were "full-time and not part-time."  (Gov't Ex. 125.)  She forwarded her conversation with Gottlieb to Breslin-Knudsen, who explained that whether a student was full-time depended on "the number of credit hours the students take in a semester."  (*Id.*)  O'Neill agreed, saying that in the past she had counted "OMBAs whose credit hours qualified them as full-time" as full-time students, while including the few "part-time OMBAs . . . in the PMBA headcount."  (*Id.*)  Counting all online students as part-time students was false, even accepting the dubious premise that they should be counted in the survey at all.

In addition, one of the effects (and purposes) of combining all three cohorts when listing the total number of students in the part-time program was to increase the average months of work experience Fox reported for the part-time program.  The result was a misleading impression of the nature and quality of Fox's part-time program.   In an email to Fox administrators, including Porat, Tutora explained that eighty-two months, the average experience for students in its part-time MBA program, was "very respectable, especially in a market where the students are getting younger."  (Gov't Ex. 130.)  She went on to say:

> [Fox has] never had an average of 11 years for the Part-time MBA program and never . . . will.  10+ years of professional experience is really reserved for the Online MBA and Executive MBA student.  When you combine all three, which we have agreed makes up a part-time student, of course the average in months will increase.

(*Id.*)

Tutora's email provided the jury everything it needed to conclude Fox's submissions were fraudulent.  Fox's part-time MBA program catered to students at a

different point in their career than their online and executive offerings.  As a result,

Fox's "agreement" regarding "what made up a part-time student" rendered its survey

response—and the resulting ranking—wildly inaccurate.  As Tutora herself explained,

Fox's response to this question was "not correct.  If you're responding for a survey for a

specific program, then [the response] should be just that population."  (Trial Tr. Day 5

at 128:22–23); *see also* (Trial Tr. Day 6, Morning Session, at 43:19–23 (Breslin-Knudsen

Test.)).

The deceptive potential of Fox's answer to this question was illustrated by Fox

administrators' reactions to the numbers the school was reporting.  In a March 2017

email, Diana Breslin-Knudsen said the number Fox was reporting for its PMBA

program "seems very high."  (Def. Ex. 49.)  Darin Kapanjie, another Fox administrator,

agreed.  (*Id.*)  Like Tutora's email, these responses indicate that those familiar with

Fox's part-time MBA program knew that combining the cohorts created a misleading

impression of its part-time program.  The jury could have concluded—regardless of how

many people at Fox "agreed" to the combination of part-time, online and executive MBA

students—that the answers it provided based on that combination were fraudulent.

b

After concluding Fox's responses about the number of students in its part-time

program and the average work experience of those students were fraudulent, it would

have been easy for the jury to conclude Porat knew these responses were fraudulent

when he ordered O'Neill to give them.  Tutora's email laid out in plain terms why it was

wrong to combine all three cohorts in response to questions regarding just the part-time

MBA program.  Porat was copied on and responded to that email.  (Gov't Ex. 130.)  His

response, which went to O'Neill alone, said: "Use whatever comes out better, but we must be consistent!"  (*Id.*); *see also* (Gov't Ex. 101P).  This email alone was enough to demonstrate Porat knowingly and intentionally conspired with O'Neill to make fraudulent representations to *U.S. News*.

The evidence showed, however, that Porat's knowledge of and involvement in the fraudulent responses to the part-time MBA survey ran deeper and began earlier.  In late June of 2014—almost a month before Gottlieb and O'Neill's conversation about falsifying the number of online MBA students who had taken the GMAT—there were several email conversations among Fox faculty and administrators about how to calculate the percentage of Fox students enrolled in the part-time MBA program.

On June 29, 2014, Gottlieb emailed Porat to complain that other schools were ranked more highly than Fox because either, like Villanova, they reported a larger percentage of their MBA students were part time, or, like Rutgers, they reported higher average work experience among part-time MBA students.  (Gov't Ex. 121.)  He ended with two "simple conclusions:"  First, "we have to find out how we report experience!"  And, second, "is [the percentage of part-time students] accurate? Is it really that low?" (*Id.*)  He copied O'Neill and Chandran.  (*Id.*)

The next day, Gottlieb emailed Porat alone.  (Gov't Ex. 122.)  He wrote:

Moshe
I was thinking about the ranking.

Margie can manage, calculate, submit and report.  She cannot "own" the ranking responsibility or be accountable.

I think every program director has to be accountable for their program's ranking.  This will also give them a direction in managing the program. They have to have an incentive or reward when the program's ranking improved.

Otherwise, things change only when you or I wake up.

I can talk to them and give them a direction or understanding when
needed
Isaac

(*Id.*)

O'Neill responded to Gottlieb's initial email on July 1.  (Gov't Ex. 123.)  She

pointed out that Fox, unlike Villanova, had a full-time MBA program, so it could "never

have 100% of our MBA students enrolled in part-time."  (*Id.*)  She also explained that

the average work experience for Fox's part-time MBA students was lower because their

"more work experienced students apply for [Fox's] OMBA and EMBA" programs.  (*Id.*)

Gottlieb replied to O'Neill, expressing frustration with her responses.  He asked,

"are we counting [the percentage of part-time students] correctly?  It has to be only on

PMBA [part-time MBA] and FMBA [full-time MBA].  Otherwise why is Villanova's

number 100%.  **They have a large EMBA class**!!!"  (*Id.* emphasis in original.)  He

went on: "I know the Rutgers students.  They are very young (PMBA).  Why do they

report 94? Why are we so low? We should have a higher number! My point is that we

should have a much higher value for the % and experience."  (*Id.*)

Porat then told Gottlieb these were "excellent observations!"  (Gov't Ex. 124.)  He

"want[ed] to know what we are reporting about experience and percentage," so he asked

Gottlieb to "talk to [him] about it [the] next time [Gottlieb] was [there]."  (*Id.*)  Gottlieb

responded, "Tomorrow morning."  (*Id.*)

Gottlieb went on to say, "I asked around for the enrollment numbers.  I don't

know who is reporting to Marjie."  (*Id.* emphasis deleted.)  In the fall, Fox had had less

than ninety full time MBA students, but "more tha[n] 255" part-time MBA students.

(*Id.*)  Accordingly, he believed Fox should be reporting that "at least 74%" of its students were part-time MBA.  (*Id.*)  Last year, it had only reported 65% were.  (*Id.*)

At that point, Porat removed O'Neill from the thread.  "Isaac," he said, "This is the problem.  She is not investigating sufficiently and does not work strategically, but more as a clerk/analyst!  We need to advise Christine, Bill and Phyllis of the yardsticks they need to control.  Let's talk."  (Gov't Ex. 124.)

It was reasonable to conclude from these emails that Porat and Gottlieb were driving Fox's push to move up in the rankings.  As Gottlieb said to Porat, "things change only when you or I wake up."  (Gov't Ex. 122.)  This, and Porat's assessment of O'Neill as "a clerk/analyst" who "does not work strategically" make it more likely Porat and Gottlieb, not O'Neill or anyone else, were deciding how to respond to the survey questions Gottlieb identified as significant.  It was circumstantial evidence of Porat's participation in engineering the fraudulent responses to both the part-time *and* online MBA surveys.  A reasonable jury could have credited Gottlieb and Porat's description of O'Neill's role in the process and conclude it was Porat who instructed O'Neill—less than a month later—to report that every incoming online MBA student had taken the GMAT.

The emails also supported the inference Porat knew about and was involved in the decision to change how Fox responded to questions regarding the number of students in its part-time programs and their average work experience.  He wanted to meet with Gottlieb to "know what we are reporting about experience and percentage," (Gov't Ex. 124), and the two set up a meeting for that purpose.

In addition, the emails are another indication Porat knew combining three programs in response to these questions was fraudulent.  The emails all bear the subject line "P-MBA ranking."  (Gov't Exs. 121–124.)  *U.S. News* wasn't ranking an abstract amalgam of "part-time students" scattered across business schools' various MBA programs.  It was a "P-MBA ranking" designed to assess the quality of a particular program, Fox's part-time ("P") MBA.  That was obvious.  Even Gottlieb acknowledged in these emails that the percentage of part-time students "has to be based only on PMBA and FMBA"—something Porat described as an "excellent observation."  (Gov't Exs. 123, 124.)

Armed with that knowledge, the decision to lump online MBA (OMBA) and executive MBA (EMBA) students into the response was clearly wrong.  The jury could have inferred everyone on this email, including Porat, knew this.  The emails also put everyone, including Porat, on notice that the combination of students from different programs would produce a misleading answer.  As O'Neill explained, "[o]ur more work experienced students apply for OMBA and EMBA."  (Gov't Ex. 123.)

In September of 2014, Gottlieb renewed his push to change how Fox responded to the part-time survey.  (Gov't Ex. 126.)  In an email to Fox administrators, including Porat, he explained that if Fox reported eighty percent of its students were part time and that part-time students on average had eighty-four months of work experience, Fox's part-time program would be ranked in the thirties.  (*Id.*)

The next day, Diana Breslin-Knudsen sent an email to Gottlieb, O'Neill, and Chandran, copying Porat.  (Def. Ex. 24.)  In it, she told Gottlieb:

> We have determined that the definition most schools are using for PT is that the student is fully employed in a job while taking the program and

therefore attends school PT.  This means that our EMBA and OMBA programs are really PT programs.  Chan wants to make sure that we use this definition and everyone who is enrolled in the PMBA is classified as Part-time for the same reason.

(*Id.*)

Gottlieb then emailed O'Neill, Breslin-Knudsen, Chandran, and Porat to say "if we report EMBA, OMBA and PMBA as part time, our PMBA ratio will look very good. This ratio is close [to] 85%." (Gov't Ex. 127.)  He explained that if Fox reported 85% of its students were part time "and change[d] work experience from the current 70 to 80, we can be ranked number 39." (*Id.*)

Again, Gottlieb's statement neatly summarizes why what Fox was doing was fraudulent.  If Fox combined its executive MBA, online MBA, and part-time MBA programs, its part-time MBA program would be ranked 39.  Why would the number of students in other types of programs be relevant to the quality of its part-time MBA?  No one on the thread had an answer to that question.  Instead, they were focused on providing a response that would make their part-time MBA program "look very good." (*Id.*)

Finally, Breslin-Knudsen testified Porat made the ultimate decision to combine these groups in its response to survey questions about its part-time program.  (Trial Tr. Day 6, Morning Session, at 41:10–12.)  Under cross-examination, she acknowledged it was a "group decision" to combine the programs, (Trial Tr., Day 6, Afternoon Session, 100:12–14), but later clarified it was Porat who "put it on the table that that's what we should be reporting," (Trial Tr. Day 7 at 62:20–25).  Whether Porat made the "ultimate" decision, "put it on the table," or both, her testimony supported the conclusion—already apparent from the documentary evidence—that Porat knowing and intentionally

34

participated in the decision to submit fraudulent information about its part-time MBA program to *U.S. News*.

iii

If all that weren't enough, Porat's conduct on and after January 9, 2018, was highly probative of his pre-2018 knowledge of and participation in the conspiracy to defraud students, applicants and donors by submitting fraudulent data to *U.S. News*. *See Bryant*, 655 F.3d at 249; *United States v. Sasso*, 695 F.3d 25, 29 (1st Cir. 2012) ("[A]n attempt to cover up the commission of a crime implies consciousness of guilt.") Porat claims that because he was forced to accept that Fox's false submissions would be reported to *U.S. News* and investigated by the university, he did not engage in a cover up.  (Mot. J. Acquittal or New Trial at 25–26.)  But a failed-cover up is still a cover-up.

As explained in subsection II.C.1, the evidence showed Porat actively renewed his commitment to the wire fraud conspiracy in January 2018.  But it also illustrated that he was working to hide and minimize his previous wrongdoing.  First, after Tom Kegelman shared the *Poets & Quants* article at the January 9th deans' meeting, Porat chose to end the meeting rather than allow O'Neill to explain why the school had reported one hundred percent of its online MBA students had taken the GMAT.  (Trial Tr. Day 2, Kiely Direct, at 46:18–22); (Trial Tr. Day 4 at 184:5–7 (Campbell Test.)); (Trial Tr. Day 6, Morning Session, at 50:14–16, 52:7–9 (Breslin-Knudsen Test.)).

The next day, Porat was "resistant" to reporting the inaccurate information to *U.S. News*.  (Trial Tr. Day 2, Kiely Direct, at 54:1–2); *see also* (Trial Tr. Day 4 at 186:11–17 (Campbell Test.)); (Trial Tr. Day 6 at 64:14–16 (Breslin-Knudsen Test.) (explaining Porat was "very, very against" reporting the inaccuracy to *U.S. News*));

35

(Trial Tr. Day 7 at 58:25–59:5 (Breslin-Knudsen Test)).  He was "agitated" that his subordinates were raising the issue and told Aubrey Kent "not to buy into Christine [Kiely]'s paranoia."  (Trial Tr. Day 8 at 25:5–7 (Kent Test.).)  He only agreed to report the inaccurate submission after his staff pressed him for ten minutes, reminding him that "[e]verybody knew" Fox did not require GMAT scores from its online MBA students.  (Trial Tr. Day 4 at 187:5–6 (Campbell Test.).)  Afterwards, he "continued to be mad" at his subordinates for "quite some time."  (*Id.* at 223:6–9.)[9]

He also made remarks to subordinates that suggested he wanted to bury the recently discovered fabrication.  He told Will Reith to "keep a lid" on the information when he saw him in the restroom on January 9th.  (*Id.* at 87:4–88:8 (Reith Test.).)  After the conversation in which he finally agreed to contact *U.S. News*, he told Christine Kiely to "stop being so ridiculous."  (Trial Tr. Day 2, Kiely Direct, at 53:22–55:6.)  Later the same day, he told Debbie Campbell she was "being influenced too much by Christine Kiely."  (Trial Tr. Day 4 at 188:14–16 (Campbell Test.).)

Porat's lies to his superiors at Temple also support the inference he wanted to conceal his role in the conspiracy by playing it off as a clerical error.  *See* (Gov't Ex. 132, 93, 96, 104M); (Trial Tr. Day 5 at 40:6–24 (Epps Test.)).   As Epps explained, if she had

---

[9] Of course, Porat told a different story.  In a memo to Englert and Epps, in his written responses to interrogatories in his defamation suit, and under oath at his deposition, Porat claimed he instructed his subordinates to alert *U.S. News* "[a]s soon as [he] learned . . . there was potentially a problem" with Fox's submission.  (Gov't Ex. 119.); *see also* (Gov't Ex. 101S ("I said first thing let's call *U.S. News & World Report* tomorrow morning.")); (Gov't Ex. 136 (claiming that on January 9, "[t]he Dean made the decision to immediately self-report this error to U.S. News.")).  Porat's memo was dated July 3, 2018, his interrogatory responses were submitted July 31, 2019, and his deposition was taken on June 23, 2020.  His claims in each were contradicted by every witness who was present at the January 9 meeting.  *See, e.g.*, (Trial Tr. Day 8, Morning Session, at 10:4–9 (Kent Test.)).  The jury was entitled to disbelieve Porat, and to conclude his multi-year campaign of lies was an attempt to coverup his coverup, to disguise both his prior involvement in the conspiracy and his intention to persevere in his scheme despite the January 9 revelation.

learned someone at Fox had intentionally misrepresented information to *U.S. News*, it would have suggested Temple was "facing a crisis," while Porat's remarks left her believing what had happened was "a forgivable mistake."  (Trial Tr. Day 5 at 45:10–15.) In a July 3, 2018, memo to Epps, Englert and university counsel, Porat attributed years of false data—what he called "errors"—to O'Neill's failure to "validate the statistics." (Gov't Ex. 136.)  But Porat admitted in his deposition he knew when he sent the memo that O'Neill had purposefully submitted the false information.  (Gov't Ex. 104E.)

Porat also opposed efforts to investigate what had happened.  (Trial Tr. Day 5 at 54:1–7 (Epps Test.).)  While his superiors were looking for a "credible way to exculpate Fox and the University and be able to say for sure this had really been an innocent mistake," Porat was telling them, "if you're in a whole, don't dig."  (*Id*. at 54:16–55:4.) In late June, Porat recommended his superiors at Temple simply "get rid of a few people . . . and say [Temple had] handled this."  (*Id*. at 59:4–21.)  He insisted on multiple occasions that the university ask O'Neill to sign a non-disclosure agreement: "he repeated it, NDA, NDA, NDA."  (*Id*. at 78:6–7; *see also* (*id*. 62:6– 63:19).  Epps always asked, "to keep her from saying what?"  (*Id*. at 78:10.)  Porat had no answer. (*Id*. at 78:11–13.)  His efforts to prevent an investigation and silence O'Neill indicated his involvement in the conspiracy began long before January 2018.

***

Considered separately, the evidence of Porat's post-revelation conduct, his role in the decision to falsify the number of GMAT takers in Fox's online MBA program and his role in the decision to fraudulently combine the online, executive and part-time MBA programs when responding to the part-time MBA survey each supported the

37

jury's conclusion that Porat knowingly and intentionally joined the conspiracy to defraud students, applicants and donors.  Taken together, the evidence is overwhelming.

### III

Porat next claims there was "no evidence" he intended to defraud students, applicants and donors of money or that the January 22 email was sent in furtherance of that scheme.  (Mot. J. Acquittal or New Trial at 28.)  The six and a half days of evidence put on by the Government tell a different story.

### A

To convict Porat of wire fraud, the Government had to prove he (1) knowingly and willfully participated in "a scheme or artifice to defraud," (2) had the specific intent to defraud and (3) transmitted an interstate wire communication in furtherance of that scheme.  *United States v. Hedaithy*, 392 F.3d 580, 590 (3d Cir. 2004).  To satisfy the first and second elements, the evidence had to show Porat devised the fraudulent scheme or "wilfully participated in it with knowledge of its fraudulent nature." *Pearlstein*, 576 F.2d at 537.

The evidence that Porat devised or willfully joined a scheme to defraud students, applicants and donors was substantial.  First, the evidence that Porat intentionally joined a conspiracy to commit wire fraud also proves his willful participation in that scheme.  *See supra* Part II.  In particular, the jury could reasonably infer Porat had the specific intent to defraud based on the email he sent to donors on January 22.  *See United States v. Hannigan*, 27 F.3d 890, 892 n.1 (3d Cir. 1994) (explaining that "a material misstatement of fact made with reckless disregard for the truth" can

demonstrate specific intent to defraud).  Similarly, the jury could have inferred that Porat intended to defraud students, applicants and donors from his attempts to prevent reporting or investigating the inaccurate submissions.  *See Bryant*, 655 F.3d at 249.

To the extent the jury wanted anything more, the Government also introduced evidence Porat devised the fraudulent scheme years before he engaged Gottlieb and O'Neill in a conspiracy to further it.  It pointed to a 2010 incident where Christine Kiely alerted Porat to an issue with Fox's submissions to another ranking publication, the *Financial Times*, and Porat refused to address the impropriety and retaliated against Kiely for bringing it to his attention.

Temple University has a sister school in Tokyo, Temple University Japan.  (Trial Tr. Day 2, Kiely Direct, at 23:13–15.)  Both Fox and Temple University Japan have executive MBA programs.  (*Id.* at 23:11–15.)  On its own, the Philadelphia-based executive MBA program was not large enough to participate in the *Financial Times* ranking of executive MBA programs.  (*Id.* at 24:8–13.)  So Fox combined the two programs and used the aggregated data to respond to the *Financial Times* survey.  (*Id.* at 23:15–18.)

There was a problem with this approach, however.  To be considered in the *Financial Times* ranking, students in the executive MBA program "must matriculate and graduate as a single cohort."  (Gov't Ex. 61); (Trial Tr. Day 2, Kiely Direct, at 23:25–24:2.)  The Philadelphia and Tokyo programs were "two separate cohorts."  (*Id.* 24:3–4.)

When Kiely noticed the issue in 2010, she raised it with Chandran and Breslin-Knudsen.  (*Id.* at 25:9–12.)  They told her not to worry; Fox had combined the cohorts in

its previous responses to the survey.  (*Id.* at 25:21–25.)  Dissatisfied with this response,

Kiely emailed Porat.  (*Id.* at 26:3–5.)  She wrote:

> I know that emotions are running high on rankings right now.  I feel that
> I must write, however, because I strongly believe that we are ineligible to
> participate in the EMBA [*Financial Times*] rankings and am not
> comfortable being associated with the submission.
>
> I know that rankings matter.  I know that it is disappointing if we are
> ineligible to participate. But, I believe that including [Temple University
> Japan's] numbers is contrary to the eligibility criteria set out by
> [*Financial Times*] (attached). . . .
>
> . . . I understand what it is to be 'strategic.' When there is ambiguity in
> the way a question is worded or phrased, it makes perfect sense to present
> our programs in the best possible light.  But, there is no ambiguity in the
> eligibility criteria provided.  And, as a leader, I cannot instruct my staff to
> do what I, myself, feel is questionable.

(Gov't Ex. 61.)

Porat summoned Kiely to his office.  (Trial Tr. Day 2, Kiely Direct, at 32:24–25.)

He had a copy of the email on his desk.  (*Id.* at 33:5.)  He tapped it and said, "you don't

send me something like this."  (*Id.* at 33:3–6.)  He told her, "the Financial Times doesn't

define cohort.  We do."  (*Id.* at 33:11–12.) Then, as the meeting ended, he said "if this is

the way you feel, then maybe this isn't the right place for you."  (*Id.* at 33:20–21.)

This evidence corroborated Porat's willful participation in a scheme to defraud

students, applicants and donors by securing inflated rankings through fraudulent

submissions to ranking publications.  Fox had two separate executive MBA programs,

one in Tokyo and one in Philadelphia.  (Trial Tr. Day 2, Kiely Direct, at 23:12–15.)

They did not "matriculate and graduate as graduate as a single cohort."  (*Id.* at 24:1–4.)

When confronted with this information, Porat made clear he, not the *Financial Times*,

called the shots.

The jury could have reasonably concluded Porat knew the information Fox was submitting to the *Financial Times* was premised on a lie and wanted it sent anyway.[10] Instead of looking into the issue or halting the submission, he threatened Kiely's job and admonished her for memorializing the fraud he intended to commit. (*Id.* at 33:2–6; 33:19–25.) Porat's only response is that the evidence tended to show others at Fox were also aware Fox's responses to the survey were fraudulent. (Mot. J. Acquittal or New Trial at 30–31.) Whatever their culpability, it does not diminish Porat's guilt.

B

Porat claims that even if he intended to secure inflated rankings by submitting false data to rankings publications, the Government failed to prove money or property was an object of the fraud. (Mot. J. Acquittal or New Trial at 29.) Like his others, this argument is unavailing.

At the most basic level, three well-established facts supported the jury's conclusion that Porat's object in submitting fraudulent data to *U.S. News* was to obtain money. First, there was a clear connection between rankings and revenue. Kiely, Breslin-Knudsen, and Epps all explained how rankings led to more students applying, and how more students applying lead to more revenue for the school. (Trial Tr. Day 2, Kiely Direct, at 14:25); (Trial Tr. Day 5 at 27:2–6 (Epps Test.)); (Trial Tr. Day 6, Morning Session, at 23:12–15 (Breslin-Knudsen Test.)). Gottlieb made this connection clear in the emails he sent Porat highlighting the financial value of rankings. (Gov't

---

[10] Porat faults the Government for not introducing evidence the *Financial Times* considered Fox's survey response to be fraudulent. (Mot. J. Acquittal or New Trial at 31.) This evidence might have been helpful, but it was not necessary. The jury could use its eyes, ears and common sense to determine whether two executive MBA programs on opposite ends of the earth "matriculate and graduate as a single cohort." *See Ferriero*, 866 F.3d at 122.

Exs. 66, 67.)  Second, under Porat's leadership, Fox made extensive efforts to tout those rankings to students and prospective applicants.  (Trial Tr. Day 4 at 73:4–6 (Reith Test.)); (*id.* at 148:3–20 (Campbell Test.)); (Gov't Exs. 26–35, 41–46).  Third, Porat was involved in and exercised control over these marketing strategies.  *See, e.g.*, (Gov't Exs. 69, 89, 90, 91, 98, 113).  As Will Reith explained, Porat was "very proud of the rankings and very interested in . . . finding more students to join the Fox school and was involved in looking at marketing materials as they went out the proverbial door."  (Trial Tr. Day 4 at 73:19–22.)

When the seeds of Porat's scheme bore fruit, he did not leave them on the vine. Instead, he made sure Fox was bragging about its bloated rankings anywhere a future Fox student might be: on Facebook (Gov't Ex. 46), on the Schuylkill Expressway (Gov't Ex. 29), "[e]ven in the airport." (Gov't Ex. 69).  Advertisements about Fox's highly ranked online MBA and part-time MBA were ubiquitous.  *See supra* section II.B.  The jury reasonably concluded Porat's object wasn't rankings for the sake of rankings, but the revenue rankings could bring.

This conclusion is reinforced by Porat's own statements.  In his manuscript, he explained that Fox "regard[ed] our students as our customers" and that school image, of which rankings were a part, was "the single most important factor in assuring continuous demand from the students, the parents and employers."  (Gov't Ex. 150 at 25, 111.)  In his op-ed in the *Philadelphia Inquirer*, Porat explained that Fox MBA students "made decisions to attend our University, based in part on rankings data they thought to be accurate."  (Gov't Ex. 120.)  And, as previously discussed, he compared a Fox degree to a stock—a stock students they paid for with their tuition—whose value

could be measured in rankings.  (Gov't Ex. 148.)  This sentiment made it into Fox's advertising too.  One set of advertisements highlighting the online MBA's position atop the *U.S. News'* rankings told readers "your stock will soar."  (Gov't Ex. 37.)

If this were not clear enough, in a January 5, 2018, email inviting Englert and Epps to a celebration of the online MBA's number one ranking, Porat explained that Fox "now ha[d] over 500 students . . . in our OMBA[,] which represents substantive [sic] revenue for the School and the University."  (Gov't Ex. 87.)  For Porat, rankings "represent[ed] . . . revenue."  (*Id.*)  And when it came to obtaining money from donors, Porat himself admitted that he used rankings as a fundraising tool.  (Gov't Ex. 104K.)

Money was not an incidental byproduct of Porat's quest for higher rankings.  In *Kelly v. United States*, 140 S. Ct. 1565 (2020), the defendants retaliated against the Mayor of Fort Lee, New Jersey, by closing lanes leading to the George Washington Bridge under false pretenses.  *Id.* at 1569–1571.  To execute their plan, they tasked engineers with conducting a fake traffic study and authorized an additional "on call" toll-collector who would cover the collector operating the single remaining toll lane.  *Id.* at 1570.  While their scheme imposed "labor costs" on the Port Authority of New York and New Jersey, those costs were simply an "incidental . . . byproduct" of their scheme, not its object.  The defendants imposed those costs in the course of pursuing their ultimate goal.

It is not plausible to describe taking money from students, applicants and donors as an incidental byproduct of Porat's efforts to secure higher rankings through fraud.  Porat's efforts did not end when *U.S. News* released its rankings.  Once he had them in hand, he worked hard to turn those rankings into money by marketing them to

prospective students and touting them to donors.  The jury naturally concluded the money higher rankings could bring to the school, not the ranking themselves, was Porat's object.

C

The trial record also eviscerates Porat's claim that the jury lacked sufficient evidence the January 22, 2018, email was sent in furtherance of his scheme to defraud students, applicants and donors.  As discussed in subsection II.C.1, Porat's deposition testimony provides strong evidence the January 22 email was sent with the hopes that high rankings would lead to donations.  *See* (Gov't Exs. 102Z, 102AA, 104K.)  He admitted he used all rankings, including the online MBA program's number one ranking in *U.S. News*, as fundraising tools.  (Gov't Ex. 104K.)  Porat's disingenuous efforts to resist this conclusion get him nowhere.

To begin, Campbell's and Breslin-Knudsen's emails approving drafts of the January 22 email, (Def. Exs. 9–11), say little about whether the email was "part of the execution of the scheme as conceived by the perpetrator at the time."  *Schmuck v. United States*, 489 U.S. 705, 715 (1989).  Both women testified that they and others verbally "discourage[d] the dean from sending anything out."  (Trial Tr. Day 6, Morning Session, at 75:9–17 (Breslin-Knudsen Test.)); (Trial Tr. Day 4 at 224:3–4 (Campbell Test.)).  But, according to Breslin-Knudsen, Porat was "determined" to send an announcement about the rankings to his VIP list.  (Trial Tr. Day 6, Morning Session, at 75:14–76:4.)  It was reasonable for the jury to conclude that by the time they approved the January 22 email, Campbell and Breslin-Knudsen felt powerless to do more to prevent it from going out.  Moreover, unlike Porat, there is no indication either woman

44

knew at the time that Gottlieb had already determined Fox would have been ranked sixth had it reported the actual number of GMAT takers.  *See* (Trial Tr. Day 7 at 125:3–8 (Breslin-Knudsen Test.)).

The same reasoning applies to the January 18 Temple Now newsletter highlighting the online MBA's number one ranking.  (Def. Ex. 66.)  While Epps learned that inaccurate information had been submitted to *U.S. News* on January 13, (Trial Tr. Day 5 at 40:6–16 (Epps Test.)), there is no evidence Epps or anyone who knew Fox had reported inaccurate data was involved in the decision to send out the newsletter.  In addition, Porat told Epps the inaccuracy was the result of a "data entry error" that "probably" would not change Fox's ranking at all.  (*Id.* at 40:18–24.)  Given Porat's lies, the Temple Now newsletter does nothing to undermine the jury's conclusion that the January 22 email was sent in furtherance of his scheme to defraud.

Porat next claims the January 22 email could not have been in furtherance of his scheme because it did not "have a donation link or the slightest suggestion to donate." (Mot. J. Acquittal or New Trial at 32.)  Would Porat say the same thing about the advertisements touting the online MBA program's number one ranking that did not explicitly extort students to apply?  *See, e.g.*, (Gov't Ex. 37 at 5, 6, 8, 9).  Messages like "no one outsmarts a fox" and "it's a three-peat" do not invite students to apply in so many words, but no one would suggest Fox plastered these advertisements across the region on a whim.  Context makes clear they are part of an effort to enhance the school's notoriety and prestige among potential applicants.  A similar inference is warranted when the dean of a business school sends an announcement highlighting the school's ranking to potential donors.  Even if he does not immediately solicit

45

denotations, he hopes the good feeling the announcement generates will pay dividends later.  To support Porat's conviction, the January 22 email "need not be an essential element of the scheme."  *United States v. Coyle*, 63 F.3d 1239, 1244 (3d Cir. 1995).  It is sufficient that it was "a step in [the] plot."  *Id.* (quoting *Schmuck*, 489 U.S. at 710) (alteration in original).

Finally, Porat argues there was no evidence the school's ranking was material to donors.  A misrepresentation is material if it has a "natural tendency to influence, or [is] capable of influencing, the decision of the decisionmaking body to which it was addressed."  *United States v. Riley*, 621 F.3d 312, 332 (3d Cir. 2010) (quoting *United States v. Wells*, 519 U.S. 482, 489 (1997)).  Here, there was sufficient evidence for the jury to conclude rankings mattered to donors.  John Byrne, an expert on business school rankings and reputations, testified that "a high ranking . . . would please the alumni to the point that the alumni would probably be more generous with their donations to the school."  (Trial Tr. Day 2 at 33:25–34:4, ECF 130.)  He explained that a school's ranking affects "the overall well-being of the alumni network and how it responds to the school for donation appeals."  (*Id.* at 115:6–7.)  The jury was entitled to rely on his opinion.

The jury could also infer that rankings were material to donors from the emphasis Porat himself put on them.  Not only did Porat admit he used "all rankings" as fundraising tools, (Gov't Ex. 104K), his single-minded determination to email potential donors about the school's number one ranking suggests he believed rankings mattered to donors, (Gov't Ex. 98); (Trial Tr. Day 6, Morning Session, at 75:14–76:4 (Breslin-Knudsen Test.)).  The jury reasonably concluded that if the successful dean of

Temple's business school thought rankings mattered to donors, it is probably because they did.

Nor is that conclusion undermined by the fact that Porat's friends would have donated to the school regardless of the rankings.  *See* (Trial Tr. Day 8, Morning Session, at 82:19–23 (Wickrema Test.)); (Trial Tr. Day 8, Afternoon Session, at 66:11–1, ECF 135 (Wiess Test.)).  Donors are not a monolith.  That some donors did not consider rankings important does not mean no donors did.  The evidence supported the conclusion that rankings were "capable of influencing" some donors, and that is enough.

## IV

Porat argues he is entitled to acquittal on both counts for two additional reasons.  First, "the recipient of the inaccurate information, *U.S. News*, was not the party who parted with any money."  (Mot. J. Acquittal or New Trial at 33.)  Second, even if students did apply to and enroll at Fox because of inaccurate rankings, they "received exactly what they paid for."  (*Id.* at 34.)

## A

Porat claims the wire fraud statute only reaches schemes where "the party to whom the fraudulent pretenses were made" is the same party deprived of money or property.  *Bryant*, 655 F.3d at 249.  This supposed requirement, often referred to as "convergence," appears nowhere in the wire fraud statute.  Section 1343 criminalizes the transmission of wire communications by someone who has devised or intends to devise "any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses."  18 U.S.C. § 1343.  Nothing indicates the scheme or artifice must involve misrepresentations made directly to the intended victim of the

47

fraud. *United States v. Greenberg*, 835 F.3d 295, 306 (2d Cir. 2016). For that reason, most Courts of Appeals to consider the issue have declined to "read into the statutes an invariable requirement that the person deceived be the same person deprived of the money or property by the fraud." *Id.* (quoting *United States v. Christopher*, 142 F.3d 46, 54 (1st Cir. 1998)); *see also United States v. Seidling*, 737 F.3d 1155, 1161 (7th Cir. 2013); *United States v. McMillan*, 600 F.3d 434, 449 (5th Cir. 2010); *United States v. Blumeyer*, 114 F.3d 758, 768 (8th Cir. 1997); *United States v. Kennedy*, 64 F.3d 1465, 1476 (10th Cir. 1995) ("The plain language of the mail fraud statute . . . requires only the devising of a scheme for obtaining money or property by means of false or fraudulent pretenses, representations, or promises—not the making of misrepresentations to any particular individual.")

But even if convergence were required, Porat's conviction would stand. The jury could reasonably have concluded the advertisements, emails, and other marketing that mentioned Fox's inflated rankings were themselves fraudulent. Again, fraudulent statements "may be effected by deceitful statements of half-truths or the concealment of material facts." *Bryant*, 655 F.3d at 249 (citation omitted). In *United States v. Olantunji*, 872 F.2d 1161 (3d Cir. 1989), for example, the Third Circuit reversed the dismissal of an indictment that alleged the defendant had obtained financial aid by "concealing from the [Department of Education] that he obtained his green card by means of false statements." *Id.* at 1167. The indictment properly alleged mail fraud not because of what the defendant said to the Department of Education, but what he concealed from it. *Id.*

The same logic applies here.  The online and part-time MBA's rankings were based on false data deliberately intended to inflate those rankings.  Porat knew the rankings were based on false information, and he instructed his staff to market them anyway.  Fox touted its "literally true" rankings, (Mot. J. Acquittal or New Trial at 32), while concealing that those rankings were based on lies.  It was reasonable for the jury to conclude those marketing efforts themselves involved half-truths and the concealment of material facts.  If so, the students, applicants and donors were both the parties deceived and the parties defrauded.  Porat "[s]hould not be shielded from criminal liability . . . simply because the scheme he . . . created [was] an elaborate one." *Olatunji*, 872 F.2d at 1168.

B

Porat's contention that he did not commit mail fraud because any students deceived by the school's fraudulent ranking got what they paid for fares no better.  Some courts have held that the wire fraud statute does not reach situations where "the purported victim received the full economic benefit of its bargain."  *See United States v. Binday*, 804 F.3d 558, 570 (2d Cir. 2015); *United States v. Takhalov*, 827 F.3d 1307, 1313 (11th Cir. 2016); *but see United States v. Feldman*, 931 F.3d 1245, 1265 (11th Cir. 2019) (Prior, J., concurring) (arguing that this interpretation of the statute is "at odds with both the common law and binding precedent").  However the Third Circuit might resolve this issue, it would not undermine Porat's conviction.

The evidence showed that an MBA program's rank influences the value of a degree from that program, and that students who enrolled relying on inflated rankings did not receive "exactly what they paid for."  *Takhalov*, 827 F.3d at 1314 (citation

49

omitted).  For example, Imbrahim Fetahi testified he chose Fox over his second-choice business school "specifically because of the rankings."  (Trial Tr. Day 2 at 125:6–8.)  He believed the "prestige" of graduating from the top ranked program "would enable [his] career acceleration at a different rate."  (*Id.* at 126:10–16.)  Ultimately, he "didn't get the brand and the prestige that was promised."  (*Id.* at 133:9–10.)  Similarly, Ara Sardarbegians testified he chose to attend Fox because of the online MBA's number one ranking.  (Trial Day 8, Morning Session, at 56:17–18.)  After Fox was stripped of its first-place ranking, it became "just another MBA program."  (*Id.* at 62:1–5.)  Sardarbegians explained that if he were choosing among generic programs, there were "plenty of other cheaper . . . MBA programs I could have gone to and saved myself thousands of dollars."  (*Id.* at 62:5–8.); *see also* (*id.* at 61:10–14) ("I could have just gone to Ball State for $20,000 and gotten the same piece of paper . . . [and] saved myself $20,000 and the Postal Service $15,000.")

Fetahi's and Sardarbegians' testimony was corroborated by Byrne and by Porat himself.  Byrne explained that rankings "affect the companies that will come on your campus to recruit your students."  (Trial Tr. Day 2 at 115:4–6.)  Good rankings are "a signal to employers that your program is a good program."  (*Id.* at 34:1–4.)  Porat concurred, writing in his manuscript that a school's image is "the single most important factor in assuring continuous demand from the students, the parents *and employers*."  (Gov't Ex. 150 at 111 (emphasis added).)  The very real economic consequences of rankings were neatly captured in the analogy Porat "often" drew between a Fox diploma and a stock, the value of which was reflected in its ranking.  (Gov't Ex. 148.)

The jury was certainly able to conclude that when students enrolled in Fox MBA programs based on fraudulent rankings, they did not get what they paid for.

V

In addition to challenging the sufficiency of the evidence against him, Porat argues four errors require the Court to order a new trial. He claims (1) the statements of Gottlieb and O'Neill in Government Exhibits 72–77 were not admissible under the co-conspirator exception to the prohibition on hearsay, (2) O'Neill's January 9, 2018, statement to Breslin-Knudsen should not have been admitted to rehabilitate O'Neill's credibility, (3) the Court's wire fraud instruction to the jury was inconsistent with *Kelly v. United States* and, (4) Porat was entitled to an unanimity instruction regarding the scheme to defraud.

A

Under Federal Rule of Evidence 801(d)(2)(E), statements made by a party's co-conspirators during the course and in furtherance of a conspiracy are not hearsay when offered against that party. For the exception to apply, the Court must find by a preponderance of the evidence that "(1) a conspiracy existed; (2) the declarant and the party against whom the statement is offered were members of the conspiracy; (3) the statement was made in the course of the conspiracy; and (4) the statement was made in furtherance of the conspiracy." *United States v. Weaver*, 507 F.3d 178, 181 (3d Cir. 2007) (citation omitted). Porat argues Exhibits 72–77 should not have been admitted because the first and second elements of this exception were not satisfied. (Mot. J. Acquittal or New Trial at 36–37.)

51

As an initial matter, Porat waived his challenge to the Court's findings regarding everything but Porat's membership in the conspiracy.  At trial, Porat's counsel said, "I'm not doubting there was a conspiracy between the two of them"; i.e., Gottlieb and O'Neill.  (Trial Tr., Day 8, Rule 29 Motion, 7:5–6.)  He then said that if there were more evidence Porat had joined the conspiracy, he would "have no argument that these were [not] co-conspirator statements."  (*Id.* at 7:15–17.)  The Government began its response by pointing out that Porat had made its task easier "by acknowledging three of the elements."  (*Id.* at 9:8–9.)  Porat never objected to this characterization of his remarks.  He cannot now claim there was insufficient evidence of an agreement to commit wire fraud, only that there was insufficient evidence Porat himself joined it.

Even if Porat could challenge the Court's determination regarding the existence of the conspiracy and O'Neill and Gottlieb's membership in it, that challenge would be meritless given the evidence discussed in Part II of this opinion.  And, as section III.C makes clear, Porat's own involvement in the conspiracy was established by far more than a preponderance of the evidence.

B

Porat next argues the Court improperly admitted O'Neill's January 9 statement to Breslin-Knudsen indicating she submitted the false GMAT data to *U.S. News* at Porat's behest.  (Mot. J. Acquittal or New Trial at 38.)

On the sixth day of trial, the Court permitted the Defense to introduce a February 2015 email O'Neill sent to Porat and others saying, "Moshe, as I've always promised you I will never do anything that will have your name, Fox, or my name published for any unethical survey submissions.  I have backup for each metric

52

submitted." (Def. Ex. 2.)  The statement was admissible under Rule 806 because it was arguably inconsistent with the assertions made by O'Neill in Government Exhibits 72–77 suggesting she had shown Porat a draft survey submission indicating one hundred percent of online MBA students had taken the GMAT.  *See* (Trial Tr. Day 6, Afternoon Session, at 13:8–14:7).

The Government then sought to rehabilitate O'Neill's credibility by asking Breslin-Knudsen about a January 9, 2018, conversation in which O'Neill said "the dean had told her . . . to indicate that we had 100 percent GMAT takers." (Trial Tr. Day 7 at 72:10–12.)  The Court instructed the jury that O'Neill's statement was "admissible solely for considering whether it is consistent with her statements in Government[] Exhibits 72 through 77." (*Id.* at 73:24–74:6.)

Federal Rule of Evidence 806 permits a hearsay declarant's credibility to be "attacked, and then supported, by any evidence that would be admissible for those purposes if the declarant had testified as a witness."  A prior consistent statement may be admissible to rehabilitate a witness' credibility even if it is not admissible as substantive evidence under Rule 801(d)(1)(B).  *United States v. Casoni*, 950 F.2d 893, 905 (3d Cir. 1991); *United States v. Cotton*, 823 F.3d 430, 437 (8th Cir. 2016).

A prior consistent statement may be admitted for rehabilitative purposes when it "clarifies[] or amplifies the meaning of the witness's testimony or inconsistent statement."  *Cotton*, 823 F.3d at 437.  It must have "some rebutting force beyond the mere fact that the witness has repeated on a prior occasion a statement consistent with his trial testimony.'"  *United States v. Ellis*, 121 F.3d 908, 920 (4th Cir. 1997).  O'Neill's January 9 statement was admissible because it reconciled her remarks in Government

exhibits 72–77 with her assurance in Defense Exhibit 2.  If O'Neill knew she and Porat were conspiring together to submit fraudulent data, she may have sent the 2015 email to cover their tracks.  Her remark "explain[s] the . . . the impeaching inconsistent statement, and therefore allow[s] the jury to better assess the substantive evidence presented."  *Cotton*, 823 F.3d at 437; *see also United States v. Simonelli*, 237 F.3d 19, 28 (1st Cir. 2001).

Her statement did more than repeat what she had said in her emails to Gottlieb. While those emails suggested O'Neill had shown Porat draft submissions containing fraudulent data, they did not explicitly say O'Neill talked with him about the GMAT scores, much less explain that he had instigated the conspiracy himself.

Porat also argues O'Neill's January 9 statement was inadmissible because it was made after her motive to fabricate arose.  But while this limit applies to substantive evidence admitted under Rule 801(d)(1)(B), it does not apply to prior consistent statements that are admitted solely for their rehabilitative purpose.  *See Casoni*, 950 F.2d at 905; *Ellis*, 121 F.3d at 920 (4th Cir. 1997) ("Because the statements . . . were not offered for the truth of the matter asserted, the restrictions of Rule 801(d)(1)(B) and the "pre-motive rule" of *Tome* have no effect."); *Simonelli*, 237 F.3d at 27; *Cotton*, 823 F.3d 436 n.3.

Finally, even if O'Neill's January 9 statement should not have been admitted to rehabilitate her credibility, the error was harmless.  The jury had already heard that O'Neill accused Porat of instructing her to submit false data to *U.S. News*.  That allegation was contained in Porat's responses to Temple's interrogatories in his defamation suit, which Agent Coughlin read to the jury.  (Gov't Ex. 119 at 17; Trial Tr.

54

Day 3 at 30:6–10.)  Porat also repeated the allegation in his own deposition testimony. (Gov't Ex. 103G.)  Porat indicated on the record he had no objection to the admission of either.  (Trial Tr. Day 3 at 99:1–3); (*id.* at 97:16–98:6).

Porat and Breslin-Knudsen provided differing accounts of when O'Neill made this statement, but not of what she said.  Whether O'Neill leveled this accusation on January 9, 2018, or late February 2018 is irrelevant for the limited purpose for which her January 9 remarks were admitted: explaining the apparent inconsistency between her 2014 emails to Gottlieb and her 2015 "assurance" email.  Thus, even if admitting O'Neill's statement for this purpose was error, the error was rendered harmless by Porat's explicit waiver of any objections to the same statement when it came from his own mouth.

## C

Porat also contends the Court erred in not adopting his proposed revisions to the model wire fraud instruction, which he claims were required by *Kelly v. United States*. (Mot. J. Acquittal or New Trial at 42.)   In *Kelly*, the Supreme Court reaffirmed that a person can only be convicted of wire fraud if money or property was "an 'object of the fraud.'"  *Kelly*, 140 S. Ct. at 1573 (quoting *Pasquantino v. United States,* 544 U.S. 349, 355 (2005)).

The first two paragraphs of the Court's instruction on the phrase "scheme to defraud or to obtain money or property" explained that obtaining money or property must be an object of the conspiracy.  The Court told the jury, "the Government must prove beyond a reasonable doubt . . . that Porat knowingly devised or willfully participated in a scheme to defraud Temple University's Fox School of Business

applicants, students, or donors of money." (Trial Tr. Day 10 at 84:12–16, ECF 137.)  In the very next sentence, it stated, "[a] scheme is merely a plan for accomplishing an object." (Trial Tr. Day 10 at 84:18–19.)  Read together, defrauding applicants, students, or donors of money was the alleged object of the scheme, and the jury was required to find the government had proven beyond a reasonable doubt that Porat willfully participated in a scheme with that object.

The next paragraph underscored this point, explaining that "a scheme to defraud is a plan, device, or course of action *to deprive another of money* by means of false or fraudulent pretenses." (*Id.* at 84:23–25 (emphasis added).)  All of this language tracked the Third Circuit's model instruction, which was revised after *Kelly*.  *See* Third Cir. Model Crim. Jury Instr. 6.18.1341-1 (revised Feb. 2021).

The Court deviated from the model instruction in one relevant respect, and it did so to address the concerns Porat now raises.  The third-to-last paragraph of the model instruction reads, "in order to establish a scheme to defraud, the government must also prove that the alleged scheme contemplated depriving another of money or property." This sentence is in some tension with *Kelly*, since a juror might believe a scheme "contemplated" depriving another of money if the defendant foresaw that it would deprive people of money, even if that was not his object.  *See Kelly*, 140 S. Ct. at 1573– 74.  To eliminate this confusion, the Court instructed the jury that "to establish a scheme to defraud, the Government must also prove that an aim of the alleged scheme was to deprive another of money." (Trial Tr. Day 10 at 86:15–17.)

The word "aim" clearly indicates that money or property "must play more than some bit part in a scheme." *Kelly v. United States*, 140 S. Ct. at 1573.  In this context,

aim means "a clearly directed intent or purpose." *Aim*, Merriam-Webster, https://www.merriam-webster.com/dictionary/aim (last visited March 1, 2022); *see also aim*, Oxford English Dictionary, https://www.oed.com/view/Entry/4347?rskey= XbKOVv&result=3&isAdvanced=false#eid (lasted visited March 1, 2022) ("A desired outcome; an end aimed at; an objective, a goal; a purpose, an intention"). The jury understood it could not convict Porat if the monetary impact of his scheme was only incidental to some other goal.

Despite this, Porat contends a new trial warranted because the Court did not deviate even further from the model instruction. In particular, he contends the Court committed reversible error when it used the indefinite article "an" rather than the definite article "the." (Mot. J. Acquittal or New Trial at 44). But *Kelly* says only that money or property must be *an* aim of the scheme. *See, e.g.*, *Kelly*, 140 S. Ct. at 1571 ("So under either provision [of the wire fraud statute], the Government had to show not only that [the defendants] engaged in deception, but that an 'object of the[ir] fraud [was] "property."'") (quoting *Cleveland v. United States*, 531 U.S. 12, 26 (2000)) (alterations in original). In fact, the Supreme Court uses the phrase "an object" or "an objective" *six times* to describe what is required to sustain a conviction under the wire fraud statute. *See id.* at 1568, 1569, 1571, 1572, 1573, 1573 n.2. If the Supreme Court intended to cabin the wire fraud statute to schemes whose *only* object was to obtain money or property, it would have used a different phrase.

This makes sense. A scheme, like a conspiracy, can have more than one object. *Cf. United States v. Freeman*, 763 F.3d 322, 343 (3d Cir. 2014) ("Although its objectives may be numerous and diverse, a single conspiracy exists if there is one overall

agreement among the parties to carry out those objectives.") (quoting *United States v. Bobb*, 471 F.3d 491, 494 (3d Cir. 2006)). Take *Kelly* as an example. If the Government had produced evidence that the defendants set out with the intent both to deprive the Port Authority of money *and* to retaliate against the mayor of Fort Lee, nothing in *Kelly* suggests the conviction would be invalid simply because the scheme had two objects, one lawful and one unlawful. As the Court explained, "the lie itself—i.e., that the lane change was part of a traffic study, rather than political payback—could not get the prosecution all the way home." *Id.* at 1572. Instead, "the deceit must *also* have had the 'object' of obtaining the Port Authority's money or property." *Id.* at 1573 (emphasis added). This suggests that "the object of obtaining the Port Authority's money" can coexist with another object—political payback—without taking the whole scheme outside the scope of the statute.

The Third Circuit's decision in *United States v. Piccolo*, 835 F.2d 517 (3d Cir. 1987), also illustrates this point. In *McNally v. United States*, 483 U.S. 350 (1987), the Supreme Court clarified the mail fraud statute was "limited in scope to the protection of property rights." *Id.* at 360. Piccolo, who had been convicted before *McNally*, argued the jury had been allowed to convict him "based solely on a finding that he participated in a scheme the sole purpose of which was to deprive [one of his victims] of its intangible right to the faithful services of [its employee]." *Piccolo*, 835 F.2d at 520.

The Third Circuit rejected Piccolo's arguments, concluding based on the description of the scheme in the jury instructions that the jury had been required to find "an object of the scheme in which he participated was to obtain money." *Id.*

(emphasis added).  The scheme's lawful object, depriving another of their right to honest services, did not negate its unlawful object, depriving them of their money.

The same logic applies here.  Whatever other objects, if any, Porat may have had, they do not negate the jury's conclusion that obtaining money was an object of his scheme.

## D

Finally, Porat claims that two separate schemes were presented at trial—one involving *U.S. News* and another involving the *Financial Times*—and that he was entitled to a specific unanimity instruction as a result.  (Mem. Supp. Mot. J. Acquittal or New Trial at 53.)

The Sixth Amendment requires criminal convictions to be unanimous.  *Ramos v. Louisiana*, 140 S. Ct. 1390 (2020).  The right to a unanimous verdict "includes the right to have the jury instructed that in order to convict, it must reach unanimous agreement on each element of the offense charged."  *United States v. Gonzalez*, 905 F.3d 165, 183 (3d Cir. 2018).  But "a specific unanimity instruction is the exception to the 'routine case.'"  *United States v. Smukler*, 991 F.3d 472, 492 (3d Cir. 2021) (quoting *United States v. Cusumano*, 943 F.2d 305, 312 (3d Cir. 1991)).  It is "only applicable when 'complexity . . . or other factors, creates the potential that the jury will be confused.'"  *Id.* (quoting *United States v. Beros*, 833 F.2d 455, 460 (3d Cir. 1987)).  Usually, a general unanimity instruction is sufficient to "ensure that the jury is unanimous on the factual basis for a conviction."  *Smukler*, 991 F.3d at 492 (quoting *Gonzalez*, 905 F.3d 165, 184 (3d Cir. 2018)).

A specific unanimity instruction may be required when the Government "advances different factual theories concerning the defendant['s] charged conduct, each of which could independently satisfy the elements of the crime." *Gonzalez*, 905 F.3d 165, 184 (3d Cir. 2018). But that was not the case here. The indictment alleged one scheme to defraud students, applicants and donors and pointed to a single email that furthered, advanced, or carried out that scheme. (Indictment, Count Two, ¶ 2, 4, ECF 1.) The Government argued its case accordingly. *See* (Trial Tr. Day 10 at 46:18–47:4).

Moreover, there was no way for the jury to convict Porat without unanimously concluding the fraudulently obtained *U.S. News* rankings were part of his scheme to defraud applicants, students and donors. The January 22, 2018, email was the only wire communication the Government identified as advancing or furthering the scheme to defraud. (Indictment, Count Two, ¶ 4); (Trial Tr. Day 10 at 46:18–21). The jury was required to find beyond a reasonable doubt that communication was "used in some manner to further or to advance or to carry out the scheme to defraud." (*Id.* at 88:24–89:3.) No jury could conclude the scheme to defraud *did not* include fraudulent submissions to *U.S. News* while simultaneously finding that the January 22 email furthered the scheme.

While Porat might quibble with the Government about whether the *Financial Times* incident was part of Porat's scheme to defraud, the Government ultimately "advance[d] only a single theory of liability." *Smukler*, 991 F.3d 493. Whatever the outer bounds of Porat's scheme to defraud, at a minimum it must have involved defrauding students, applicants and donors by using fraudulent rankings in *U.S. News*. There was no possibility, much less a "genuine possibility," that Porat's conviction

resulted from "different jurors concluding that the defendant committed different acts." *Gonzalez*, 905 F.3d at 184 (quoting *Beros*, 833 F.2d at 461).

Porat does not respond to this analysis, which the Court articulated when it originally ruled on this issue.  (Trial Tr. Day 10 at 9:5–10:25.)  Nor does he cite or discuss *Smukler* or *Gonzales*, the two most recent Third Circuit cases discussing specific unanimity instructions.  Instead, he latches onto dicta from *United States v. Ryan*, 828 F.2d 1010 (3d Cir. 1987),  for the proposition that a general unanimity instruction does not suffice where the allegations in a single count are "either contradictory or only marginally related to one another."  *Id.* at 1020.  His reliance is misplaced.

*Ryan*, like *Beros* and its progeny, concerned cases in which the "indictment provides two or more factual bases upon which a conviction could conceivably rest."  *Id.* It acknowledged that only a small subset of cases meeting that description require a specific unanimity instruction.  *Id.*  It then suggested the subset included cases in which the various allegations that could independently satisfy the elements of the crime were "only marginally related to other."  *Id.*  But as previously discussed, Porat could only have been convicted if the jury agreed that scheme included fraudulent submissions to *U.S. News*.  Whether the *Financial Times* fraud was part of the overarching scheme or a separate scheme was immaterial.

Even accepting Porat's premise, there was substantial evidence the *Financial Times* fraud and the *U.S. News* fraud were part of the same overarching scheme.  The "fraudulent conduct and purpose" was consistent across both schemes, and the identity of its key player was the same.  *United States v. Maker*, 751 F.2d 614, 625 (3d Cir.

1984).  Both schemes shared the same architect (Porat), goal (defrauding students, applicants and donors of money), and the method of carrying out the scheme (inflating the rankings of Fox's MBA programs through fraudulent submissions to ranking publications).  That the supporting characters changed is not surprising: Porat needed more pliable accomplices than Christine Kiely to continue his scheme.

Finally, even if it were theoretically possible for the jury to have convicted Porat without unanimous agreement regarding the scheme he participated in, that did not occur.  The jury also convicted Porat of conspiracy to commit wire fraud, and the allegations and evidence underlying his conspiracy conviction only related to the fraud he, Gottlieb and O'Neill perpetrated through *U.S. News*.  To have convicted him on this Count, the jury had to agree that there was a scheme to defraud that involved fraudulent submissions to *U.S. News* and that Porat intentionally joined a conspiracy to further that scheme.  This conviction eliminates all doubt the jury was unanimous in finding that the scheme involved, at minimum, an effort to defraud students, applicants and donors by submitting false and fraudulent data to *U.S. News*.  *See United States v. Smukler*, 991 F.3d 472, 493 (3d Cir. 2021) (concluding the defendant's convictions on related counts rendered the failure to provide an unanimity instruction harmless.)

An appropriate Order follows.

BY THE COURT:

*/s/ Gerald J. Pappert*
GERALD J. PAPPERT, J.