**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| v. | CRIMINAL ACTION<br>NO. 21-170 |
| MOSHE PORAT | |

**PAPPERT, J.**                                                    **March 16, 2022**

### MEMORANDUM

On November 29, 2021, a jury convicted Moshe Porat of conspiracy to commit wire fraud and wire fraud.  At his sentencing, the Court declined to increase his offense level based on United States Sentencing Guideline § 2B1.1(b)(1) because the Government did not prove by a preponderance of the evidence facts that permitted the Court to reasonably estimate the amount of loss associated with Porat's crimes.  This memorandum explains the reasons for that decision.

I

A

While dean of Temple University's Fox School of Business, Moshe Porat devised a scheme to defraud students, applicants and donors of money by submitting false information to publications that rank MBA programs, then touting those rankings to donors and prospective students.  In 2014, he enlisted Isaac Gottlieb and Marjorie O'Neill in his efforts.  Gottlieb, a statistics professor and "consultant" to Porat, identified variables Fox could manipulate to improve its rankings in *U.S. News & World Report*.  O'Neill, a Fox administrator who worked with Porat on rankings issues,

prepared Fox's fraudulent responses to *U.S. News*' survey questions.  At Porat's direction, she (1) falsely reported that one hundred percent of incoming students in Fox's online MBA program had taken the GMAT and (2) fraudulently combined the online, part-time and executive MBA programs when answering questions related to the percentage of Fox students enrolled in its part-time program and the average work experience of those students.  The fraudulent submissions continued until Porat's scheme was discovered in early 2018.

While the Government did not have to do so to prove its case, it put on evidence establishing that students had in fact been victimized by Porat's fraudulent scheme. First, it demonstrated that the online and part-time programs' rise in the *U.S. News* rankings was followed by a corresponding increase in enrollment.  The following charts illustrate the programs' growth during the years of the fraud:

**Online MBA Program**

| Academic Year | Rank before the academic year began | Total Enrollment | Enrollment above pre-fraud baseline |
|---|---|---|---|
| 2014-2015 | 9 | 133 | N/A |
| 2015-2016 | 1* | 198 | 65 |
| 2016-2017 | 1* | 253 | 120 |
| 2017-2018 | 1* | 336 | 203 |
| Total increase in enrollment above pre-fraud baseline: | | | 388 |

**Part-time MBA Program**

| Academic Year | Rank before the academic year began | Enrollment | Enrollment above pre-fraud baseline |
|---|---|---|---|
| 2014-2015 | 53 | 88 | N/A |
| 2015-2016 | 20* | 182 | 94 |
| 2016-2017 | 16* | 166 | 78 |
| 2017-2018 | 7* | 194 | 106 |
| Total increase in enrollment above pre-fraud baseline: | | | 278 |

*See* (Gov't Exs. 24, 143, 144); (Presentence Investigation Report ("PSR") ¶ 48); (Trial Tr. Day 4 at 51:23–53:10; 54:1–21, ECF 132 (Coughlin Test.)).

The Government then showed that the increase in enrollment generated millions of dollars in additional revenue for Temple and Fox. In 2016 and 2017, the total cost of Fox's online MBA was $59,760. (Gov't Ex. 145.) In 2017, the total cost of its part-time program was $58,755. (*Id.*) Using those numbers, FBI Special Agent Brian Coughlin made a rough estimate of the increase in gross revenue attributable to the fraud. Multiplying by $60,000 the number of students above the pre-fraud baseline for each program, he calculated Fox's tuition revenue for the online and part-time programs increased by slightly less than $23.3 million and $16.7 million, respectively. (Trial Tr. Day 4 at 51:23–53:22, 54:1–55:11 (Coughlin Test.).)

Second, the Government presented testimony from two students who had enrolled in Fox's online MBA specifically because of its number one ranking. Ibrahim Fetahi liked "the education or the quality [of] the program better" at Syracuse, his

second-choice school, but ultimately chose to attend Fox "specifically because of the rankings." (Trial Tr. Day 2 at 125:6–7, ECF 130.)  For him, the value of an MBA lay "not just [in] the quality of education," but in its brand.  (*Id.* at 124:17–20.)  He believed that "having a good brand" on his resume would make him a more competitive applicant for the types of jobs he wanted.  (*Id.* at 124:19–21.)  While he acknowledged that he received an education and degree from Fox, he was adamant he "didn't get what [he paid] for."  (*Id.* at 133:8.)  He "didn't get the brand and the prestige that was promised to [him] in the beginning.  (*Id.* at 130:9–10.)

Ara Sardarbegians also chose Fox because of its number one ranking.  (Trial Tr. Day 8, Morning Session, at 56:17–18, ECF 126.)  He chose it over the University of Maryland despite his ties and proximity to that school.  (*Id.* at 60:3–6.)  Indeed, Fox would not have "been on [his] radar had [it] not been ranked Number 1."  (*Id.* at 60:6–8.)

When Sardarbegians learned Fox had been stripped of its ranking, he was upset because he had been "promised one thing and then delivered another."  (*Id.* at 59:11–12.)  While he "still received an accredited MBA," he maintained that there was "a difference between . . . any online MBA" and the top ranked program in the county.  (*Id.* at 59:15–16.)  If all he wanted was an MBA from an accredited school, he "could have just gone to Ball State for $20,000 and gotten the same piece of paper."  (*Id.* at 61:10–13.)  Without its ranking, Fox's online MBA was "a great MBA program, but . . . just another . . . regular MBA program."  (*Id.* at 61:24–62:1.)  "[T]here [were] plenty of other,

cheaper . . . MBA programs [he] could have gone to and saved . . . thousands of dollars."
(*Id.* at 62:6–8.)

Third, the Government called John Byrne, an expert in business schools
rankings and reputations, who testified about the significance of rankings to both
students and employers.  Byrne explained that Fetahi's and Sardarbegians' experiences
were not unique.  Surveys of business school applicants had shown that "[f]ar and
away, rankings were more important [to applicants] than the cost of the program, than
the location of the program, than the academic focus of the program, and even the
quality of the faculty."  (Trial Tr. Day 2 at 35:10–15.)   Byrne also testified that Fox's
number one ranking misrepresented the true value of its educational offerings relative
to other schools.  As Byrne explained, Temple's online MBA program was ranked above
the University of North Carolina, Indiana University, and Carnegie Mellon University,
schools that had "more resources to pour into their programs" and, as a result, were
able to recruit better faculty.  (*Id.* at 62:9–18.)

Fourth, the Government put on evidence—from both Byrne and Porat himself—
that linked MBA rankings to employment prospects.  Byrne testified that rankings
were "a signal to employers that your program is a good program," and that "employers
would be more likely to recruit new students" at schools with higher rankings.  (*Id.* at
34:4–6.)  Porat made similar statements.  In his manuscript, he wrote that a school's
image was "the single most important factor in assuring continuous demand from the
students, the parents and employers."  (Gov't Ex. 150 at 111.)  This was consistent with
his oft-repeated assertion that a diploma from Fox was "like a share of stock in an

enterprise" in which students "remain[ed] shareholders long after [they] graduated."
(Gov't Ex. 148.)  Just as rising rankings showed the Fox diploma was "appreciating in
value," Fox's fall in the rankings could be expected to cause it to depreciate.

What the Government did not do, however, was peg a dollar amount to the loss
suffered by students who enrolled at Fox relying on fraudulent rankings.  It did not
attempt to quantify the employment consequences caused by Fox's precipitous fall in
the rankings after Porat's fraud was exposed.  It did not try to estimate in dollars the
value students placed on an MBA program's brand, separate and apart from the value
of the education itself.  It did not even introduce evidence about the difference between
the revenue Fox charged students and the cost of running its online and part-time
programs.  Instead, it confined itself to Agent Coughlin's back-of-the-envelope estimate
of the total tuition revenue generated by Porat's scheme.

B

After Porat's conviction, the Court convened a January 12, 2022 telephone
conference with counsel to discuss the need for an evidentiary hearing to determine the
fraud loss amount prior to sentencing.  (Minute Entry, ECF 129.)  During the call, all
parties agreed to hold such a hearing on January 31, and the Court scheduled it
accordingly.  (Notice of Hearing, ECF 128.)  In a January 20 letter to the Court,
however, the Government explained it had decided "the appropriate measurement of
loss under Section 2B1.1(b)(1) of the sentencing guidelines [was] $5.475 million, which
represent[ed] the combined settlement amounts of the two class action lawsuits brought
against Temple by Fox students."  (Ex. A, attached.)  The Government had informed the

6

Probation Office of its proposed method of calculating loss, and it advised the Court that the Probation Office no longer believed a hearing was necessary. *Id.* The Court held a second telephone conference to discuss the letter. (Minute Entry, ECF 144.) Given the Government's position, the parties agreed a hearing was unnecessary, so the Court cancelled it. (Notice, ECF 143.)

## II

Under subsection 2B1.1(b)(1) of the United States Sentencing Commission Guidelines, the offense level of a property crime may be increased based on the amount of loss the defendant caused or intended to cause, whichever is greater. USSG § 2B1.1(b)(1) cmt. n.3(A). Actual loss is confined to the "reasonably foreseeable pecuniary harm" caused by the loss; it does not include non-economic harm. *Id.* Intended loss is the economic harm "the defendant purposely sought to inflict." *Id.* If the offenses caused a loss, but the amount of that loss is not reasonably determinable, the Court should use "the gain that resulted from the offense as an alternative measure of loss." *Id.* cmt. n.3(B); *United States v. Nagle* (*Nagle II*), 664 F. App'x 212, 216 (3d Cir. 2016). In any case, the Court "need only make a reasonable estimate of the loss." *United States v. Ali*, 508 F.3d 136, 145 (3d Cir. 2007) (quoting USSG § 2B1.1 cmt. n.3(C)).

"The [G]overnment is not entitled to a punitive loss calculation," however. *United States v. Free*, 839 F.3d 308, 323 (3d Cir. 2016). Instead, loss amount is a sentencing fact the Government must prove by a preponderance of the evidence. *United States v. McClure-Potts*, 908 F.3d 30, 40 n.12 (3d Cir. 2018); *Ali*, 508 F.3d at

7

145. And while the Court need not determine loss with precision, its estimate must be "grounded in the evidence and not derive from mere speculation." *United States v. Coppola,* 671 F.3d 220, 249–250 (2d Cir. 2012); *see also United States v. Evans*, 155 F.3d 245, 252 (3d Cir. 1998);[1] USSG § 2B1.1, comment. (n.3(C)) ("The sentencing judge is in a unique position to assess the evidence and estimate the loss *based upon that evidence*.") (emphasis added).  "The government *always* bears the burden of proving . . . the facts support a sentencing enhancement, and the defendant does not have to prove the negative to avoid the enhanced sentence." *United States v. Kirschner*, 995 F.3d 327, 336–37 (3d Cir. 2021) (quoting *United States v. Diallo*, 710 F.3d 147, 151 (3d Cir. 2013)) (alternation in original).

When a fraud victim receives something of value from the perpetrator, the victim's loss is not the total amount of money he paid the fraudster, but "the difference between the value he or she gave up and the value he or she received." *United States v. Nagle* (*Nagle I*), 803 F.3d 167, 180 (3d Cir. 2015) (quoting *United States v. Dickler*, 64 F.3d 818, 825 (3d Cir.1995)); *see also* USSG § 2B1.1, cmt. n.3(E)(i) (instructing that loss be reduced by "the fair market value of  . . . the services rendered . . . before the offense was detected").

---

[1] Prior to 2001, a separate section of the Guidelines dealt with fraud and deceit.  *See United States v. Nagle (Nagle I)*, 803 F.3d 167, 180 n.7 (3d Cir. 2015).  That section has since been merged with § 2B1.1, but cases like *Evans* interpreting the earlier section remain relevant.  *Id.*

Accordingly, the loss to students who enrolled in Fox's programs relying on its fraudulent rankings is not the full amount they paid in tuition, but the difference in value between what they paid in tuition and what they actually received.[2]

### III

The Government contends the settlement amounts used in the PSR "represent[] the actual loss attributable to Porat's crimes."  (Gov't Sentencing Mem. at 17, ECF 155.)  But no evidence ties the settlement amounts—either the lump sum payments or the average distributions to class members—to the actual loss suffered by students.  In fact, both the nature of the class action settlement approval process and the specifics of the litigation against Temple suggest the resulting settlements were not tethered to the actual, economic loss suffered by Porat's victims.  The Court cannot accept the settlement as a reasonable estimate of the victims' loss on little more than faith.

In *Smith v. Temple University*, the court approved settlements between Temple University and two classes of Fox students affected by the inaccurate rankings in *U.S. News & World Report*.  Final Judgment, *Smith v. Temple University*, No. 18-590 (E.D. Pa. Aug. 5, 2019),  ECF 48.  One settlement awarded $4,000,000 to students who enrolled in Fox's online MBA program between January 2015 and December 2018.  Class Settlement Agreement Between OMBA Plaintiffs and Temple University ¶¶ 22, 31 ("OMBA Settlement"), *Smith*, No. 18-590 (E.D. Pa. May 10, 2019), ECF 42-6.  The other awarded $1,475,000 to students who enrolled in other Fox programs over the

---

[2]  Since donors do not typically receive anything of value in exchange for their beneficence, there would be little or nothing to credit against their loss.  But the Government chose not to present evidence that any donors actually fell for Porat's scheme, or to quantify the amount Porat hoped to take from them.

same period.  Class Settlement Agreement Between GMBA, PMBA, EMBA, HRM, DIM and OBBA Plaintiffs and Temple University ¶¶  22, 31 ("Non-OMBA Settlement"), *Smith*, No. 18-590 (E.D. Pa. May 10, 2019), ECF 42-7.  After subtracting attorneys' fees and administration costs, funds were distributed to class members based on each class member's share of the total tuition paid by the class.  Pls. Uncontested Mot. Approval Disbursement of Funds at 1–3, *Smith*, No. 18-590 (E.D. Pa. Oct. 31, 2019), ECF 57.

There are a number of reasons why the Court doubts the settlement between Temple and its former students is a reasonable estimate of the actual loss suffered by Porat's victims.   To begin, settlements often reflect considerations beyond the actual value of the underlying claim.  *Cf.* Fed. R. Evid. 408, advisory committee notes on proposed rules (explaining that a settlement offer "may be motivated by a desire for peace rather than from any concession of weakness of position").  This is especially true in the class action context, where difficulties in establishing damages at trial weigh in favor of approving class-wide settlements.  *In re Nat'l Football League Players Concussion Inj. Litig.*, 821 F.3d 410, 439 (3d Cir. 2016).  The same logic that leads courts to conclude settlements may be better for class members than further litigation also suggests those settlements are not reliable indicators of the average or aggregate loss the plaintiffs actually suffered.  Moreover, the primary responsibility of a court approving a class action settlement is to protect absent class members from a settlement that releases their claims for less than they are worth, not to prevent defendants from being too generous.  *See id.* at 436; *see also* Fed. R. Civ. P. 23(e)(2)(C) (requiring courts to find that the relief provided is adequate "for the class.").  Given

those realities, it would be unfair to uncritically accept a settlement between other parties—Temple and Fox students—as a presumptively reasonable measure of Porat's criminal liability.

Indeed, the Court could find no cases in which a sentencing court used a settlement in a related civil case to determine the amount of loss attributable to the defendant's crimes. Nor could the Government. (Sentencing Hr'g Tr. at 16:20–17:14, ECF 164.) Instead, it pointed to a case where the defendant was convicted of "defrauding consumers who sued one of [his] businesses into settling their case for a fraction of its worth." *United States v. Neff*, 787 F. App'x 81, 85 (3d Cir. 2019). The court found the intended loss was $10 million because that is what the defendants estimated their exposure to be before they fraudulently settled the lawsuit. Tr. Sentencing Hr'g Def. Wheeler Neff at 54:11–15, *United States v. Neff*, 16-130-2 (E.D. Pa. June 8, 2018), ECF 485. The differences between that case and this one are obvious. There, the victims' cause of action was the "property" the defendant sought to obtain by fraud. *See Neff*, 787 F. App'x at 90–91. Here, the "property" was students' tuition checks. More is needed to demonstrate that the Fox students' settlements were a reasonable estimation of what they actually lost.

The Government put forward no evidence to explain how the settlement amounts were calculated or why they represent the "concrete, monetary harm" experienced by students who enrolled in the online or part-time MBA programs relying on those programs' inflated rankings. *See United States v. Free*, 839 F.3d 308, 321 (3d Cir. 2016) ("[T]he gravamen of any loss calculation is concrete, monetary harm to a real-world

11

victim."). Nor was any connection apparent on the face of the record in the *Smith* litigation. Indeed, counsel did not estimate how much the settlement was worth per class member until they were asked about it during the final hearing on class certification and settlement approval. At that point, "sitting [there] with [their] calculators," they performed some "quick math" to determine its estimated value per claimant. Tr. Hr'g Mot. Final Approval Class Action at 25:25–26:6 ("Final Approval Hr'g"), *Smith*, No. 18-590 (E.D. Pa. Aug 5, 2019), ECF 55. This suggests neither the lump sum awards nor the average amount received by individual class members were tied to an evidence-based analysis of the pecuniary harms the plaintiffs suffered.

In fact, in seeking approval for their settlement, both plaintiffs' and defense counsel emphasized the difficulty of determining damages. *See, e.g.*, Plaintiffs' Mot. Final Approval Class Settlements at 20, *Smith*, No. 18-590 (E.D. Pa. May 10, 2019), ECF 42-1 ("[T]he proposed Settlements stand in stark contrast to the outcomes in numerous other class actions against education institutions, where courts granted motions to dismiss because of the inability to allege viable damages theories."); Final Approval Hr'g at 16:10–12, *Smith*, No. 18-590 (E.D. Pa. Aug 5, 2019), ECF 55 (stressing "the difficulty that the Plaintiffs would have in proving cognizable, non-speculative damages"). Even the Government recognizes that "the settlement and resulting payment to affected students represented a compromise that reflected the risks of litigation, finality for University and the students, and other factors." (Mem. Regarding Imposition of Restitution at 7, ECF 156.) Both settlements expressly state that Temple entered them "solely to avoid the further expense, inconvenience and distraction of

12

burdensome and protracted litigation." OMBA Settlement at 1–2; Non-OMBA
Settlement at 2.

When one turns to the details of the settlements, the questions become even
thornier. Which better estimates the actual value of the fraud, the lump sum awarded
to each class, or the amount actually distributed to students after paying attorneys' fees
and administration costs? Should the numbers be reduced to reflect the fact that the
settlement classes included all students in the programs, not just those who actually
relied on the rankings in deciding to enroll at Fox? What should be made of the fact
that the settlement classes included some students who enrolled at Fox after its
programs were removed or withdrawn from the rankings? Should the $1.475 million
settlement be ignored entirely because it includes many students who were enrolled in
other programs, or should the Court attempt to calculate the proportion of the
settlement that actually went to part-time MBA students? These questions might have
answers if there was evidence linking the settlement amounts to the actual loss
students suffered, but there is none. Any attempt to reverse-engineer actual loss from
these settlements would be guided by little more than speculation about the true value
of the students' loss.

The Government's primary defense of the settlement amounts is that they are
"substantially less than the nearly $40 million in extra tuition revenues generated for
Fox's OMBA and PMBA programs during the years of the fraud." (Gov't Sentencing
Mem. at 17, ECF 155.) But that extra tuition revenue represents only half the
equation. The students' actual loss was *the difference* between what they paid and

what they received.  Without any information about the value of what they received; it is impossible to tell whether the settlements are more, less or a "reasonable estimate" of that difference.

At sentencing, the Government attempted to justify the reasonableness of the settlement figures as a proxy for actual loss by pointing to the testimony of Fetahi and Sardarbegians.  It claimed they "suffered more than what they agreed to take." (Sentencing Hr'g Tr. at 38:17–18.)  But Fetahi did not testify about the relationship between the amount he received in the lawsuit and what he believed he had lost at Fox. *See* (Trial Tr. Day 2 at 137:2–12).

While Sardarbegians did believe the settlement had not "made [him] whole," (Trial Tr. Day 8, Morning Session, at 61:4–5), his brief testimony on this point is not enough to reasonably estimate the value of his own loss, much less the loss of all similarly situated students.  First, some harms that may have factored into his assessment of the settlement amount—like his bitterness and feeling of having been "bamboozled"—are not loss under the Guidelines. *Compare* (*id*. at 61:18–22) *with* USSG § 2B1.1 cmt. 3(A)(iii).  Second, it is clear that Sardarbegians' decision about where to go to school was influenced by more than just the tradeoff between prestige and price.  If he had not gone to Fox, he would not have attened the cheapest school he could find.  Instead, he "probably would have ended up at University of Maryland College Park."  (Trial Tr. Day 8, Morning Session, at 60:3–4.)  And even if Sardarbegians' testimony had established the payout he received underestimated his personal pecuniary loss, it is too slender a reed with which to tie the settlement

14

amount—or any fraction of it—to the aggregate actual loss suffered by online and part-time MBA students.  It may have been convenient, and certainly easier for the mathematically disinclined, to rely on the settlement figures, but it would not have been reasonable to do so.

IV

Given the Government's burden and its choice to proceed on the basis of the settlement amount, it is not clear the Court is obligated to trawl the record looking for an alternative way to calculate the victims' loss in this case.  *See Nagle II*, 664 F. App'x at 217 n.9 (explaining that "it is up to . . . the Government to calculate loss in the first instance").  But the question is academic.  There is no other evidence in the record with which the Court could make a reasonable estimate of the victims' loss, either actual or intended.

As the Government acknowledged at Porat's sentencing, the total revenue generated by Porat's scheme is "only the start" of calculating the students' fraud loss. (Sentencing Hr'g Tr. at 34:4.)  But it did not provide the information necessary to get the Government home.  Regardless of how the students' loss is conceptualized—as a premium they paid for prestige or as the impact of the scandal on their future employment prospects—there was not enough evidence to put a dollar amount on what was taken from them.  As a consequence, the Government did not prove by a preponderance of the evidence what students actually lost.

On this record, it is impossible to determine the "fair market value" of a Fox degree.  MBA programs are not fungible commodities.  Instead, students' decisions

15

about where to go are driven by a variety of hard-to-quantify and hard to compare factors, including the "quality" of the program, its "prestige," its geographic location, their own ties to the school, enrichment experiences like international travel, and (in the case of online programs) opportunities for in-person learning and networking. *See, e.g.*, (Trial Tr. Day 2 at 122:12–16, 123:19–22, 125:1–8 (Fetahi Test.)); (Trial Tr. Day 8, Morning Session, at 60:1–8 (Sardarbegians Test.)).

That same opacity makes it difficult to isolate the relationship between prestige and price. The absence of a clear price premium for prestige is illustrated by Fox's relatively affordability. Fox's online MBA was cheaper than other programs ranked in the top ten, (Gov't Ex. 2), and both Fetahi and Sardarbegians testified that their second-choice schools were more expensive than Fox, (Trial Tr. Day 2 at 130:6–13 (Fetahi Test.)); (Trial Tr. Day 8, Morning Session, at 54:11–12 (Sardarbegians Test.)).

Porat goes too far, however, when he suggests the difficulty of calculating the amount of loss means there was no loss at all. (Sentencing Mem. Moshe Porat at 34, ECF 154.) Many students became "shareholders" in Fox based on Porat's lies about the value of the "stock" he encouraged them to purchase with their tuition dollars. (Gov't Ex. 148.) When the value of that stock imploded, "their interest [in attending and graduating from a top ranked MBA program] was not fulfilled." *Nagle I*, 803 F.3d at 182; *see also Nagle II*, 664 F. App'x at 216.

The evidence demonstrated part of the value of a Fox degree was wrapped up in its prestige. The rapid increase in enrollment after Fox's rankings improved suggests many students would not have chosen Fox, even at its relatively low price, had it not

been ranked first.  Fetahi and Sardarbegians said as much.  Fox's lower price tag was not enough to entice them away from Syracuse or Maryland.  Only when Fox was ranked first was it worth the price.  *See* (Trial Tr. Day 2 at 125:6–7 (Fetahi Test.)); (Trial Tr. Day 8, Morning Session, at 56:17–18 (Sardarbegians Test.)).  Undoubtedly, Fox's diploma was worth less than what students paid for it.  *Cf. Chatlos Sys., Inc. v. Nat'l Cash Reg. Corp.*, 670 F.2d 1304, 1306 (3d Cir. 1982) ("Evidence of the contract price may be relevant to the issue of fair market value, but it is not controlling.")  What remains elusive, however, is any way of assessing the value of what they *did* receive.

The Government did not prove by a preponderance of the evidence facts that established the value of a Fox degree when stripped of its prestige (or, conversely, what prestige alone was worth).  Without this information, the Court cannot make a "reasonable estimate" of the actual loss Porat's scheme inflicted on students.  And the same basic issue would stymie any effort to calculate intended loss, because intended loss must also account for the value of the service the perpetrator intended to provide.  *Dickler*, 64 F.3d at 825.

V

When the victims' loss cannot reasonably be determined, the Court should use "the gain that resulted from the offense as an alternative measure of loss."  USSG § 2B1.1, cmt. n.3(b).  Again, however, the Government failed to prove facts that would have enabled the Court to calculate gain.  The Government's attempt to equate Porat's salary as dean with the "gain that resulted from the offense" was misguided, and it did not introduce evidence of Fox's net revenue from each additional student in its online

17

and part-time MBA programs.  Without this information, the Court could not determine gain for the purposes of applying § 2B1.1(b).

At Porat's sentencing, the Government argued the Court should use the difference between Porat's salary as dean and his salary as a tenured professor to calculate gain under the Guidelines.  (Sentencing Hr'g Tr. at 99:15–21.)  That would be wrong for two reasons.  First, gain is only relevant when it functions as an "alternative measure of loss."  USSG § 2B1.1, cmt. n.3(b).  Put another way, it must "reasonably serve as a surrogate" for the victims' loss.  *Dickler*, 64 F.3d at 826.  Otherwise, "the defendant's gain cannot be said to be an 'estimation' of actual loss."  *Id.*  An enhancement under § 2B1.1(b) must be based on "a reasonable estimation of loss, not an alternative, unrelated value."  *Id.*

Porat's salary as dean is too attenuated from the fraud to be a "surrogate" for the students' loss.  In the mine-run fraud case, the victims' money flows directly into the pockets of the perpetrator.  Here, however, students' tuition dollars went to Fox and Temple, not Porat himself.  In an abstract sense, Porat's salary was tied to rankings because his superiors pressured him to improve the school's standing, *see* (PSR ¶¶ 106–08); (Trial Tr. Day 5 at 27:17–30:1, ECF 133 (Epps Test.)), but it was not a proxy for what the students lost.

In addition, even if Porat's personal gain from the fraud could be used as an alternative measure of his victims' loss, the Government did not prove by the preponderance of the evidence that he would not have received some part of his salary but for the fraud.  Porat became dean of the business school long before 2010, and there

18

is no evidence he would have been fired had the online MBA or part-time MBA programs not skyrocketed in the rankings.  Porat's salary and Temple's pressure on him to raise the rankings were relevant to demonstrate his motive to commit the fraud, (Mem. Op., ECF 87), but the Government fell short of showing his compensation would have been different had he not engaged in his crimes.

The "gain that resulted from the offense" was not Porat's salary, but the net revenue Temple took in as a result of the scheme.  The Government did not, however, introduce evidence regarding the net revenue generated by additional students in the online and part-time MBA programs.  The only potentially relevant evidence was an email from Isaac Gottlieb, where he asserted that doubling enrollment in the full-time program "would leave fox with a profit of over $700,000 a year."  (Gov't Ex. 67 (emphasis deleted).)  But the Court has no way of knowing whether Gottlieb's calculation was correct.  The Government produced no evidence of cost, tax, or scholarship figures that might support his math, and no one testified that Gottlieb was familiar with Fox's finances.  Most importantly, Gottlieb's estimate concerned net revenue for the *full-time* program.  The Court has no information about the costs associated with the part-time and online MBA programs or the relative expense of these programs.  Any attempt to calculate the net revenue of the part-time and online programs based on Gottlieb's assertions regarding the full-time program would be pure speculation.

BY THE COURT:

*/s/ Gerald J. Pappert*
GERALD J. PAPPERT, J.