**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 22-1560

_____

UNITED STATES OF AMERICA

v.

MOSHE PORAT,
Appellant

_____

Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. No. 2-21-cr-00170-001)
District Judge: Honorable Gerald J. Pappert

_____

Argued May 18, 2023

_____

Before: KRAUSE, PHIPPS, and CHUNG, *Circuit Judges.*

(Filed: August 7, 2023)

Mark B. Dubnoff **[ARGUED]**
Nancy E. Potts
Mary Teresa Soltis

Office of the United States Attorney
615 Chestnut Street
Suite 1250
Philadelphia, PA 19106

*Counsel for Appellee*

Avery D. Medjuck
Theodore D. Sampsell-Jones
Alexandra A.E. Shapiro **[ARGUED]**
Shapiro Arato Bach
1140 Avenue of the Americas
17th Floor
New York, NY 10036

*Counsel for Appellant*

Tai H. Park
1140 Avenue of the Americas
17th Floor
New York, NY 10036

*Counsel for Amicus Appellants Professor Stephen F.
Smith and Notre Dame Law School*

Michael D. Pepson
Americans for Prosperity Foundation
1310 N Courthouse Road
Suite 700
Arlington, VA 22201

*Counsel for Amicus Appellant Americans for
Prosperity Foundation*

––––––––––––––––

OPINION OF THE COURT

––––––––––––––––

CHUNG, *Circuit Judge.*

Moshe Porat, the former Dean of the Fox School of Business at Temple University ("Fox"), appeals his convictions for conspiracy to commit wire fraud, in violation of 18 U.S.C. § 371, and wire fraud, in violation of 18 U.S.C. § 1343.

On appeal, Porat argues that the government did not plead or prove by sufficient evidence (1) that he sought to deprive his victims of money, (2) that he sought to personally obtain money, or (3) that the party he deceived was the same party he defrauded of money (*i.e.*, "convergence"). With regard to the second issue, Porat also argues that the District Court erred in refusing to provide the jury with the instructions he sought. Because the evidence was sufficient for a rational jury to convict him, and because the government need not prove either that the scheme was intended to personally benefit Porat or "convergence," we will affirm.

## I.    BACKGROUND

### A.    Factual Background

Porat was convicted for his scheme to raise Fox's "rankings" in U.S. News and World Report ("U.S. News"), a publication that rates colleges and graduate schools, including

business schools.[1]  The government offered evidence that, while some have criticized these rankings as poor measures of a school's quality, many people rely on them to compare business schools.  These include applicants, students, alumni, donors, employers, faculty, and the schools themselves.

Porat was Fox's Dean from 1996 to 2018.  During his time at Fox, he was "almost obsessed with rankings."  Suppl. App. ("SA") 399.  Sometime in the early 2000s, Porat created a committee that met regularly to consider the data that Fox would provide for use by U.S. News in formulating rankings.  It also studied the rankings and strategized ways by which Fox could improve its rankings.  Over time, Porat came to work most closely on rankings with two Fox employees, Isaac Gottlieb and Marjorie O'Neill.  Porat eventually eliminated the committee and consolidated responsibility for Fox's survey submissions in O'Neill, who reported directly to him.  After that, Porat continued to confer with both Gottlieb and O'Neill on rankings strategy.

At some point, Porat's efforts to raise Fox's rankings crossed the line from strategy to falsification.  Evidence at trial showed that Fox may have submitted false data to rankings publications as early as 2010.  By 2014, having reverse-

---

[1] On appeal, Porat does not challenge the truth of the evidence presented at trial, but only whether it was sufficient to convict him.  And in reviewing Porat's appeal of his conviction, "we must consider the evidence in the light most favorable to the government."  *United States v. Rowe*, 919 F.3d 752, 758 (3d Cir. 2019).  Accordingly, we state the facts as shown at trial.

engineered the methodology behind the U.S. News rankings, Porat, Gottlieb, and O'Neill used falsifications to manipulate Fox's rankings—in particular, the rankings for its Online MBA ("OMBA") and Part-Time MBA ("PMBA") programs. To better Fox's OMBA ranking, they falsely stated that 100 percent of Fox's OMBA students had taken the Graduate Management Admission Test ("GMAT"), when the actual number was much lower. They also misreported data on offers of admission, student debt, and average undergraduate grade point average. To better Fox's PMBA ranking, they combined data for Fox's PMBA program with data for its OMBA and Executive MBA ("EMBA") programs to overstate the PMBA students' average work experience and the percentage of Fox's MBA students who were PMBA students. As with the OMBA program, they also falsely reported that 100 percent of Fox's PMBA students had taken the GMAT.

Partly because of these deceptions, Fox's OMBA program rose from its U.S. News rank of Number Nine in 2014 to Number One in 2015—a position that it held for four straight years. Fox's PMBA ranking climbed steadily over three years from Number Fifty-Three in 2014 to Number Seven in 2017.

Porat viewed Fox's high rankings as a key way to market Fox to students and to thus generate more tuition money.[2] One Fox administrator testified that Porat believed

---

[2] Although the Indictment alleged that Porat sought to defraud "Fox applicants, students, *and donors*" of money, Appendix ("A") 98, 115 (emphasis added), Porat notes that most of the government's evidence at trial concerned applicants and students only. On appeal, Porat's arguments

Fox needed "good rankings and to publicize good rankings for enrollment." SA475. In a book manuscript, Porat boasted about Fox's OMBA ranking as Number One and wrote that "enhancing the school's image" is "the single most important factor in assuring continuous demand from the students, the parents, and employees." *Id.* at 299. And with Porat's knowledge and involvement, Fox aggressively marketed its false high rankings. Fox advertised its deceptively obtained rankings on its website, on social media, and on billboards and signs. Porat also sent or approved emails touting Fox's false rankings to students, student recruiters, and donors. Porat also represented to students that Fox's high rankings would bring them continuing—and even increasing—benefits. In a 2017 speech, Porat told graduating Fox students, "I often say that your diploma is like a share of stock in an enterprise … in which you remain shareholder long after you have graduated." Gov't Ex. 148. He further said that "many leading publications"—including "U.S. News"—"rank our programs among the best in the world and they agree that our stock indeed has been appreciating in value." *Id.* During a 2017 "champagne toast" held to celebrate the rankings, Porat posed for a photo with students in front of a banner that read "YOUR STOCK IS SOARING." SA733–35. Fox printed the banner and arranged the photo to use it for "PR." *Id.* at 734.

---

mainly concern his scheme to defraud applicants and students of tuition money. Because Porat's arguments on appeal focus on tuition money, and because proof that he defrauded students and applicants is enough to convict him, the discussion that follows focuses on this element of the scheme.

The advertising worked. At trial, former students testified that they chose Fox because of its rankings. One former student testified that he "decid[ed] to go with Temple University because of [its] Number 1 ranking." *Id.* at 502. He further explained that he chose Fox because he knew that "people look at [rankings]," and that "once [he] graduat[ed]," he wanted to have "been a part of" a program that "was ranked Number 1." *Id.* at 503. After learning that Fox's rankings were inflated, he regretted not choosing a school that would have given him the "same piece of paper" at a much lower cost. *Id.* at 507. Another former student testified that he believed employers hire students from schools with the best "brand" and that Fox's highly ranked brand would help him "compete in the marketplace." A172. Ultimately, Fox's Number One ranking "was the only factor in [his] decision making" in choosing Fox over another school. SA133. Enrollment numbers corroborate that Fox's falsely inflated ranking influenced students' enrollment decisions. Between the 2014–2015 and 2017–2018 academic years, enrollment in Fox's OMBA and PMBA programs spiked from 133 students to 336 students and 88 students to 194 students, respectively. The increased enrollment was tremendously lucrative. The government estimated that Fox gained nearly $40 million in tuition from the additional students who enrolled during this period (2014–2018).

As the money poured in, Porat's team discussed how to keep the rankings high and make even more money. In a January 2015 email to Porat, Gottlieb emphasized Fox's need to maintain its high rankings, cautioning that just as "being number one can potentially add over 1–200 students a year" and bring corresponding "financial value" to Fox, so could "moving down" in the rankings "result in financial losses

associated with a reduction of the 100+ students." SA749. Porat responded, "Good stuff." *Id.* In September 2015, Gottlieb copied Porat on an email about rankings for another Fox program, its Global MBA ("GMBA"). Gottlieb noted that Fox's "OMBA and PMBA doubled in intake numbers when we had a striking increase in ranking," and estimated that increasing Fox's GMBA ranking would produce "a profit of over $700,000 a year." *Id.* at 756.

Then, in early 2018, Porat's scheme was exposed. On January 9, 2018, an article discussing Fox's repeated Number One ranking highlighted Fox's self-reported 100-percent GMAT figure. That figure raised an "enormous red flag" among other Fox administrators who knew that it was false. *Id.* at 189. Nonetheless, and despite warnings from administrators that they should not proceed, Porat pushed ahead with a celebratory toast, saying "we're going." *Id.* at 336. At the toast, Porat lauded Fox's OMBA ranking. The next day, Fox administrators decided to disclose the false GMAT data to U.S. News. Yet even then, Porat continued to publicize the rankings. On January 22, 2018, he sent an email to his "Porat 100," a VIP list that included Fox donors and potential donors, with the subject line "#1 Online MBA and #2 Online BBA in the nation AGAIN!" *Id.* at 810. Two days later, on January 24, 2018, U.S. News announced that Fox's "misreported data resulted in the school's numerical rank being higher than it otherwise would have been," and that "[b]ecause of the discrepancies," it would move Fox's OMBA program to the "Unranked" category. A528–29. Fox then withdrew its other programs, including its PMBA program, from consideration in U.S. News' rankings for that year.

The exposure was a disaster for Fox's rankings. When U.S. News resumed ranking Fox, it placed both Fox's OMBA and PMBA programs in forty-first place. And as Fox's rankings fell, its enrollment did as well. Fox's OMBA enrollment plummeted from its high of 336 students in the 2017–2018 academic year to 144 in 2018–2019, and 106 the year after. Fox's PMBA enrollment dropped in each of the three years after the deception came to light, from its high of 194 students to 145, 117, and 89.

## B. Procedural Background

On April 15, 2021, a grand jury charged Porat with one count of conspiracy to commit wire fraud in violation of 18 U.S.C. § 371, and one count of wire fraud in violation of 18 U.S.C. § 1343.

In the conspiracy count, the Indictment alleged that Porat conspired with Gottlieb and O'Neill "to devise a scheme and artifice to defraud and to obtain money and property from Fox applicants, students, and donors, by means of materially false and fraudulent pretenses, representations, and promises." A98. For the "Manner and Means" of the conspiracy, the Indictment alleged that Porat "conspired … to deceive readers of U.S. News by providing false and misleading information to U.S. News about Fox's OMBA and PMBA programs in order to fraudulently inflate Fox's ranking in the U.S. News surveys," with "goals … includ[ing] attracting more students to apply to Fox, matriculate at Fox, and pay tuition to Fox, and enticing Fox alumni and other benefactors to donate money to Fox." *Id.* at 98–99. In the wire fraud count, the Indictment alleged that Porat "devised and intended to devise a scheme to defraud Fox applicants, students, and donors out of money and

property," and incorporated the "Manner and Means" from the conspiracy count. *Id.* at 115.

Porat moved to dismiss the Indictment for failure to state an offense under Rule 12(b)(3) of the Federal Rules of Criminal Procedure. The District Court denied Porat's motion, and the case went to trial in November 2021. After a two-week trial, the jury convicted Porat on both counts.

Porat filed a post-trial motion for acquittal under Rule 29 of the Federal Rules of Criminal Procedure or, in the alternative, for a new trial under Rule 33 of the Federal Rules of Criminal Procedure. The District Court denied Porat's motion. The Court entered judgment on March 14, 2022, convicting Porat and sentencing him to fourteen months in prison and $250,200 in fines and assessments.

Porat timely appealed.

## II.   DISCUSSION

### A.   The Evidence Was Sufficient to Convict Porat

We conduct plenary review of the sufficiency of the evidence. *Rowe*, 919 F.3d at 758. In doing so, we must affirm Porat's conviction if, considering the evidence in the light most favorable to the government, there is "substantial evidence from which any rational trier of fact could find guilt beyond a reasonable doubt." *Id.* at 758–59. We conclude that there is.

We begin by briefly reciting the requirements of wire fraud as relevant to Porat's challenges on appeal. The federal wire fraud statute criminalizes "any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises." 18

U.S.C. § 1343.  The Supreme Court has consistently held that the federal fraud statutes "protec[t] property rights only." *Ciminelli v. United States*, 143 S. Ct. 1121, 1126 (2023) (alteration in original) (quoting *Cleveland v. United States*, 531 U.S. 12, 19 (2000)).[3]  Moreover, "property must play more than some bit part in a scheme: It must be an 'object of the fraud.'" *Kelly v. United States*, 140 S. Ct. 1565, 1573 (2020) (quoting *Pasquantino*, 544 U.S. at 355).  Thus, "a property fraud conviction cannot stand when the loss to the victim is only an incidental byproduct of the scheme." *Id.*

Based on the evidence at trial, a rational jury could have found beyond a reasonable doubt that Porat engaged in the kind of scheme the wire fraud statute criminalizes: that is, that Porat trumpeted Fox's knowingly false, inflated rankings to students for the purpose of enticing his victims to pay tuition money. Moreover, a rational trier of fact could have found that the evidence established that this financial purpose was an object of Porat's scheme.  This evidence included Porat's repeated emphasis on using rankings to increase Fox's enrollment and tuition revenues, and expert testimony that rankings are crucial to many students' decisions about where to spend their tuition dollars.

The evidence also reflected that Porat intended the falsely inflated rankings to be used as an indicator of a Fox

---

[3] Congress has enacted statutes criminalizing both mail fraud and wire fraud.  *See* 18 U.S.C. §§ 1341, 1343.  We interpret "identical language in the wire and mail fraud statutes *in pari materia*." *Pasquantino v. United States*, 544 U.S. 349, 355 n.2 (2005).

degree's future value to students. As described above, Porat "often" said that a Fox degree was like a "stock" that was "appreciating in value" as Fox's rankings rose. Gov't Ex. 148. Consistent with Porat's "rising stock" assessment, the evidence at trial reflected that students viewed rankings as a way to evaluate the future yield of a Fox degree in terms of employment and earnings. Likewise, the government's expert testified that rankings are "a signal to employers that [the] program is a good program." A151.

Further, although success of the scheme is not required to sustain a wire fraud conviction, *see United States v. Frey*, 42 F.3d 795, 800 (3d Cir. 1994), evidence showed that Porat's scheme was wildly profitable for Fox. This evidence included the government's estimate that students drawn in by Porat's deception paid Fox a total of nearly $40 million. It included testimony from Fox alumni that they chose Fox for its rankings. It also included enrollment data showing that the increased rankings changed how students valued Fox's programs. In the 2014–2015 academic year, a combined total of only 221 OMBA and PMBA students were willing to pay Fox's tuition. Three years later, when Fox's rankings were at their zenith, 530 students—nearly two-and-a-half times that number—considered Fox's programs worth the price. And when Fox's rankings plummeted after the deception was exposed, Fox suffered a corresponding drop in enrollment as far fewer students decided that the Fox degree merited the tuition.

Given this substantial evidence, a rational jury could have found beyond a reasonable doubt that Porat engaged in a scheme to defraud victims of their money, and could have found that this financial object was more than an "incidental

byproduct" of the scheme.  That is sufficient to convict Porat of wire fraud.

## B.     The Evidence Was Sufficient to Prove Deprivation of Money

Porat argues that he did not deprive his victims of money, and makes two arguments in support.  First, Porat argues that students were deprived only of rankings, and "rankings are not property."  Porat Opening Br. 25.  But Porat was not convicted on the theory that he deprived students of rankings; he was convicted for depriving them of *tuition money*.  The Indictment charged that Porat used deception to "attract[] more students to apply to Fox, matriculate at Fox, and pay tuition to Fox."  A99; *see also id.* at 115.  The District Court instructed the jury that to convict Porat, it must find that he engaged in a scheme to defraud Fox "applicants, students, or donors of money," *id.* at 381, and Porat did not object to the basic contours of this instruction.[4]  By convicting Porat, the jury necessarily found that he sought to defraud his victims of money.  The jury's finding was reasonable, given evidence that Porat employed a scheme to "add … students" and thereby, their tuition, producing "financial value" through materially false representations of Fox's rankings.  SA749.  Thus, despite Porat's attempt to redirect focus to the rankings, money was an object of his scheme.

_____

[4] While Porat did ask for an instruction that the jury must find he personally obtained money (an argument we address below), he did not object to the basic proposition that money satisfies the property element of fraud, nor did he ask for an instruction that a deprivation of a ranking is not a deprivation of "property."

13

Second, Porat argues that even if he did aim to take money from his victims, he still did not deprive them of money or property, because they received the "essential benefit of the bargain," an education. Porat Opening Br. 29. Porat further argues that the rankings, as intangible considerations, cannot legally be an essential part of the bargain because there is no "independent property interest in the U.S. News rankings." *Id.* Relying on cases from other circuits, Porat contends that there was no fraud here because the victims received a Fox education, which was the "*full* benefit of their bargain" or "*exactly* what they paid for." *Id.* at 27, 32 (emphasis added) (first quoting *United States v. Binday*, 804 F.3d 558, 599 n.46 (2d Cir. 2015), *abrogated by Ciminelli*, 143 S. Ct. at 1121; and then quoting *United States v. Takhalov*, 827 F.3d 1307, 1314 (11th Cir. 2016)). But the cases Porat relies upon do not stand for the proposition that the value of a bargain cannot include intangible considerations; rather, they suggest that a victim is only "deprived" of property when the false representation affects the very nature or value of the bargain. *See, e.g.*, *United States v. Guertin*, 67 F.4th 445, 451 (D.C. Cir. 2023) (fraud occurs when "defendant lies about the nature of the bargain itself" (quoting *Takhalov*, 827 F.3d at 1314)); *Binday*, 804 F.3d at 570 ("[W]e have upheld convictions for mail and wire fraud where the deceit affected the victim's economic calculus or the benefits and burdens of the agreement.").[5]

---

[5] Some of these cases, like *Binday*, upheld fraud convictions where no tangible property was taken, but the defendant deprived the victim of the "interest … in controlling his or her own assets." 804 F.3d at 570 (quoting *United States v. Carlo*, 507 F.3d 799, 802 (2d Cir. 2007)). However, the Supreme Court has since invalidated that theory, as "the right

Moreover, as set forth more fully above, *see supra* Section II.A, the evidence at trial reflected that the nature of the bargain between Fox and the students included not only the actual education afforded them, but also the current value of a highly ranked program, and even the future value of Fox's MBA degrees.  To be sure, it is commonly understood and fully expected that a school's ranking, and the current and future value of a particular school's degree, may fluctuate over time in the normal course, *e.g.*, with changes in a school's administration, faculty, and student body, as well as changes in the overall marketplace.  But it is not commonly understood or expected that a ranking will soar or plummet as a result of deceit or misrepresentation.  While Porat asserts that the bargain only encompassed an exchange of tuition for education, the jury was free to come to a different conclusion,[6]

_____

to valuable economic information needed to make discretionary economic decisions is not a traditional property interest" protected by the fraud statutes.  *Ciminelli*, 143 S. Ct. at 1128.  To the extent these cases are still good law and rely on other theories of fraud not explicitly endorsed by this Circuit, we do not opine on those matters nor adopt any positions here.  Rather, we note that the broader fraud principles set forth in the cited cases do not ultimately support Porat's position.

[6] As noted above, we do not read the cases relied upon by Porat to call the jury's conclusion into question.  That is because the bargain here was simply different than the bargains at issue in the cases Porat cites.  Those cases often involved situations where the victims set the asking price and did not involve the additional consideration of the future value of the bargained-for items.  Even if those cases had involved the same

especially in light of the fact that Porat neither requested a jury instruction on this theory, nor argued it to the jury. In addition, and as set forth above, the evidence indicated that Fox's falsely inflated rankings impacted students' valuation of the bargain, impacting their assessment of a Fox education's worth and their assessment of the future yield of a Fox MBA, and causing many more students to enroll at Fox. Accordingly, we conclude that a rational jury could find beyond a reasonable doubt that the students did not receive the full benefit of their bargain, and—in the language from the cases Porat cites—that Porat's false ranking representations affected their "economic calculus," *Binday*, 804 F.3d at 570, and that he "lie[d] about the nature of the bargain itself," *Guertin*, 67 F.4th at 451.

---

type of bargain, the false representations were not of the kind that could materially affect present and future value. *See, e.g.*, *United States v. Sadler*, 750 F.3d 585, 588–90 (6th Cir. 2014) (creation of fake patients in order to buy pills from distributor at asking price); *United States v. Shellef*, 507 F.3d 82, 89–90 (2d Cir. 2007) (buyers falsely represented intent to redistribute chemicals domestically in bargain to pay distributor asking price for chemicals); *Takhalov*, 827 F.3d at 1310–11 (hostesses posing as customers in sales of alcoholic drinks to bar customers). Unlike the items bargained for in those cases, an MBA is a costly, debt-inducing, once-in-a-lifetime "purchase" expected to have long-term effects on employment and earnings. Thus, in making a cost-benefit analysis, a student-buyer would be prudent to assess the degree's effect on future earnings. While the reality may be that rankings are a poor proxy for present and future value, the jury heard evidence that both Porat and the students recognized the influence of rankings in these areas.

In sum, because the substantial evidence was sufficient for a rational jury to find that Porat knowingly used materially false representations of Fox's rank to obtain students' money in the form of tuition, the evidence satisfies the property element of wire fraud. Accordingly, we will defer to the jury's verdict.

### C. The Government Did Not Have to Prove the Object of Porat's Scheme Was to Personally Obtain Money

Porat next argues that even if the government did prove that he sought to deprive his victims of money, it failed to prove a necessary corollary: that he sought to *personally obtain* money or property from his victims. The statutory text and the case law do not compel such a reading.

The text of the wire fraud statute does not expressly provide that the defendant must seek to personally obtain property. Rather, it broadly criminalizes "any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises." 18 U.S.C. § 1343. The wire fraud statute makes no reference to what the defendant receives. Porat argues that we should narrowly interpret the statutory term "obtaining" to mean bringing "into one's *own* possession." Porat Opening Br. 37 (emphasis added) (quoting *Honeycutt v. United States*, 581 U.S. 443, 450 (2017)). But as the Second Circuit has stated, "[b]y the plain language of the statute, the identity of the ultimate beneficiary is not dispositive and the plain meaning of the word 'obtain' is sufficiently capacious to encompass schemes by defendants to obtain money for the benefit of a

favored third party."  *United States v. Gatto*, 986 F.3d 104, 124 (2d Cir. 2021).  We agree.

Case law also lends no support for a requirement that the defendant seek to personally obtain property.  It is true that, at times, the Supreme Court has referred to the money-or-property requirement in terms of either "depriving" the victim of money or property, or "obtaining" money or property. *Compare Kelly*, 140 S. Ct. at 1571 ("The wire fraud statute thus prohibits only deceptive 'schemes to deprive [the victim of] money or property.'" (alteration in original) (quoting *McNally v. United States*, 483 U.S. 350, 356 (1987)), *with id.* at 1572 ("fraudulent schemes violate that law only when, again, they are 'for obtaining money or property'" (quoting 18 U.S.C. § 1343)).  But in varying the language it used to describe the money-or-property element, the Court has never suggested that the defendant must seek to personally obtain property.   In addition, in the Third Circuit, we have suggested that a defendant need not personally benefit from his fraudulent scheme to be criminally liable.  *See, e.g.*, *United States v. Riley*, 621 F.3d 312, 332 (3d Cir. 2010) ("To support a fraud conviction it is 'not necessary for the Government to demonstrate that [the defendant] personally benefitted from [the] scheme.'" (alterations in original) (quoting *United States v. Goldblatt*, 813 F.2d 619, 624 (3d Cir. 1987))); *see also United States v. Al Hedaithy*, 392 F.3d 580, at 605 (3d Cir. 2004) ("[T]he mail fraud statute does not require that a scheme be designed to obtain any property from the victim; rather it is

sufficient that the scheme is designed to fraudulently deprive the victim of property or an interest in property.").[7]

Porat seeks support in the Supreme Court's statement in *Skilling v. United States*, 561 U.S. 358 (2010), that honest-services fraud lacks the "symmetry" of other kinds of "fraud in which the victim's loss of money or property supplied the defendant's gain, with one the mirror image of the other." *Id.* at 400. He argues that this passage from *Skilling* sets out a "mirror-image" rule for property fraud and means that there is no fraud unless the defendant seeks to personally obtain what the victim loses. But *Skilling* invokes the mirror-image concept only to highlight the basic structural difference between honest-services fraud and property fraud. It does not, however, prescribe a necessary condition for property fraud.

Accordingly, we reject Porat's contention that wire fraud requires proof that the defendant sought to personally obtain money or property. Because we reject this requirement, we need not address Porat's argument that the District Court

---

[7] The government argues that *United States v. Pabey*, 664 F.3d 1084, 1089 (7th Cir. 2011), and *United States v. Delano*, 55 F.3d 720, 723 (2d Cir. 1995), show that lying to benefit a third party can still be federal fraud. But it is not clear that these cases stand for that proposition, as the defendants in each case still derived at least an indirect economic benefit from their deceptions. In any event, our case law indicates that no direct personal economic benefit is required for a defendant's fraud conviction to stand. *See Riley*, 621 F.3d at 332.

erred in failing to provide his requested jury instructions on this point.[8]

### D. The Government Did Not Have to Prove Convergence

Finally, Porat asks us to adopt a "convergence" requirement for wire fraud—that is, a requirement that the defendant deceive the same party he defrauds of money. Porat argues that the government neither pleaded nor proved convergence here because its theory was that he deceived U.S. News, but sought to take money from students, applicants, and donors.

The Ninth Circuit is the only Court of Appeals that has required convergence. *See United States v. Lew*, 875 F.2d 219, 221–22 (9th Cir. 1989).[9] Other Courts of Appeal have considered and rejected it. *See, e.g.*, *United States v. Christopher*, 142 F.3d 46, 54 (1st Cir. 1998); *United States v. Greenberg*, 835 F.3d 295, 306–07 (2d Cir. 2016); *United States v. McMillan*, 600 F.3d 434, 449–50 (5th Cir. 2010); *United States v. Seidling*, 737 F.3d 1155, 1161 (7th Cir. 2013); *United States v. Blumeyer*, 114 F.3d 758, 767–68 (8th Cir. 1997); *United States v. Kennedy*, 64 F.3d 1465, 1476 (10th Cir. 1995).

---

[8] We also need not address the government's arguments that Porat did not properly preserve his arguments on this point in the District Court.

[9] The District of Columbia Circuit has also "assume[d] without deciding" that convergence was required where "the indictment properly allege[d] convergence." *United States v. Abou-Khatwa*, 40 F.4th 666, 675 (D.C. Cir. 2022).

In *United States v. Bryant*, 655 F.3d 232 (3d Cir. 2011), we addressed a defendant's convergence argument, and noted that "[w]e have yet to decide this issue." *Id.* at 249. We also determined that "we need not make that decision" in *Bryant* because the evidence showed convergence in any event. *Id.* at 250.

Here, although the evidence did show that Porat sought to deceive U.S. News, it also showed that he made false statements directly to his victims. For example, evidence showed that Porat approved emails to students and student recruiters touting the rankings, celebrated the high rankings with students, represented that the high rankings would bring students future benefits, and was involved in Fox's marketing campaigns to advertise its rankings to potential applicants. Thus, as in *Bryant*, the evidence was sufficient to convict Porat even if convergence were required.

However, we also reject Porat's argument because we hold that the wire fraud statute does not require convergence. Nothing in the text of the statute supports such a requirement. *See, e.g.*, *Christopher*, 142 F.3d at 54 ("Nothing in the mail and wire fraud statutes requires that the party deprived of money or property be the same party who is actually deceived."). Neither do our precedents limit wire fraud in this way. Accordingly, we join our sister circuits in rejecting the so-called convergence requirement and hold that a defendant need not deceive the same party he defrauds of money.

## III. CONCLUSION

For the foregoing reasons, we will affirm the District Court's judgment and conviction order.